**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| SPECTRUM PHARMACEUTICALS, INC.,<br>Plaintiff,<br>v.<br>THE BUXTON HELMSLEY GROUP, INC., ALEXANDER ERWIN PARKER, and KELLIE ANN MOORE,<br>Defendants. | **Civil Case No. 1:24-cv-12489**<br><br>**DECLARATION OF ALEXANDER PARKER IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Alexander Erwin Parker, hereby declare that the following is true and correct:

1. I am a named Defendant in the above-captioned action (the "Action"). I am over the age of eighteen and otherwise competent to make this Declaration.

2. My statements herein are based on my personal knowledge as a result of my position at The Buxton Helmsley Group, Inc. ("BHG"), another named Defendant in this Action, as well as publicly available information. I make this Declaration in opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion").

3. I am the Senior Managing Director and Chief Executive Officer of BHG. At various points over the course of its existence, BHG has had other executive-level employees, but I was the only BHG employee involved in the dispute giving rise this Action, and I am the only BHG employee with knowledge relevant to this Action.

4. BHG is a New York corporation located at 1185 Avenue of the Americas, Floor 3, New York, New York 10036-2600.

5. BHG is an investment management firm with a particular focus on: (i) ensuring public companies meet their disclosure obligations under applicable accounting standards and securities laws; and (ii) building shareholder value by taking an active role in corporate governance matters.

BHG began accumulating a substantial number of equity shares of Assertio Holdings, Inc. ("Assertio"), a NASDAQ-listed company (traded under the ticker "ASRT"), in April 2024.

6. In 2023, Assertio acquired Plaintiff Spectrum Pharmaceuticals, Inc. ("Spectrum" or "Plaintiff"), which develops Rolvedon, a product that Spectrum claims reduces the risk of infection in chemotherapy patients. As stated within Rolvedon's FDA-approved package insert, "Rolvedon is indicated to decrease the incidence of infection, as manifested by febrile neutropenia, in adult patients with non-myeloid malignancies receiving myelosuppressive anti-cancer drugs associated with clinically significant incidence of febrile neutropenia."[1]

7. It quickly became apparent to BHG that Assertio's SEC filings surrounding its acquisition of Spectrum included insufficient disclosures. Alarmingly, less than one month after Assertio's acquisition of Spectrum closed, Assertio/Spectrum admitted Rolvedon was overvalued by approximately seventy-five percent (75%) at the time of the acquisition—a colossal due diligence failure. As a result, the economic interests of Assertio's shareholders were diluted exponentially more than anticipated.

8. Assertio attempted to explain this away in its SEC-filed financial statements by simply stating that the total/collective value of Assertio's stock had dropped below the stated net asset value for its equity, but this explanation was wholly unsupported by Assertio's SEC disclosures (related to Spectrum and otherwise).

9. BHG requested an explanation of Assertio's public disclosures by contacting Assertio's board of directors, in writing, on April 22, 2024 (the "April Letter"). A copy of the April Letter is attached hereto as Exhibit 1. The April Letter is focused entirely on Assertio's highly suspicious public disclosures. While the Rolvedon write-down was very concerning to BHG, the April Letter does not mention Rolvedon and instead focuses on seeking information that would

[1] https://www.rolvedon.com/pdf/rolvedon-prescribing-information.pdf

typically be included in financial statements and other SEC disclosures.

10. Assertio's response to the April Letter, sent to BHG on May 6, 2024 (the "May Response," attached hereto as Exhibit 2), simply directed BHG to Assertio's SEC filings, which, of course, BHG had already seen. In other words, Assertio relied entirely on the questionable disclosures that gave rise to BHG's April Letter in the first place.

11. On behalf of BHG and its investors, I met with Assertio's Audit Committee Chair, Sravan Emany, and its Chief Financial Officer, Ajay Patel, in a closed-door virtual meeting on May 7, 2024. Messrs, Emany, and Patel claimed they were "not following" many of the questions BHG had posed and refused to elaborate beyond what was stated within Assertio's SEC filings.

12. BHG responded with a letter to Assertio dated May 8, 2024 (the "May Letter," attached hereto as Exhibit 3), wherein BHG re-articulated its concerns with Assertio's public disclosures (which, as stated in the May Letter, were so deficient as to appear on their face to violate the federal securities laws) and proposed a course of action involving the appointment of two new directors to the Assertio board and the resignation of the long-time director who had overseen the Spectrum acquisition. BHG also informed Assertio in the May Letter that the issues BHG had identified based on Assertio's public disclosures were so serious that BHG felt the need to publish a press release about these issues if Assertio was not willing to engage in a substantive dialogue with BHG and answer the questions raised in the April Letter. BHG was motivated not by greed or malice—as alleged by Plaintiff throughout its Motion—but by a desire to protect the financial interests of Assertio's shareholders, including BHG's own investors.

13. Assertio failed to respond in any way to the May Letter, and BHG subsequently published a press release on May 13, 2024 (the "May 13 Release," attached hereto as Exhibit 4), reiterating the points made in the April and May Letters to Assertio. BHG published another press release on May 17, 2024 (the "May 17 Release," attached hereto as Exhibit 5), disclosing a

preliminary report from Rumbi B. Petrozzello ("Petrozzello"), a Certified Public Accountant and Certified Fraud Examiner engaged by BHG to provide a written report based on Assertio's public filings and other publicly available information regarding the Spectrum acquisition. Though Rolvedon was not mentioned by name in the May 17 Release or Petrozzello's report, Petrozzello noted: "The value of intangible assets was reported to have dropped precipitously (approximately 75%) in the mere months following the acquisition of Spectrum…[I]nvestigation is warranted by unconflicted parties (not chosen by Assertio leadership," in part "because of the questionable admission of sudden asset value depreciation". (*See generally* Ex. 5.)

14. After the May 17 Release was published, BHG was contacted by Kellie Ann Moore ("Moore"), another named Defendant in this action. Moore informed me that she was Spectrum's former Senior Counsel for Global Research and Development, focused on Spectrum's compliance with FDA and other protocols for clinical trials and research. She told me she had blown the whistle repeatedly over fraud surrounding the Rolvedon clinical data submitted to the FDA during her employment with Spectrum, and was laid off in 2019 as a result.

15. Moore's information-sharing with BHG did not go beyond providing summaries of her whistleblower reports/complaints. (Moore and Spectrum had been involved in litigation regarding her Rolvedon whistleblowing, and those litigation documents are publicly available.) Moore told me that she had blown the whistle because Spectrum had submitted falsified clinical data to the FDA at the time Spectrum sought regulatory approval of Rolvedon. She explained that Spectrum had, among a number of other wrongful/fraudulent acts, purged Severe Adverse Events ("SAEs") from clinical trial databases prior to submitting that clinical data to the FDA. Moore also stated that certain of the purged clinical data documented that some study subjects, after having received Rolvedon during clinical trials, developed *increasing* cancer-prone cells (referred to in the medical world as "pre-cancerous oncolytic blood blasts"), rather than *decreasing* cancer-prone cells.

Moore also told me Spectrum had failed to collect "aliquot" blood samples, required to determine whether Rolvedon had caused the increase in cancer-prone cells. I have learned that Aliquot blood samples are a standard component of clinical trials (to determine the cause of possible SAEs experienced during those clinical trials), but Spectrum did not collect them, apparently as a cost-cutting measure. Moore also told me that Spectrum never informed Rolvedon study subjects or their doctors that subjects had experienced those SAEs after receiving Rolvedon dose during clinical trials, despite Spectrum having agreed to do so.

16. In my conversations with Moore, I always asked her not to disclose any privileged or confidential material to me or to BHG. I did this not because I believed Moore had any legal obligation not to share such material, but because I wanted BHG to be privy only to information to which other shareholders would be privy to. Moore respected these requests, instead providing basic background information and pointing BHG to publicly available pre-Assertio acquisition documents related to Spectrum and Rolvedon.

17. Moore put me in contact with a second former executive of Spectrum (the "Second Spectrum Executive"). The Second Spectrum Executive confirmed that multiple Spectrum employees had blown the whistle on the Rolvedon clinical data fraud and the numerous other, sweeping clinical trial issues at Spectrum. The Second Spectrum Executive is a Harvard-educated physician who oversaw Spectrum's clinical trials and was terminated in 2019 after speaking up about the same conduct Moore alleged that she had witnessed, and after repeatedly sounding the alarm internally. At this point, BHG decided to retain outside legal counsel to investigate not just Assertio's public disclosures, but the allegations of fraud related to Rolvedon, which were apparently relevant to the due diligence failures BHG had identified in April. While I found Moore and the Second Spectrum Executive to be intelligent and experienced, neither I nor BHG would contact Assertio with respect to the alleged fraud without an independent evaluation of the relevant facts.

18. BHG next engaged Blank Rome LLP ("Blank Rome") to conduct an investigation. Over the course of Blank Rome's independent investigation, the law firm spoke to former employees of Spectrum, including Moore and the Second Spectrum Executive, and thereafter provided a substantive report (the "Blank Rome Report") as to the many internal complaints of fraud prior to the Assertio's acquisition of Spectrum related to clinical trials of Rolvedon made by multiple whistleblowers, including individuals other than Moore and the Second Spectrum Executive (the "Spectrum Whistleblowers"). In particular, the Blank Rome Report included an opinion of likely "very strong" liability related to the alleged Rolvedon clinical data fraud. I was not privy to Blank Rome's conversations with any of the aforementioned individuals, or to any documents within their possession. As I had done in all of my conversations with Moore and the Second Spectrum Executive, I repeatedly emphasized to Blank Rome that neither BHG nor I should be exposed to or provided with any confidential or privileged information or material—requests that were always honored.

19. BHG's concerns about Assertio's acquisition of Spectrum were deepened by the Blank Rome Report, as indicated in another letter from BHG to Assertio dated June 10, 2024 (the "June Letter," attached hereto as Exhibit 6), which is the first time BHG raised the issue of the allegations of Rolvedon clinical data fraud to Assertio. However, the June Letter, like the April Letter and the May Letter, is premised on public disclosures and information contained in public court filings. The June Letter also makes a shareholder's books and records demand pursuant to Delaware law. The June Letter references the Spectrum Whistleblowers in the context of advising Assertio and Spectrum that BHG had been contacted by those individuals, who possessed knowledge relevant to the fraud that was evident based on publicly available information alone.

20. Assertio did not substantively respond to the June Letter, but BHG, Blank Rome, and Schulte Roth & Zabel LLP ("Schulte")—which took over as outside counsel after Blank Rome told

BHG it had discovered a possible conflict of interest[2]—all received correspondence from Spectrum's outside counsel, Baker Botts, LLP, in August and September of 2024. In these letters, Spectrum reiterated the positions that were previously asserted in the correspondence between Assertio and BHG, falsely claimed that it had fully investigated the Spectrum Whistleblowers' reports, accused BHG of reviewing evidence from Moore specifically, rejected BHG's requests to further discuss or come to an agreement on the issues and proposed resolutions noted in BHG's prior correspondence, denied the books and records request made in the June Letter, and made a number of false statements about BHG's motivations and its ownership of Assertio shares.

21. BHG responded to these letters in an appropriately detailed twenty-page letter to Assertio dated September 27, 2024, attached hereto as Exhibit 7 (the "September Letter"). The September Letter responds to all allegations and objections made by Spectrum in its August and September correspondence, including, notably, Spectrum's accusation that BHG had improperly viewed non-public, confidential, or privileged material. BHG responded as follows:

> "We have not viewed the whistleblowers' non-public evidence, but our legal advisors have independently done so. BHG's involvement with non-public evidence has been strictly limited to instructing the whistleblowers to share their evidence with certain of our external counsel for review and safekeeping."

(*See* Ex. 7 at 13.)

22. Importantly, the September Letter also clarifies that BHG's understanding of the fraud related to Rolvedon "can be gleaned from public records," including FDA reports, Spectrum's own pre-acquisition press releases, and the Merger Agreement memorializing the acquisition, which was filed with the SEC. *Id*. at 15.

23. Assertio/Spectrum failed to respond to the September Letter. On November 8 and November 11, 2024, BHG issued press releases (the "November 8 Release" and the "November 11

[2] Blank Rome continues to serve as BHG's outside counsel with respect to other matters.

Release," attached hereto as Exhibit 8 and Exhibit 9, respectively). The November 8 Release links to and provides a summary of BHG's open letter to Assertio shareholders, also dated November 8, 2024 (the "Open Letter," attached hereto as Exhibit 10). The November 11 Release is a response to Assertio's own press release from the same day reporting Assertio's third-quarter financials and promoting Rolvedon as Assertio's "lead asset".[3] The November 11 Release contains a link to a page on BHG's website titled "Assertio Holdings, Inc. (NASDAQ: ASRT)." The web page contains links to all prior correspondence between BHG and Assertio/Spectrum and the Open Letter, and was later updated to include a link to a letter from BHG to the United States Senate Committee on Health, Education, Labor & Pensions dated November 15, 2024 (the "Senate Letter," attached hereto as Exhibit 11). The Open Letter summarizes the findings from BHG's outside counsel's investigation of Spectrum, and it also clarifies: "The Spectrum illegalities BHG learned of in May 2024 from [Moore] are publicly included in court filings/documents, among other sources." (Ex. 10 at 11.)

24. The BHG web page also contains: (i) a link to a photograph of an email from a Spectrum employee related to the manipulation of Rolvedon clinical data, where the employee indicates being asked to delete SAEs from clinical trial databases; and (ii) photographs of pages of a printed-out copy of a site audit report summarizing various "major" "deficiencies" and "discrepancies" in Spectrum's Rolvedon clinical trials (collectively, the "Photographs"). The Senate Letter cites to the Photograph of the email. (*See* Ex. 11 at 1.) Spectrum baselessly claims, in its Motion, that the Photographs are "photographs of documents from Moore's Spectrum laptop" (Pl.'s Mem. of Law in Supp. of Motion, Dkt. No. 3, at 5). **This is not true**.

25. The Photographs included in the November Release were shared with BHG in November 2024, not by Moore, as Spectrum alleges throughout its Motion, but by *Schulte*, who had received them from Blank Rome as part of Blank Rome's Assertio/Spectrum case file. I do not know

[3] https://www.globenewswire.com/news-release/2024/11/11/2978556/0/en/Assertio-Reports-Third-Quarter-2024-Financial-Results.html

who provided the Photographs to Blank Rome, if the Photographs were provided by a Spectrum Whistleblower, Moore, or the Second Spectrum Executive, or who may have possessed or taken the Photographs. Neither BHG nor I are in possession of any other documents or material from Schulte or Blank Rome (other than the Blank Rome Report), and again, *neither BHG nor I have ever received any material directly from Moore*, the Second Spectrum Executive, or any of the Spectrum Whistleblowers. Given my constant insistence that BHG did not want to possess confidential or privileged material, which had been reiterated to Schulte when it took over as outside counsel, I naturally assumed the Photographs were not subject to any applicable confidentiality law or privilege.

26. Further, despite Spectrum's implications to the contrary (Pl.'s Mem. of Law in Supp. of Motion, Dkt. No. 3, at 4 – 5), to date I have never seen or otherwise been made aware of any employment agreement for Moore, the Second Spectrum Executive, or any of the Spectrum Whistleblowers that would have led me to believe those individuals' disclosure of any of the documents disclosed to Blank Rome would have constituted a breach of contract.

27. As a shareholder of Spectrum's parent company, Assertio, BHG had the right to demand disclosures of material information related to a transaction such as the Spectrum acquisition, particularly when the outcome of this acquisition confirmed admitted due diligence failures and that the existing disclosures are facially inadequate and misleading. BHG sought that information from Assertio/Spectrum, but it was never provided.

28. As a shareholder, BHG also had the right (and the obligation, given its fiduciary duty to protect the interests of its investors) to demand one or more Assertio board seats if a portfolio company was refusing to even discuss suspicious disclosures. If a company is unwilling to voluntarily appoint a shareholders' director candidate to its board, under circumstances similar to those in this case, a shareholder has the right to conduct a "proxy contest" to poll fellow stockholders to approve/elect that director candidate's appointment. BHG's first letters to Assertio were an

attempt to avoid unnecessarily burdening the company with the major expense of a proxy contest by proposing that BHG and Assertio enter into what is commonly known as a "cooperation agreement".

29. Spectrum's Motion tries to frame BHG and I as malicious and motivated by greed. This is nonsense. Rather, shareholder demand letters and corporate governance proposals, even those that take an aggressive tone—as is appropriate in the wake of unlawful disclosure inadequacies, astonishing due diligence failures, and serious and supported allegations of fraud with very real impacts on cancer patients— are not at all unusual. I also note that while BHG proposed, in its September Letter, that I be appointed to Assertio's board (*see* Ex. 7 at 6), that proposal specifically states that I would not receive *any* compensation, which undermines Spectrum's claim that I was or am simply seeking financial profit. BHG also avoided any trading in Assertio securities after receipt of the Photographs (abstaining from trading until they were released publicly), contrary to Spectrum's claim that BHG issued its press releases to "manipulat[e] Assertio's stock price and benefit BHG/Parker's short position." (*See* Pl.'s Mem. in Supp., Dkt. No. 3, at 5.) Respectfully, the Court should not in any way credit Spectrum's attacks on me.

30. I want to reiterate that neither BHG nor I have ever received any confidential or privileged documents or other material directly from Moore, the Second Spectrum Executive, or any of the Spectrum Whistleblowers. To my knowledge, only Schulte, Blank Rome, and the individuals themselves possess the type of privileged and/or confidential documents and information that would be subject to the injunctive relief sought by Spectrum.

31. While BHG is in possession of the Blank Rome Report, it has not published it, and does not intend to and will not publish it or make it publicly available in the future. BHG also does not intend to, and will not, issue any press releases containing any information not already in the public domain with respect to Assertio and/or Spectrum. BHG also does not intend to, and will not, communicate with Assertio and/or Spectrum, other than through counsel, as is appropriate during

litigation.

32. Neither I nor BHG instructed Moore, the Second Spectrum Executive, or any of the Spectrum Whistleblowers, to commit any statutory or common law violations by disclosing confidential or privileged information to various "third parties," as alleged by Spectrum throughout its Motion. These individuals provided information only to Blank Rome.

33. The harm resulting from the injunction sought by Spectrum far outweighs any of the potential harm to Assertio/Spectrum alleged in the Motion. For example, granting the injunction would set a worrisome precedent for investors and shareholders concerned about inadequate due diligence, improper disclosure(s), and fraud. Granting an injunction to a public company that is refusing to speak to a non-insider shareholder about unaddressed, serious allegations of fraud (especially where it could potentially put peoples' lives in danger) would merely set a precedent that public companies do not need to answer to public investors/shareholders responsibly conducting due diligence. Perhaps more importantly, the injunction would effectively punish the whistleblowers, which is similarly troubling; the whistleblowers would be subjected to being personally identified and may suffer retaliatory action by Spectrum, including but not limited to litigation. These individuals did nothing wrong; they simply shared information relevant to alleged fraud with a law firm.

34. Further, I believe that Assertio's board of directors, through Spectrum, will use its requested injunction to obtain an inventory of the evidence about the Rolvedon clinical data fraud in anticipation of related litigation and inquiries from regulators, which could severely compromise those processes. I find it highly suspicious that Assertio/Spectrum are only now seeking this information for the first time. Spectrum is seeking a sweeping injunction that would impact individuals who are not even parties to this Action. I respectfully request that the Court deny the injunctive relief sought by Spectrum, as doing so would be in the interest of investors, shareholders,

whistleblowers, and the general public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 30, 2024

Signed by:
730157F3C4BA4CE...
Alexander Erwin Parker

# Exhibit 1

BUXTON HELMSLEY
NEW YORK | EST. 2014

**VIA U.S. REGISTERED MAIL & ELECTRONIC MAIL**

April 22, 2024

c/o Mr. Matthew Kreps
Assertio Holdings, Inc.
100 South Saunders Road, Suite 300
Lake Forest, IL 60045
Attn: Board of Directors – All Members
investor@assertiotx.com

Re: Assertio Holdings, Inc. ("**Assertio**" or the "**Company**")

Dear Assertio Board of Directors (the "**Board**"):

The Buxton Helmsley Group, Inc. ("**BHG**" or "**we**"), a New York City-based investment fund manager, has begun accumulating the Company's common stock. Shortly, and at the appropriate time, BHG may make the necessary regulatory filings with the U.S. Securities and Exchange Commission (the "**SEC**") as to our beneficial interests in the Company, pursuant to applicable obligations under Section 13(d) of the Securities and Exchange Act of 1934.

With this letter and, depending on the Company's response, we hope to avoid the need for aggressive public action. **We request a written response to this letter within ten (10) business days. If the Board should wish to meet with BHG prior to a written response, we are – of course – willing to do so, but we would also expect that meeting to take place within ten (10) business days. Depending on the outcome of any such meeting, BHG likely will still expect a written response to this letter (there would be limited avenues for BHG to no longer require the below-requested information, as part of our due diligence process).**

* * *

## I. BHG'S LONGSTANDING TRACK RECORD OF INVESTOR ADVOCACY.

If the Company is not aware, it should first note BHG's involvement leading up to the bankruptcy filings of Endo International plc. (formerly, NASDAQ: ENDP) and Mallinckrodt plc. (formerly, NYSE: MNK) (specifically, leading up to Mallinckrodt's second bankruptcy filing on August 28, 2023). In both instances, the companies filed for bankruptcy protection just over a quarter after BHG had gone public with specifically identified apparent violations of accounting standards and securities laws. Due to conflicting accounting and financial statements made by the companies – between statements made as part of and outside of filings with the SEC – BHG determined that the companies had implicated themselves in apparent accounting and securities fraud schemes.

Indeed, the *day after* BHG went public with its findings of an apparent ongoing, repeat accounting and securities fraud scheme occurring at Mallinckrodt, class-action securities fraud investigations were announced by several law firms, and certain class-action lawsuits are still pending. In the case of Endo International, within five days of BHG going public concerning Endo's apparent accounting discrepancies and refusal to answer BHG's questions, *The Wall Street Journal* reported that the company was under siege by first-lien creditors. BHG was forced to take that public action after Endo's management backed out of its own proposed conference call with BHG.

Thus, BHG has a well-established track record of uncovering, identifying, and successfully arguing apparent accounting standards and securities law violations. In many cases, BHG needs to act publicly to protect its investment when companies are not forthcoming in response to BHG's questions. Most recently, at Fossil Group, Inc., the company did not answer BHG's due diligence questions with the necessary transparency that investors like BHG expect of fiduciaries. BHG was eventually forced to nominate directors at Fossil after its board and CFO continued to dodge BHG's questions. In the days after BHG's initial proxy filing, there were two discussions between BHG and Fossil's board, followed by Fossil's long-time Chairman and CEO being separated from his leadership posts. Less than two weeks thereafter, Fossil's board also opted to avert BHG's imminent proxy contest by granting BHG representation on Fossil's board. During the course of BHG's public engagement, many shareholders contacted BHG after our being forced to go public, appalled by the inappropriate response to those reasonable due diligence questions posed by BHG, which any educated shareholder (just like those who contacted BHG) would understand why are being asked. There are major negative inferences with a lack of transparency by issuers.

## II. DUE DILIGENCE QUESTIONS FOR ASSERTIO.

Given our financial interest in the Company, we have a few questions we request answers to. Many of these questions should not be difficult to answer. Accordingly, we encourage the Company to be forthright in its answers. We hope the Company will agree with us that investors deserve direct answers.

1. The Company is subject to Regulation S-X of the Securities Act of 1933, as amended ("**Regulation S-X**"). Pursuant to Regulation S-X § 210.5-02(14), in combination with the Generally Accepted Accounting Principles ("**GAAP**") codified at ASC 360, the Company is bound to disclose all accumulated depreciation of property, plant, and equipment assets within each periodic report filed with the SEC. **Has the Company disclosed all material accumulated depreciation of such assets within its historical periodic filings with the SEC (to ensure that the "property and equipment, net" line item is truly "net" of depreciation, representative of the *present* fair value of those assets, and not an unrealistic excess amount of the *historical* cost basis)?** The answer to this question should be an unqualified "Yes". We are already aware the Company has claimed compliance with accounting standards and securities laws, so we are asking these questions to ensure that such claimed compliance is truly the reality.
2. Regulation S-X § 210.5-02(16), in combination with GAAP ASC 350, requires the Company to similarly disclose accumulated depreciation of indefinite-lived assets. **Has the Company disclosed all accumulated depreciation of such assets within its historical periodic filings with the SEC (to ensure that the "intangible assets, net" line item is truly "net" of depreciation, representative of the *present* fair value of those assets, and not an unrealistic excess amount of the *historical* cost basis)?** As with Item No. 1, the answer to this question should be an unqualified "Yes".
3. **Does the Company agree that it has charged off any material excess carrying values of assets (any carrying values exceeding the true, fair value of assets)?** The answer to this question should also be an unqualified "Yes" (given the Company's obligations under GAAP ASC 350/360 and Regulation S-X).

4. The Company, within its financial reporting for Q3 and Q4 2023, disclosed very significant (purportedly sudden) depreciation of intangible assets. The Company stated each quarter's depreciation reporting was due to Assertio's equity "market capitalization declin[ing] [] below the book value of [Assertio's] equity, which management determined represented an indicator of impairment with respect to [Assertio's] long-lived assets."
   a. **How did the Company know that the decline in market capitalization was not due to a fear of public market participants as to a possible lack of adequate insurance coverage over opioid-related claims asserted against the Company?**
   b. **What underlying triggering events did the Company believe the market was responding to, as part of Assertio's equity market capitalization declining, which would have substantiated such a sizable write-down of asset value?**
   c. **If (i) public market participants fear further depreciation being reported due to the Company already reporting depreciation quarter-after-quarter due to a depressed price-to-book ratio; and if (ii) that market fear of possible continued depreciation/loss reporting causes continued pressure on the Company's stock, and therefore the stock's price-to-book ratio remains heavily suppressed; then (iii) will the Company continue recording depreciation/losses (this leadership, therefore, essentially conceding that its valuation inputs and depreciation forecasting have been woefully inaccurate, and continue to be woefully inaccurate)?**
   d. **Why did the Company revert to its prior asset-related forecasts (for means of valuation inputs) being woefully inaccurate quarter-after-quarter (causing back-to-back depreciation reporting in the hundreds of millions of dollars), rather than defending its forecasts, while also capitalizing on Assertio's equity interests trading at such a discount to certified net asset value (likely, through a share repurchase program)?**
   e. **Why did the Company not explain its forecasts (whether in a press release, on a conference call, or otherwise) and the reasons for them being realistic, to attempt to persuade public market participants that they are incorrect in their pessimistic valuations of the Company's equity?**
   f. **Is it safe to assume that Assertio's Board and management believe that public market participants are more accurate in forecasting cash flows for the Company's assets than themselves, despite this Board and management having unfettered access to Company data (which public market participants do not have access to)?**
   g. **Why would public market participants ever believe the Company's own valuations if the Company does not defend them and instead concedes as to the ongoing woeful inaccuracy of those valuations (not to mention, then-apparent woeful inaccuracy in assigning an initial purchase price for the assets), quarter-after-quarter?** It is likely that the Company's market capitalization will continue on a downward spiral when a management constantly concedes it cannot maintain a long-term forecast as short a time as quarter-to-quarter, and constantly concedes woeful inaccuracy in valuations. With regard to woeful inaccuracy by management in assigning initial purchase prices for assets, we note that BWS Financial dropped its analyst coverage, indicating, "we have reservations on management's due diligence in conducting future transactions".
   h. **Regarding the Company's 2023 acquisition of Spectrum, we assume the Board voted to approve that material transaction?**
   i. **Does the Company believe any assets have a fair market value materially above book value (given the preclusion of accruing market value gains under GAAP ASC 350/360)?**
5. The Company, in its April 2024 presentation titled "Profitable Growth and Cash Flows from Commercial Pharmaceutical Assets", states that it is "well-funded" and expects to produce positive

free cash flow over 2024. That being said, at a time when the Company's stock is trading well below certified net asset value on Assertio's books. **Why has the Company not engaged in share repurchases amid consistently positive free cash flow the past few years, continued expectations of positive free cash flow for 2024, and being so "well-funded"? Why would the Company not take up such an opportunity to concretely defend its valuations (through share repurchases) and stem the market's pessimism?**

6. It was also stated in the Company presentation referenced in Item No. 5 that revenue declines are expected for 2024. **Can you elaborate as to the principal reasoning for this forecasted decline in revenue? Does the Company expect this negative trend in revenues to continue past 2024?**
7. Regarding the Company's opioid-related litigation:
   a. **Have the Company's insurers been covering defense costs related to the pending opioid-related litigation?**
   b. **Have any claims asserted to date been deemed by the Company's insurers to fall outside the scope of coverage?**
   c. **Does the Company believe it has any liability in the pending opioid-related claims?** We will, of course, be alarmed if this is anything other than an unqualified "No".
   d. **Does the Company believe it has effective insurance coverage for these matters?**
   e. **The Company does not appear to have accrued any loss reserves related to the opioid-related litigation. This is, again, because the Company vehemently denies the asserted allegations, correct?** We assume the Company would have accrued loss reserves on some level if it believed the claims asserted had any merit. In accordance with GAAP ASC 450-20, we would expect the Company could "reasonably estimate" an appropriate loss reserve, on some level, if there were any believed level of merit to the asserted claims. Accountants are supposed to be conservative—not optimistic—when it comes to these areas of a balance sheet, both in terms of determining whether there is a probability of liability and the amount thereof.
   f. **Does the Board agree they have no fiduciary duty to contingent claimants until such claimants have concrete claims against the Company's capital structure (through a settlement or full adjudication/verdict on the allegations)?**
8. **Why has not a single director or officer purchased a single share (personally) of the Company's stock for nearly three years? Is this because the Board is aware of still-unreported depreciation?** If this Board and management are confident in their collective leadership abilities, actually believe the balance sheet values they are certifying in the Company's SEC filings, have disclosed all asset value depreciation to date, and are forecasting both positive EBITDA and free cash flow (with even further profit optimizations supposedly in the pipline), we would expect the very opposite.
9. **At the time the Company engaged in the issuance of its 6.500% Senior Convertible Notes due 2027, why did the Company not instead obtain a revolving credit facility that was secured by accounts receivable and inventory assets? Why has the Company still not proactively secured further liquidity (even if it does not immediately tap that liquidity) through such a revolving credit facility?** The Company currently has significant net asset equity (even after the recent depreciation reported for Q3 and Q4 2024), with a debt-to-capitalization ratio of only ~52%, making it unfathomable that the Company would not have willing lenders for such a secured revolving credit facility. Investors certainly are at more ease (resulting in better valuations of traded securities) when a company has the mindset of proactively securing more liquidity than required as a precaution, given that it will not be as easy to secure when that company could truly *need* it.
10. The Company's recent proxy filing with the SEC (dated April 9, 2024), on page 28, states:

> "Both NEOs [Non-Employee Officers] and non-employee directors have five years from commencement of their service to meet their respective Guidelines. As of January 1, 2023, all of our NEOs and all non-employee directors were in compliance with achieving the Guidelines within the aforementioned timeframe. However, due to the significant drop in the Company's stock price during the second half of 2023 and the corresponding decrease in the value of their stock holdings, on April 8, 2024, the Board adopted retention mechanisms such that any participant who is not currently in compliance with the Guidelines is expected to become compliant in a timely manner." (emphasis added)

**With respect to the underlined sentence, can you please explain the adopted "retention mechanisms" that are referred to (and how they are expected to cause "complian[ce] in a timely manner")? Also with respect to the underlined sentence, can you please elaborate as to what timeframe is considered a "timely manner"?**

11. **Can you please explain how paying for analyst coverage builds long-term value for shareholders?** We would like to understand how the Company could rationalize putting hundreds of thousands of dollars for paid analyst coverage, for effective promotion of short-term "buzz" over the Company's securities, to be in the best interest of long-term investors, when those funds could be going to share repurchases. With the trend of the Company's stock, paid analyst coverage is clearly not even creating short-term shareholder value, nor has it over the long-term (again, a historical chart for the Company's stock is very telling).
12. **Is the Board open to (and willing to publicly commit to, as a firm indication of dedication to shareholder interests) proactively fielding interest in a possible acquisition (partial or whole) of the Company?** We believe the Board will agree that interest in the Company should be proactively explored at a time of uncertainty in the financial markets, to protect the Company's shareholders from a possible future incremental dissipation of leverage in such a potential transaction. We believe the Board will agree that the Company should consider fielding any possible interest only after proactively unlocking additional borrowing power over its asset equity value (and engaging in sensible, but material, repurchases of the Company's securities), to maximize the valuations of the Company's common stock prior to such a possible solicitation of interest in the Company.

We lastly point out that the Company, within its most recent periodic filing with the SEC (the most recent Form 10-K filing), stated:

> "We believe that our existing cash will be sufficient to fund our operations and make the required payments under our debt agreements due for the next twelve months from the date of this filing."

**What steps is the Company taking to ensure long-term shareholder value, by proactively addressing its long-term indebtedness and unlocking further liquidity?** With respect to the periodic filing quote above, we agree with that assessment of capital and liquidity adequacy, and expect that the Company will not cease its upholding of obligations related to long-term debt until: (a) such maturities are imminent; (b) the Company has reached out to investors, including BHG; (c) the Company has exhausted the financial resources available to it via its shareholders, including BHG; and (d) the Company has taken the steps its shareholders expect by making full good-faith efforts to preserve/maximize value throughout the entirety of the Company's capital structure (including an attempt to sell the Company's equity). That said, the Company has more than enough time—leading up to its nearest-maturing indebtedness (2027)—to proactively address its "required payments under [] debt agreements", in the midst of "cash… be[ing] sufficient to fund [] operations".

*　　*　　*

It is not the intent of BHG, but instead its mere realistic understanding, that the answers to these questions (effective and complete answers) may require a broader disclosure than a private letter response, given the provisions of Regulation FD (codified at 17 C.F.R. § 243). We would like to avoid the private exchange of any information that would restrict our trading in the Company's securities. We, therefore, do not object and understand if the Company files this letter and the Company's response as part of a Form 8-K filing with the SEC. That said, we remain open to a discussion if the Board wants to avoid broad disclosures and to enter into an agreement with BHG, in the best interest of the Company and its shareholders.

Given that some of these questions should be easily answered (merely affirming compliance with accounting standards and securities laws, largely), we—again—expect an initial response to this letter within ten (10) business days. If certain questions require further time to respond, we request that the Company's responses be delivered to BHG on a rolling basis.

Lastly, we remind the Company of its fiduciary duty to act in the best interests of shareholders, with those duties precluding the Board from taking actions adverse to the interests of shareholders. Actions adverse to the interest of shareholders (though, affecting investors far beyond shareholders, including creditors) would include:

(a) Adopting a so-called "poison pill" that would dilute shareholder powers, in an effort of the Board to maintain control over the Company after investors have been significantly harmed by this leadership's gross valuation failures (and continued failures), including as part of the Spectrum acquisition (such a "poison pill", suppressing the rights of the constituency this Board has a fiduciary duty to and, as a byproduct, broadly disincentivizing value-maximizing acquisition offers, entirely contrary to the Board's fiduciary duties of only acting in a way that *maximizes* value);
(b) Delaying shareholder meetings;
(c) Implementing "golden parachutes" that benefit Assertio's Board members and/or management; or
(d) Taking any other action that materially affects Assertio's shareholders, without the approval of Assertio's shareholders.

If the Board should, after receipt of this letter, take any actions that we believe are materially adverse to the interest of Assertio shareholders, we are prepared to take immediate action in response. Such actions could also result in the Board being stripped of its director and officer insurance coverage, to be left personally liable for breaches of fiduciary duty and harms as a result of actions taken adverse to the interest of Assertio's shareholders.

We look forward to the Company's response, with appreciation of your time and attention.

Very Truly Yours,

[signature]

Alexander E. Parker
Senior Managing Director
The Buxton Helmsley Group, Inc.

# Exhibit 2

Confidential

6 May 2024

c/o Mr. Alexander E. Parker
The Buxton Helmsley Group, Inc.
1185 Avenue of the Americas, Floor 3
New York, NY 10036-2600

Re: The Buxton Helmsley Group, Inc.'s ("BHG") Letter to Assertio Holdings, Inc. ("Assertio" or the "Company") dated April 22, 2024

Dear Mr. Parker,

Thank you for your letter and follow-up correspondence. Assertio's Board of Directors (the "Board") and management team value constructive engagement and appreciate the opportunity to discuss the Company's business and value creation strategy with stockholders. The Company also welcomes thoughtful feedback and ideas from stockholders that can lead to long-term value creation.

Since the summer of 2023, Assertio's Board and management team have been navigating a challenging transition period in the Company's history. Key steps in this transition have included: closing on the acquisition of Spectrum Pharmaceuticals and their lead product, Rolvedon, to diversify the Company's product portfolio; working to optimize the on-going value of Indocin in the face of a highly aggressive generic competitor; implementing cost cutting actions to align expenses to the current revenues across the Company; and managing through a change in leadership (Assertio is currently in the midst of a search for a permanent Chief Executive Officer). In addition, Assertio recently added three new independent directors who collectively bring a combination of deep industry experience and financial expertise – Dr. Jeffrey Vacirca, CEO and Chairman of the Board of New York Cancer & Blood Specialists; Sravan Emany, Chief Financial Officer of Ironwood Pharmaceuticals; and Sig Kirk, former Executive Vice President of Corporate Business Development at Allergan. Assertio can assure you that the Board and management team are acutely aware of the recent declines in the Company's share price and have continued to place long-term shareholder value, while continuing to address the needs of patients, at the top of its list of priorities.

In the interest of establishing a constructive dialogue this letter includes Assertio's responses to the questions set out in your April 22nd letter, and as noted below, a few of BHG's questions will require some clarification and can be addressed during our scheduled discussion.

Assertio's Board and management team hope to have a cordial, productive discussion, as BHG states is the goal in its May 1st correspondence. Assertio shares that goal, and notes that a commencement of a public campaign prior to an initial conversation, let alone meaningful dialogue, would not be consistent with that goal. Company representatives will relay any feedback BHG shares during the discussion back to the full Board of Directors, who will evaluate that feedback through the lens of constructiveness, value creation and the best long-term interests of stockholders. This is the Company's process for keeping the full Board updated on stockholder engagement and evaluating all suggestions regarding value creation initiatives made by stockholders.

Assertio notes your request to not receive material non-public information that would restrict you from trading Assertio securities. As such, the responses below are provided within the confines of Regulation FD.

**Assertio's Responses to Questions in BHG's April 22, 2024 Letter**

Several of your questions involve the Company's accounting practices, and some background information should be useful in this area. First, as you note in your letter, Assertio is highly committed to integrity in its financial statement preparation. That commitment not only includes complying with the rules and guidelines set forth by the Financial Accounting Standards Board but also engaging the expertise of an internationally recognized independent public accountant to audit its financial statements, a nationally recognized internal control advisory firm to oversee its internal audit processes over internal controls and a nationally recognized SEC Counsel to review its filings and disclosures. Importantly, Assertio's Board maintains a highly qualified Audit Committee, which actively and consistently reviews internal processes and personnel associated with Assertio's internal and external audit functions and evaluates the integrity of the Company's financial reporting processes and controls.

1. **Response to BHG question 1:**
    a. Assertio would first like to distinguish that your question discusses two different types of assets – (1) property and equipment and (2) intangible assets – which are treated distinctly under ASC guidelines. As disclosed in Footnote 1, Footnote 7 and Footnote 8 in Item 8 and Critical Accounting Estimate in MD&A in Item 7 of Assertio's Form 10-K, Assertio complies with ASC 360. In addition, as noted above, the Company's financial statements are audited by an independent registered public accounting firm that is ratified annually at the Company's annual meeting of stockholders.

2. **Response to BHG question 2:**
    a. As of December 31, 2023, Assertio does not have any indefinite-lived assets.

3. **Response to BHG question 3:**
    a. Assertio refers you to its discussion in Footnote 8 and the Critical Accounting Estimate in MD&A and Risk Factor on Long Lived Assets in Assertio's Form 10-K that was filed on March 11, 2024. This footnote is provided specifically to address questions such as those you are asking.

4. **Response to BHG question 4a:**
    a. Accounting standards specifically contemplate and require that impairment tests be done following substantial changes in market capitalization regardless of the reason. Like all public companies, Assertio's stock price is impacted by a variety of factors, including, but not limited to, company-specific news, developments with competitors, general economic events and investor sentiment. As a result, Assertio cannot opine on the precise causes for changes in its stock price.
    b. Assertio also notes that the Company has disclosed opioid-related risk factors and information about pending litigation over the past seven years.

5. **Response to BHG question 4b:**
    a. Please see Assertio's response to question 4a. The Company also notes that accounting standards (including ASC 360) specifically contemplate and require that impairment tests be done following substantial changes in market capitalization.

6. **Response to BHG question 4c:**
    a. Please see Assertio's response to question 3.

7. **Response to BHG questions 4d, 4f and 4g:**

a. Assertio believes these questions are rhetorical in nature and respectfully declines to answer them in this letter.

8. **Response to BHG question 4e:**
    a. Assertio regularly uses its quarterly results reporting to share information about the Company's outlook and underlying assumptions. Specific to your questions:
        i. As stated during the Company's second quarter earnings call on August 3, 2023, the FDA approved a generic competitor to Assertio's then-biggest product, Indocin, earlier that day. The Board and management team believed it was prudent to withdraw guidance in light of the uncertainty surrounding the impact of a new generic entrant competing with the Company's largest source of revenues.
        ii. Assertio did not reinstate guidance during its third quarter earnings call on November 8, 2023, due to continuing uncertainties, but instead provided qualitative commentary on how the Company viewed the business, to give investors and analysts context.
        iii. Assertio provided guidance for 2024 during its fourth quarter earnings call on March 11, 2024. The underlying assumptions to the Company's 2024 guidance are detailed as bullet points in the April 2024 investor deck referenced in your letter.
        iv. Discussions regarding Assertio's guidance can be found in the materials for the aforementioned earnings disclosures on the Company's website or in its SEC filings.

9. **Response to BHG question 4h:**
    a. As disclosed in the Form S-4 filed with the SEC on June 1, 2023, Assertio's Board unanimously voted to approve the Spectrum acquisition. Page 83 of the filing includes the factors the Assertio Board considered in unanimously supporting the transaction, including that adding Rolvedon to Assertio's product portfolio represents meaningful further asset and revenue diversification and extends the portfolio's weighted average duration of exclusivity.

10. **Response to BHG question 4i:**
    a. The response to this question requires disclosure of material non-public information and BHG has requested it not receive information that would restrict its trading.

11. **Response to BHG question 5:**
    a. The Board and management team regularly review Assertio's capital allocation strategy and priorities with a view towards the best long-term interests of stockholders. Your feedback on capital allocation has been relayed to the Board of Directors.

12. **Response to BHG question 6:**
    a. Assertio refers you to its response to question 4e and the Company's fourth quarter 2023 earnings disclosures for a comprehensive discussion on the Company's 2024 guidance, including additional detail provided to help investors better understand the assumptions in the outlook. These underlying assumptions are also detailed as bullet points in the April 2024 investor deck referenced in your letter.
    b. Assertio only provides guidance for the current calendar year.

13. **Response to BHG question 7:**
    a. Assertio has disclosed opioid-related risk factors and information about pending litigation.
    b. Please refer to the Company's disclosures on opioid-related risks and litigation contained in Assertio's 10-K and 10-Q filings since 2018.
    c. Assertio's policy is to not comment on active litigation beyond what is in the public domain. However, the Company notes that Assertio has been dismissed from approximately 40% of all

opioid cases ever filed that included Assertio with no monetary payment made to, or other relief obtained by, any plaintiff to date.

14. **Response to BHG question 8:**
    a. Assertio's Board believes the interests of the Board and management team are appropriately aligned with the long-term interests of the Company's stockholders. Assertio is willing to address your question further during the discussion.

15. **Response to BHG question 9:**
    a. Assertio periodically reviews various options for debt financing available to the Company with the assistance of financial advisors. The Board and management team determined that the transaction was in the best interests of Assertio and its stockholders.
    b. The convertible notes transaction allowed the Company to refinance its then current debt which had a 13% coupon and was due to be paid off in 2024. The re-financing transaction reduced the Company's cash interest cost and provided additional financial flexibility because of the extended due date of the debt.
    c. Please refer to the Company's August 22, 2022 press release.

16. **Response to BHG question 10:**
    a. The retention mechanisms were developed in consultation with an independent and nationally recognized compensation advisor retained by the Compensation Committee. Assertio's Board and its Compensation Committee reviewed and approved the retention mechanisms as the Board believes they align management compensation with and are in the best long-term interests of stockholders.

17. **Response to BHG question 12:**
    a. Assertio's Board and management team remain focused on executing against the Company's plan to build and deliver long-term value for stockholders. The Board continually evaluates opportunities to drive stockholder value and considers all reasonable proposals that align with the Company's strategic goals.
    b. As a public company, Assertio's Board would review and evaluate any bona fide offer from a credible interested party, consistent with its fiduciary duties.

18. **Response to BHG question 13:**
    a. Assertio's Board and management team regularly evaluate opportunities that can strengthen the Company's balance sheet and that in their opinion are consistent with the Company's long-term objectives, as evidenced by the refinance in 2022 that is referenced in the response to BHG question 9.
    b. Assertio welcomes the opportunity to address this question further in the discussion.

We look forward to engaging in a constructive manner.

Assertio Holdings Inc.

***

# Exhibit 3

BUXTON HELMSLEY
NEW YORK | EST. 2014

**VIA U.S. REGISTERED MAIL & ELECTRONIC MAIL**

May 8, 2024

c/o Mr. Matthew Kreps
Assertio Holdings, Inc.
100 South Saunders Road, Suite 300
Lake Forest, IL 60045
Attn: Board of Directors
investor@assertiotx.com

Re: May 7 Conference Call – Assertio Holdings, Inc. ("**Assertio**" or the "**Company**")

Dear Assertio Board of Directors (the "**Board**"):

Thank you for our correspondence and for my meeting yesterday, May 7, 2024, with Messrs. Patel and Emany. While I appreciated Assertio's willingness to enter into a dialogue, I was disappointed by Messrs. Patel and Emany's seeming unwillingness to confront the issues I raised in my prior letter to the Company. Their apparent reticence seems to reflect the Company's general posture towards these issues, as evidenced by the Company's responses provided in its May 6, 2024, letter to BHG (the "**May 6 Response Letter**"). I'm afraid, therefore, that much of our correspondence to date largely has been unproductive. We also forewarned that any explanation needed to be in writing, yet Messrs. Patel and Emany attempted very material explanations on the call that they suspiciously could not bring themselves to put in writing, which leads us to question whether it was a complete and/or genuine explanation. We, therefore (as forewarned), must disregard any such explanations on the May 7 conference call which were not included in the May 6 Response Letter.

As you know, with most things in life, the first step to fixing a problem is admitting that you have one. It was said on the call that the Company has never been asked questions like those BHG has posed, but—as I responded—we at BHG pride ourselves on asking the hard questions that other shareholders often do not dare to ask, even when it means uncovering serious accounting and securities issues at public companies. There is a reason why we've posed hard questions to you that we know any other Assertio investor would understand. We will note, it was also very alarming that the Company was not aware that Regulation S-X requires notes of any material information that financial statements (whether in compliance with GAAP or not) would be misleading without (*See* Regulation S-X § 210.1, in conjunction with Regulation S-X § 1-02(o)). Based on that statutory disclosure obligation alone, numerous issues discussed on the call leave the Company's disclosures, very apparently, woefully deficient (it is moot whether other companies are upholding disclosure obligations like they are supposed to and like investors require to make fully educated transactions in a company's securities). While the Company has been continually citing its disclosures within public filings, that does not mean they are complete.

The bottom line is that we think leadership's missteps in areas such as disclosure, due diligence (again, analysts have dropped coverage for the reason that they also believe this leadership is incapable of appropriate

THE BUXTON HELMSLEY GROUP, INC.
1185 AVENUE OF THE AMERICAS, THIRD FLOOR NEW YORK N.Y. 10036
T. +1 (212) 561-5540 F. +1 (212) 561-6349 ALEXANDER.PARKER@BUXTONHELMSLEY.COM

due diligence), capital allocation strategy (you can ask any shareholder, and I can bet they would rather you devote capital toward share repurchases instead of analyst coverage), among others, are largely unintentional and due to a lack of thought-provoking conversation in the boardroom.

You noted in your May 6 Response Letter a desire to remain "cordial" and "productive." To that end, BHG wants to move forward and make this Board look good It doesn't want to be forced, for instance, to initiate a "vote no" campaign or, if required, a more aggressive solicitation effort or engagement that some might categorize as "scorched earth." As you know, leadership teams of other public companies were sadly mistaken when they thought they knew the lengths to which we would go to protect investors.

<u>Our Offer</u>

The following constitutes our offer aimed at avoiding conflict. If the Board wants to retain control, we recommend the Company respond with a proposed form of agreement by 9:00am ET, Monday, May 13, 2024. BHG must otherwise immediately begin our public statements over these alarming matters. Such press releases will call attention to the Company's potential failure to satisfy regulatory requirements, the Board's collective and individual failures, etc. As of Monday, there is simply no other choice but to capture the attention of our fellow stockholders, proxy advisory firms, journalists, regulators, and others. We cannot sit idle in the face of these matters.

1. **The appointment of two new directors:** This should include directors who are known shareholder advocates to bring further oversight and perspective to (simultaneous to filling gaps in) the current Board, including with relation to the optimization of disclosures, due diligence, capital allocation strategy, and otherwise:

   **Director #1:** Myself. I have zero doubt that I would be able to help re-instill the trust that this Board has lost and desperately needs to regain immediately.

   The Company needs to begin allocating capital like an investor—wasting money on paid analyst coverage is nothing a long-term shareholder would ever do—and you are already nearing rock bottom. Beyond capital allocation strategy, I bring far more experience than I wish with regard to strategic restructuring (both in-and out-of-court restructuring for the benefit of all stakeholders, including shareholders) and an immense network of advisors (including lawyers and investment bankers) to cost-effectively guide this company through challenges including resolution of the opioid litigation, balance sheet strengthening, etc. There are certain possible strategic frameworks that could serve to (entirely or partially) lift this Company's cloud of litigation, with minimal to no existing equity interest impairment, and while preserving this Board's positions; that is clearly then in the best interest of not only Assertio investors, but this Board, too.

   With issues like the opioid litigation, the Company needs someone like me who has proven ability to strategize for resolution of issues through strategically aggressive action (and optimizing disclosures in the process, to keep investors informed in a way that maximizes optimism), where required— it is clear from my track record that I know how to get results in such a fashion, and quickly.

   In addition, regulators have begun calling me in to provide insights related to investigations due to my ability to conduct due diligence, sniffing out and detecting misrepresentations

and/or falsehoods by counterparties, and pitfalls/inequities in transactions, is demonstrably far above average. By my track record, I clearly know the right questions to ask and what to ask for, as part of conducting such due diligence. I have caught fraud at public companies when even their auditors and the largest investors in the world (with mammoth due diligence teams) did not. That level of due diligence know-how and such critical thinking is exactly what this Board needs, especially if it is looking to make any further acquisitions. There is no reason why this Board should not welcome such expertise with open arms. This Board cannot afford to commit another blunder like those of recent that clearly led to the "resignation" of your CEO and CFO – you will destroy your reputations as corporate directors (which have already been tainted) and bankrupt this Company in the process. Again, the buck stops at this Board. I also bring the other critical know-how that this present Board clearly needs more of, which is capital allocation strategy.

Lastly, the perk to my directorship is my willingness to take full stock compensation—no cash retainer—as long as RSUs are issued at less than 0.85x book value, with the portion that would have been cash vesting in 6 months' time. This Board has a fiduciary duty to conserve and maximize value, where possible (including as part of director selection), and I am offering this Board an opportunity to uphold that duty with such all-equity compensation. My directorship would not cost the Company a dime, with the Company still benefiting from my expertise, experience, and proven track record. The all-equity compensation will undoubtedly send a strong message to investors that the Board not only believes the current, highly-depressed price-to-book ratio is unjustified, but also belief in long-term value of the Company's equity. To be very clear, I am refraining from forming any full opinions as to actions the Company should be taking until I would be able to freely and fully discuss matters with the Board, management, Company advisors, etc., as it is only appropriate to form full opinions and subsequent recommendations after being able to "see under the hood", as they say. At this point though, I know that what is generally happening at Assertio makes zero sense. I, again, would rather help this Board look good, than look bad. It makes more sense to work together than against each other, but that is not my decision.

**Director #2:** BHG will provide five (5) candidates for the Board to interview, with one candidate to be chosen and appointed (by the Board) within ten (10) days of the Company's annual meeting.

2. **One Director Stepping Down:** Investors cannot afford too many directors or an even-sized Board, leaving the potential for dangerous gridlock over critical matters. We believe it is most appropriate for Peter Staple to stand down, given he has not only met the Board's mandatory retirement age, but also ultimately oversaw the Spectrum acquisition which resulted in legacy Assertio shareholder interests being diluted four times more than necessary due to either a lack of due diligence or fraud (while it was clear on Monday that the Company does not want to own up to the catastrophe). The Company's top management has been refreshed after such a blunder (that replacement of a CEO and CFO did not "just happen" immediately after such admittedly horrific results), but not the head of the Board who is ultimately responsible for the issues. We can hammer these points in a press release, but we think Peter would be better off exiting gracefully, as the Company's policies dictate he already should have done (absent the preferential treatment which we admire Mr. Tyree for standing up against). We also note that companies with a focus on best corporate governance practices set a policy for the maximum length of time that a director may serve (for the very logical reason that it is not worth the risk that a company falls into stagnation without new perspective coming into the

boardroom), and Peter's length of service is far beyond what companies with best focus on corporate governance deem to be appropriate. For instance, Fossil's policy was a maximum of 10 years of service.

As noted above, we very much hope that we can come to resolution that benefits everyone rather than engage in a costly fight. BHG wants to begin building Assertio up and wants to end the aggression now, to begin working together instead of against each other (if we must aggressively, publicly engage). We look forward to your response by Monday and are open to speaking again and conducting formal interviews to begin a Board appointment process. Please note, however, the above basic terms of agreement are non-negotiable. If the Board tries to counter those basic terms, we will begin the process of forcibly effectuating change as of Monday. We will not delay our public action if we receive a counteroffer on those basic terms.

Thank you for your engagement and attention to these important matters.

Very Truly Yours,

Alexander E. Parker
Senior Managing Director
The Buxton Helmsley Group, Inc.

# Exhibit 4

# BUXTON HELMSLEY URGES ASSERTIO STOCKHOLDERS TO VOTE "AGAINST" DIRECTORS AFTER DISCLOSURE FAILURES, INAPPROPRIATE BOARDROOM ACTIVITY, STRATEGIC BLUNDERS

NEWS PROVIDED BY
**Buxton Helmsley Group, Inc. →**
May 13, 2024, 17:52 ET

*Urges Assertio Stockholders to Vote Against All Directors at Upcoming Annual Meeting in Order to Either Pressure Current Board to Accept New Stockholder-Recommended Directors or Force Resignations of Significant Portion of Board Pursuant to Bylaws*

*Board and Management Inappropriately Answered or Refused to Answer Questions Over Very Material Matters*

*Believes Insiders May Have Not Personally Purchased Shares in Over Three Years Due to Material Non-Public Information*

*Last Remaining Investor-Minded Advocate on Board Has Chosen to Step Down Over Inappropriate Boardroom Activity, Leaving a Largely Out-of-Touch Board*

*Analysts Have Dropped Coverage of Assertio Due to What Appears to be Lost Faith in Leadership's Due Diligence Abilities, Reinforcing BHG's Concerns*

*Intends to Imminently Release Third-Party Expert Opinions Concerning Assertio Board and Management's Apparent Disclosure Failures and Deficiencies, for Further Delivery to Regulators*

*Believes Board Should Promptly Explore Strategic Alternatives, Including a Possible Sale, Given Significant Opportunity to Achieve Post-Acquisition Operating Profit Enhancement through Reduced SG&A Expenses*

NEW YORK, May 13, 2024 /PRNewswire/ -- The Buxton Helmsley Group, Inc. (together with certain of its affiliates, "BHG" or "we"), a New York City-based investment fund manager that holds a significant interest in the common stock shares of Assertio Holdings, Inc. ("Assertio" or the "Company") (NASDAQ: **ASRT**) urges Assertio stockholders to **vote "against" all of the Company's director nominees** at the Company's upcoming 2024 annual meeting of stockholders on May 23, 2024 (the "Annual Meeting"). BHG strongly believes that significant change to the Assertio board of directors (the "Board") is necessary in order to bring about new oversight and reinstate stockholder-like judgment in the Boardroom. Any stockholders who have already cast their ballots should immediately call their broker to change their ballot to reflect a **vote "against" all Assertio directors**.

**In addition, Assertio stockholders are urged to communicate their support of BHG's campaign and opposition to the present Assertio Board via a news release or private letter to the Board. Letters to the Board may be sent to investors@assertiotx.com, with a copy to BHG at asrt@buxtonhelmsley.com.**

Alexander Parker, Senior Managing Director at BHG, explained the rationale for the campaign:

> "Assertio is a valuable company that fulfills very critical needs in the healthcare system. That said, after alarming communications between us and Assertio's Board and management, we have concluded that Assertio's Board requires change to reinstate stockholder-like judgment in the Boardroom and restore value for all stockholders. It is abundantly clear to us that without meaningful change, stockholders likely face imminent irreparable harm.
>
> "We have made numerous attempts to avoid aggressive public action, but it seems more and more clear to us that this incumbent Board requires outside pressure to change. To that end, we recently privately proposed that the Board appoint two new directors, which the Company and Board appears to have rejected. Such a rejection makes it very clear that this Board just wants to retain

control. It's no wonder they have driven out the last apparent remaining director (James Tyree) who was able to recognize the Board's inappropriate decision-making, who was willing to put his foot down, and who now has resigned in protest.[1]

"If the Board simply accepts our proposal to add directors (who will serve without cash compensation), it can avoid a costly proxy contest with BHG that would cost stockholders hundreds of thousands of dollars, if not millions.

"Developments under the current regime are disturbing. Under the leadership of Chairman Peter Staple, Assertio acquired Spectrum Pharmaceuticals in Q3 2023, yet admitted—within a mere quarter's time—to have overpaid by approximately 75%, or $150 million. This resulted in legacy Assertio stockholder interests being diluted four times as much as necessary (effectively handing a substantial portion of the legacy Assertio business to Spectrum's pre-acquisition stockholders at no cost to them).

"This Board has made clear it is both incapable of sufficient oversight of management and that it does not hold itself accountable for massive blunders like the Spectrum acquisition. Nor does it seem to be incentivized to since there's a tension created between pursuing a financial recovery over misrepresentations in the Spectrum acquisition catastrophe and what we can only imagine is the Board's desire to save face after clearly failing to conduct adequate due diligence and forethought leading up to the Spectrum acquisition. This Board has a clear conflict of interest in that pursuing recovery for the Spectrum blunder that occurred under its oversight, would likely be perceived by most investors as failures of this Board to engage in due diligence. The only directors who would not be exposed to that conflict of interest would be new, shareholder-appointed directors, and that is precisely what BHG is pursuing and has proposed."

"While the Board has just taken action by ousting some of Assertio's top executives, not a single non-executive director has held themselves accountable by tendering a resignation. Even Mr. Staple—who has ultimate responsibility for oversight of the Board as Chairman—continues to serve in his role. Mr. Staple was due to resign this year after nearly two decades on the Board and upon reaching Assertio's mandatory retirement age, yet the Board outrageously granted him the preferential treatment of a waiver to remain serving as a director. As a result of this, James Tyree resigned in protest and the Company announced he would not stand for re-election at the Annual Meeting."[2]

> "When BHG inquired about the due diligence failures in the Spectrum acquisition, the Assertio Board and management's responses were beyond alarming. The Company refused to give a reliable written response over critical, material matters that should have already been disclosed in SEC filings – in certain cases also implicating that the response to the questions would indeed be material. In a meeting with BHG on May 7, 2024, certain members of Assertio's Board and management gave materially different responses than what they put in writing before the meeting, when BHG had already forewarned any material explanation needed to be in writing due to the criticality of the matters and to ensure a genuine, reliable answer was being given. The Board and management then resorted to defending their existing public disclosures. We now see that Assertio's Board and management are apparently fine with minimal, inadequate disclosure, which represents a danger of imminent irreparable harm to Assertio's public investors who rely on such woefully deficient disclosures."

> "It is not possible for investors to effectively value Assertio securities without the information BHG has sought. BHG believes this undisclosed information may be the reason behind why none of Assertio's directors have purchased a single share of stock with their own funds in the past three years. We also believe the Company's stock would likely not be trading at such depressed levels if the Board would disclose certain information implicated to be materially positive. The Board and management of Assertio outrageously questioned BHG why it was obligated to disclose positive financial information that it is withholding, effectively suppressing Assertio's stock price. That information, if material as the Company implicated it to be, was already required to be disclosed to public market participants pursuant to Regulation S-X."

BHG, with a track record of relentless investor advocacy, has demanded two seats on the Assertio Board to provide currently lacking oversight in the areas of disclosure, due diligence, capital allocation strategy, and otherwise.

BHG also believes that Assertio's Board should initiate a modest, but material share repurchase program (to take some level of action for defense against the Company's valuation, and to capitalize on the Company's depressed stock price for the benefit of long-term stockholders), and also wishes to restore stockholder-like judgment in the boardroom in relation to expenses. For instance, the Board has spent hundreds of thousands of dollars on paid analyst coverage—which even this Board and management could not justify as to how that creates long-term stockholder value—and, though the Board could not justify the expense, they regarded this corporate waste as being acceptable to continue because it is "immaterial."

BHG does not regard hundreds of thousands of dollars as "immaterial" at Assertio (especially, when Assertio's equity market capitalization is approximately $94 million), and knows that investors would rather see these funds allocated toward share repurchases. We believe the Board's cluelessness regarding the effects of its decisions on investors is likely due to its low ownership stake in Assertio.

Mr. Parker concluded, "This Board clearly spends 'other people's money' – including in connection with acquisitions and unjustified expenses – with no regard. Stockholders need to immediately correct this problem by installing directors who will serve as fiduciaries committed to conserving and maximizing value. The current Board is failing miserably in this regard."

BHG intends to provide additional detail regarding these matters in the time leading up to the Annual Meeting. Unless the Board accepts BHG's proposal, BHG will likely initiate a solicitation as a referendum on the Board. BHG's current proposal involves:

- **The Addition of Two New Directors:**
    1. **Director #1: Alexander E. Parker** – Mr. Parker serves as Senior Managing Director of Buxton Helmsley, overseeing the firm's investor advocacy efforts. Through a number of investor advocacy campaigns, he is known for utilizing his straightforward business acumen, in combination with his extensive knowledge of accounting and legal obligations at publicly traded entities, to both maximize and protect the financial interests of the investors whose interests he is entrusted to represent. Mr. Parker's track record of above-average due diligence capability, having uncovered even repeat accounting and securities fraud schemes at public companies, has led to his insight being requested as part of regulatory investigations and his allegations being pursued via class-action investor litigation.

       Most recently, Mr. Parker secured independent board representation at Fossil Group, Inc. after receiving answers to due diligence questioning that presented an apparent risk to investors.

       BHG's proposal involves Mr. Parker agreeing to accept all-equity compensation, and to then share his expertise, extensive experience, and track record of stockholder advocacy for the benefit of all Assertio stockholders. BHG notes that no other Assertio director has accepted such zero cash compensation. BHG believes Mr. Parker's presence on the Board will both dissuade further inappropriate Board conduct and also foster an environment of directors not simply accepting inappropriate actions, such as the inappropriate herd behavior that led to director James Tyree resigning in protest.

    2. **Director #2** – BHG has delivered a list of six (6) highly qualified candidates to serve as the second new director, leaving the choice to the Board. These candidates have varying backgrounds and experience, primarily relating to capital markets, capital allocation strategy, regulatory compliance, and financial reporting. Thus far, the Board has not advised BHG that it is unable to find a suitable candidate on this list.

- **One Director Stepping Down:** One Assertio director must step down, both to eliminate stale knowledge in the Boardroom and to avoid an even-sized Board that could lead to gridlock. As it stands, Assertio's current six-person, even-numbered Board leaves dangerous room for gridlock in deciding critical matters and is yet another example of poor corporate governance.

**BHG urges Assertio stockholders to immediately cast votes "against" all of Assertio director nominees** at the upcoming May 23, 2024 Annual Meeting. If a stockholder has already cast their ballot, they should immediately call their broker to change their ballot to reflect a **vote "against" all Assertio directors**.

THE FOREGOING INFORMATION MAY ALSO BE DISSEMINATED TO STOCKHOLDERS VIA TELEPHONE, AND EMAIL AND SHOULD NOT BE CONSTRUED AS INVESTMENT ADVICE OR AS A SOLICITATION OF AUTHORITY TO VOTE YOUR PROXY. THE COST OF DISSEMINATING THE FOREGOING INFORMATION TO STOCKHOLDERS IS BEING BORNE ENTIRELY BY BHG. PROXY CARDS WILL NOT BE ACCEPTED BY BHG. PLEASE DO NOT SEND YOUR PROXY TO BHG. TO VOTE YOUR PROXY, PLEASE FOLLOW THE INSTRUCTIONS ON YOUR PROXY CARD SENT TO YOU BY ASSERTIO.

**About Buxton Helmsley**

The Buxton Helmsley Group, Inc. is a New York City-based investment advisory firm and fund manager, engaging both active and passive investment strategies across a range of asset classes, with a general focus on opportunities in North America and Europe. The investment approach is based on deep fundamental analysis and risk management, with a focus on ensuring disclosure obligations are being upheld under applicable accounting standards and securities laws.

Media Contact:
Public Relations and Corp. Comm.
Tel: +1 (212) 561 - 5540, Option 4
**press@buxtonhelmsley.com**

**Cautionary Statement Regarding Forward-Looking Statements**

This press release does not constitute an offer to sell or solicitation of an offer to buy any of the securities described herein in any state to any person. The information herein contains "forward-looking statements". Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "may," "will," "expects," "believes," "anticipates," "plans," "estimates," "projects," "potential," "targets," "forecasts," "seeks,""could," "should" or the negative of such terms or other variations on such terms or comparable terminology. Similarly,statements that describe our objectives, plans or goals are forward-looking. Forward-looking statements are subject to various risks and uncertainties and assumptions. There can be no assurance that any idea or assumption

herein is, or will be proven, correct or that any of the objectives, plans or goals stated herein will ultimately be undertaken or achieved. If one or more of such risks or uncertainties materialize, or if BHG's underlying assumptions prove to be incorrect, the actual results may vary materially from outcomes indicated by these statements. Accordingly, forward-looking statements should not be regarded as a representation by BHG that the future plans, estimates or expectations contemplated will ever be achieved.

[1] *See* Form 8-K, filed by the Company on April 2, 2024.

[2] *See* Form 8-K, filed by the Company on April 2, 2024.

SOURCE Buxton Helmsley Group, Inc.

WANT YOUR COMPANY'S NEWS

**FEATURED ON PRNEWSWIRE.COM?**

**GET STARTED**

**440k+**
**Newsrooms & Influencers**

**9k+**
**Digital Media Outlets**

**270k+**
**Journalists Opted In**

# Exhibit 5

# BUXTON HELMSLEY RELEASES LETTER FROM CERTIFIED FRAUD EXAMINER ATTESTING TO DISCLOSURE FAILURES AND DEFICIENCIES BY ASSERTIO HOLDINGS BOARD OF DIRECTORS

---

NEWS PROVIDED BY
**Buxton Helmsley Group, Inc.** →
May 17, 2024, 07:30 ET

---

*Letter Expresses Several Significant Concerns and Recommends That Further Investigation is Warranted*

*Urges Assertio Stockholders to Vote Against All Directors at Upcoming Annual Meeting in Order to Either Pressure Current Board to Accept New Stockholder-Recommended Directors or Force Resignations of Significant Portion of Board Pursuant to Bylaws*

NEW YORK, May 17, 2024 /PRNewswire/ -- The Buxton Helmsley Group, Inc. (together with certain of its affiliates, "BHG" or "we"), a New York City-based investment fund manager that holds a significant interest in the common stock shares of Assertio Holdings, Inc. ("Assertio" or the "Company") (NASDAQ: **ASRT**), today released a letter from Rumbi B. Petrozzello, a Certified Public Accountant and Certified Fraud Examiner who previously served as President of the New York State Society of CPAs. In the letter, Ms. Petrozello attests to disclosure failures and deficiencies by Assertio's Board of Directors, and expresses several significant concerns. She recommends that further investigation is warranted, but that it should only be conducted by parties not connected to or selected by Assertio's Board and management.

Buxton Helmsley released the letter in conjunction with its campaign to urge Assertio stockholders to **vote "against" all of the Company's director nominees** at the Company's upcoming 2024 annual meeting of stockholders on May 23, 2024 (the "Annual Meeting"). BHG strongly believes that significant change to the Assertio board of directors (the "Board") is necessary in order to bring about new oversight and reinstate stockholder-like judgment in the Boardroom. Any stockholders who have already cast their ballots should immediately call their broker to change their ballot to reflect a **vote "against" all Assertio directors**.

**In addition, Assertio stockholders are urged to communicate their support of BHG's campaign and opposition to the present Assertio Board via a news release or private letter to the Board. Letters to the Board may be sent to investors@assertiotx.com, with a copy to BHG at asrt@buxtonhelmsley.com.**

The full text of the letter is below:

May 15, 2024

c/o Mr. Alexander E. Parker
The Buxton Helmsley Group, Inc.
1185 Avenue of the Americas, Floor 3
New York, N.Y. 10036-2600

Re: Preliminary Report of Opinions – Assertio Holdings, Inc. ("**Assertio**" or the "**Company**")

Dear Mr. Parker,

At your request, I am providing a preliminary report of opinions after analyzing the various public disclosures filed by Assertio with the U.S. Securities and Exchange Commission (the "**SEC**"), in conjunction with other publicly available data and materials discovered through the process. I am also issuing this report after reviewing certain private letters exchanged between The Buxton Helmsley Group, Inc. ("**BHG**") and Assertio.

It should also be noted that I have informally agreed to potentially serve as a director of Assertio, given my expertise and concerns related to the Company's disclosures. I further understand that BHG has proposed my directorship at Assertio (with BHG indicating it is likely to conduct a solicitation of stockholders to

forcibly effectuate my directorship, if required). I remain amenable to serving as a director of Assertio and believe investors would be greatly benefited by such qualified oversight.

**I. QUALIFICATIONS TO GIVE OPINION.**

In relation to my qualifications for providing such an opinion regarding the financial reporting and related disclosures filed by Assertio, I would like to provide some context. From a credential perspective, I am a Certified Public Accountant licensed in both the State of New York and the Commonwealth of Massachusetts. However, what sets me apart is my additional qualifications of not only being Certified in Financial Forensics, but also my standing as a Certified Fraud Examiner, which brings a unique perspective to my analysis; more particularly, a distinctive ability to detect irregularities in disclosures. From an experience perspective, I began my career at the "big four" public accounting firms PricewaterhouseCoopers and Deloitte Touche Tohmatsu Limited. I also have extensive experience serving in internal, corporate finance positions, including having spent seven years as the Controller of a real estate investment company, where I oversaw the financials of funds holding over $500 million in assets. Presently, I am a Principal of Rock Consulting, LLC, which provides services related to forensic accounting, including litigation support around accounting and securities fraud claims. Beyond serving as a member of the Litigation Services Committee of the New York State Society of Certified Public Accountants (NYSSCPA), I also later served as organization-wide President of the NYSSCPA.

**II. OPINION OF PRIVATE CORRESPONDENCE BETWEEN BHG AND ASSERTIO.**

After review of the private correspondence between BHG and Assertio, I did not believe that any of the BHG questions were answered. Perhaps vagueness was the goal of the Assertio correspondence; if that is the case, then Assertio's goal was achieved. For example, in response to BHG asking why directors and officers had not purchased shares of Assertio, Assertio responded that the "interests of the Board and management team are appropriately aligned with the long-term interests of the Company's stockholders." In addition, although the Assertio financial statements are audited by an independent registered public accounting firm, management is responsible for the financial statements, and it makes one wonder the cause when a company's Board and management are unwilling to answer (in writing) such reasonable questions posed by BHG. I believe BHG's questions around financial statements are warranted under the circumstances. To be even clearer, I also believe the evasive nature of Assertio leadership's responses to BHG's reasonable due diligence questioning underscores the need for investigation by an unconflicted

party not chosen by present leadership. I, therefore, also believe it is even further irregular that the Company appears to have rejected BHG's proposal for adding two truly unconflicted directors with experience so relevant to the reasonable concerns raised by BHG.

**III. CONCERNS AFTER INITIAL ANALYSIS OF DISCLOSURES.**

My primary concerns after reviewing Assertio's disclosures:

- The value of intangible assets was reported to have dropped precipitously (approximately 75%) in the mere months following the acquisition of Spectrum Pharmaceuticals. I believe investigation is warranted by unconflicted parties (not chosen by Assertio leadership), not only because of the questionable admission of sudden asset value depreciation, but also given the Company's claim that impairment of asset value was evidenced due to the Company's equity market capitalization dropping below the book value for equity.[1] Under the circumstances of Assertio's material contingent liability exposure, it is difficult to fathom that a decline in equity market capitalization occurred due to asset value depreciation when a company (like Assertio) has such contingent liability exposure to interfere with the open market's valuation of net asset equity (i.e., concerns over the adequacy of insurance policies to cover possible ultimate liability resulting from asserted claims, etc.).

- Despite Assertio's reported net loss at the end of 2023, due to the impairment of intangible assets, Assertio does appear to have very sufficient cash holdings and also itself claims to be "well-funded." [2] It is curious that a company claims to be so "well-funded," has not accrued any contingent loss reserves related to material contingent liabilities. Yet the Company has not repurchased any amount of common stock in the open market, in addition to directors and officers not purchasing common stock with personal funds for the past approximately three years. Given the Company's vague non-response to BHG's inquiry, in addition to the conflicting statements and actions, I believe further investigation is warranted by unconflicted parties not connected to or selected by Assertio's Board and management.

- BHG questioned whether the fair value of the Company's assets exceeded the book value of assets, since the accrual of value gains (beyond the present book value) is disallowed under the Generally Accepted Accounting Principles ("**GAAP**") codified at ASC 350 and ASC 360. The Company indicated (within its May 6 private response letter to BHG) that the response to this question posed by BHG is, indeed, material, which leads me to further question the Company's failure to disclose such knowledge under Regulation S-X. While GAAP does not allow for such (post-acquisition) fair value gains of assets to be accrued, such material positive circumstances not reflected under GAAP financial reporting are not only material to the Company's stockholders, but also to other public market participants, including potential or actual short sellers of Assertio's traded capital structure interests. I believe it would be a horrific shock to short sellers of the Company's traded securities for the Company to later admit GAAP financial reporting was misleading in the way of not reflecting a higher true, fair value of assets, and with that knowledge of materially different financial position not being disclosed alongside the Company's financial statements. The Company appears to have knowledge of undisclosed positive financial circumstances (implicated to be material knowledge by

the Company itself), that would be critically concerning. If that material omission is indeed the case, it begs the question of what other material knowledge is not being disclosed by Assertio insiders.

- I believe the Company has not disclosed a number of items required for a prudent investor to effectively value the Company's traded securities. Among other perceived disclosure failures, the largest apparent disclosure failures in the case of Assertio would surround the Company's contingent liability exposure. Such information presently not disclosed by Assertio, but required by investors to effectively value the Company's financial position, includes: a) disclosure of claims asserted against Assertio, which were deemed by insurers to fall outside the scope of coverage; b) collective monetary damages claimed/asserted by plaintiffs in pending legal matters; and c) details surrounding the Company's applicable insurance limits. This information could shed light on the Company's full circumstances of financial position, and it is in my opinion highly inappropriate that Assertio's insiders are able to transact (or refrain from transacting) in the Company's traded securities with the benefit of such knowledge, while public shareholders are left to transact in the Company's securities without such material information. The Company has referred BHG to existing disclosures, but I am not convinced that those disclosures are sufficient.

- My concerns are exacerbated by James L. Tyree's refusal to stand for reelection to the Assertio Board. I believe Mr. Tyree's resignation in protest of, as reported by the Company, the board's decision-making over governance matters may signify deeper-seeded issues and underscores the need for investigation by additional parties not connected to or selected by Assertio's Board or management.

**IV. CONCLUSION**

After my analysis of Assertio disclosures, it is my opinion that further investigation is warranted. I believe such an investigation should only be conducted by parties not connected to or selected by Assertio's Board and management (or any new directors that could be proposed by the present Assertio Board), whether that is BHG's proposed director nominees or another stockholder. Because the current Board appears unwilling to transparently answer such reasonable questions by an educated investor conducting due diligence, it would only be prudent for an inquiry to be conducted by such independent, qualified parties. A continued resistance by Asssertio's Board and management to provide clarity to investors posing reasonable questions has even further increased the necessity of such investigation.

Very truly yours,

Rumbi B. Petrozzello, CPA/CFF, CFE

------------------------------------------

**Stockholders should refer to Buxton Helmsley's May 13, 2024 news release** introducing its campaign to **urge Assertio stockholders to immediately cast votes "against" all of Assertio director nominees** at the upcoming May 23, 2024 Annual Meeting. If a stockholder has already cast their ballot, they should immediately call their broker to change their ballot to reflect a **vote "against" all Assertio directors**.

THE FOREGOING INFORMATION MAY ALSO BE DISSEMINATED TO STOCKHOLDERS VIA TELEPHONE, AND EMAIL AND SHOULD NOT BE CONSTRUED AS INVESTMENT ADVICE OR AS A SOLICITATION OF AUTHORITY TO VOTE YOUR PROXY. THE COST OF DISSEMINATING THE FOREGOING INFORMATION TO STOCKHOLDERS IS BEING BORNE ENTIRELY BY BHG. PROXY CARDS WILL NOT BE ACCEPTED BY BHG. PLEASE DO NOT SEND YOUR PROXY TO BHG. TO VOTE YOUR PROXY, PLEASE FOLLOW THE INSTRUCTIONS ON YOUR PROXY CARD SENT TO YOU BY ASSERTIO.

**About Buxton Helmsley**

The Buxton Helmsley Group, Inc. is a New York City-based investment advisory firm and fund manager, engaging both active and passive investment strategies across a range of asset classes, with a general focus on opportunities in North America and Europe. The investment approach is based on deep fundamental analysis and risk management, with a focus on ensuring disclosure obligations are being upheld under applicable accounting standards and securities laws.

Media Contact:
Public Relations and Corp. Comm.
Tel: +1 (212) 561 - 5540, Option 4
**press@buxtonhelmsley.com**

**Cautionary Statement Regarding Forward-Looking Statements**

This press release does not constitute an offer to sell or solicitation of an offer to buy any of the securities described herein inany state to any person. The information herein contains "forward-looking statements".

Specific forward-looking statements canbe identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words suchas "may," "will," "expects," "believes," "anticipates," "plans," "estimates," "projects," "potential," "targets," "forecasts," "seeks,""could," "should" or the negative of such terms or other variations on such terms or comparable terminology. Similarly,statements that describe our objectives, plans or goals are forward-looking. Forward-looking statements are subject to variousrisks and uncertainties and assumptions. There can be no assurance that any idea or assumption herein is, or will be proven,correct or that any of the objectives, plans or goals stated herein will ultimately be undertaken or achieved. If one or more of such risks or uncertainties materialize, or if BHG's underlying assumptions prove to be incorrect, the actual results mayvary materially from outcomes indicated by these statements. Accordingly, forward-looking statements should not be regardedas a representation by BHG that the future plans, estimates or expectations contemplated will ever be achieved.

[1]*See* Company's Form 10-K filed with the SEC on March 11, 2024, and its Form 10-Q filed with the SEC on November 8, 2023.

[2]*See* Company's April 2024 presentation titled "Profitable Growth and Cash Flows from Commercial Pharmaceutical Assets".

SOURCE Buxton Helmsley Group, Inc.


WANT YOUR COMPANY'S NEWS

**FEATURED ON PRNEWSWIRE.COM?**

**GET STARTED**

**440k+**
**Newsrooms & Influencers**

**9k+**
**Digital Media Outlets**

**270k+**
**Journalists Opted In**

# Exhibit 6

BUXTON HELMSLEY
NEW YORK | EST. 2014

**VIA U.S. REGISTERED MAIL & ELECTRONIC MAIL**

June 10, 2024

Members of the Board of Directors
Assertio Holdings, Inc.
100 South Saunders Road, Suite 300
Lake Forest, IL 60045
c/o Mr. Matthew Kreps
investor@assertiotx.com

Dear Assertio Board of Directors (the "**Board**"):

The Buxton Helmsley Group, Inc. ("**BHG**" or "**we**") is writing to the Board of Assertio Holdings, Inc. ("**Assertio**" or the "**Company**") following our letter of April 22, 2024, to confirm that, as you likely expect, our previously expressed concerns remain unresolved. Following our public statements, we have been contacted by and spoken with multiple whistleblowers, and now we have far greater concerns than before.

The vote results from the 2024 Annual Meeting reveal that more than 6% of shareholders opposed newly appointed directors Emany and Kirk. Moreover, the percentage of votes cast against Peter Staple more than doubled since the 2023 Annual Meeting. These results show that, even on extremely short notice, BHG's campaign has helped to inform shareholders' perspectives and shareholders increasingly agree with us that the Assertio boardroom needs change.

**Buxton Helmsley's Collaborative Approach**

BHG's first priority is to create value for Assertio shareholders. It is also our priority to do so with minimal disruption. We greatly prefer to work constructively with directors at the companies in our portfolio, when possible. As an example, please direct your collective attention to the cooperation agreement reached between Buxton Helmsley and Fossil Group in March of this year (https://www.sec.gov/ix?doc=/Archives/edgar/data/883569/000110465924038442/tm249659d1_8k.htm).

The Board should also note that, within one month of Fossil agreeing to cooperate and collaborate with BHG, Fossil shares rose over 80%. BHG, very clearly, brings confidence to the investor bases for whom we advocate. Assertio investors need that confidence desperately.

**Communication with the Board**

With the above all said, in the time since our previous outreach and Assertio's unconvincing response, we have received additional information regarding the acquisition of Spectrum Pharmaceuticals, Inc. ("**Spectrum**") which suggests why the Board has been unable or unwilling to answer BHG's questions, and also why the Board was reluctant to appoint new directors not hand-picked by the present Board.

In light of this additional information, our previous settlement offer is rescinded. The proposal we initially made now appears to be insufficient to produce the change that is required at Assertio. We would be open to

THE BUXTON HELMSLEY GROUP, INC.
1185 AVENUE OF THE AMERICAS, THIRD FLOOR NEW YORK N.Y. 10036
T. +1 (212) 561-5540 F. +1 (212) 561-6349 ALEXANDER.PARKER@BUXTONHELMSLEY.COM

discussing a settlement (we would expect discussions to begin immediately) without an outstanding proposal, but if it is not possible for us to see eye-to-eye regarding Assertio's challenges, we are prepared to put the matters before shareholders.

The coming pages will detail our concerns, but we would first like to make clear the objective of this letter. We believe the next step in our efforts to resolve the Board's shortcomings is a call with Chairman Staple, so that we can express our concerns directly and ensure that there is no miscommunication in his response. The seriousness of our concerns regarding the Board's conflicts of interest, questionable commitment to its fiduciary obligations, and unethical conduct necessitate immediate action from the Board. Mr. Staple or his scheduling assistant should contact the undersigned at alexander.parker@buxtonhelmsley.com to set a date and time.

Again, we prefer to work collaboratively but we remain unimpressed with the Board's response to date. If the Board is unwilling to help address the recent destruction of shareholder value and opportunities for future value creation, we will have little option but to take more aggressive steps to catalyze value for Assertio shareholders. Some of the steps we may take include a formal demand under Section 220 of the Delaware General Corporation Law, filing of class-action lawsuits (we already have cooperating witnesses as to the below-discussed issues), calling for regulatory attention, or calling a special meeting (or, alternatively, utilizing a consent solicitation) to immediately replace the Board. Finally, all members of this Board should particularly bear in mind that you are not immune from the consequences of your actions. As directors, you potentially have personal liability for actions that are contrary to your obligations to shareholders, and our additional findings lead us to believe that liability is ballooning by the day. BHG does not believe it will be possible for Board members to "deny, deny, deny" their way around these issues. Your only viable option is getting in front of them and shifting strategy to work with transparency to promote shareholders' interests. Part of that solution requires the Board to add Directors with skills and expertise that are directly relevant to the challenges that Assertio faces. Given the serious issues we have become aware of, however it is clear that new directors must be shareholder-appointed.

**<u>Points of Concern</u>**

After learning more about the Spectrum deal, the following are some of our related points of concern:

1) It has been brought to our attention that, out of what seems like a desire to avoid responsibility for its apparent failure to conduct appropriate due diligence in the Spectrum deal, the Board has not disclosed to Assertio shareholders that: A) Spectrum made false statements and submitted falsified records and clinical data related to Rolvedon (also known as Rolontis) and excluded, edited and/or covered up relevant substantive study subject safety data from a clinical trial in the material provided to the FDA and reported to the EMA, among other parties it had a duty to disclose that clinical trial data to; B) there is a very real possibility that the Rolontis BLA (biologics drug application) could be revoked due to data integrity challenges resulting in not having the statistically significant number of evaluable study subjects with complete data. Among other issues (as is also generally alleged in public court filings):

    - Although Spectrum's CRO reported for 6+ months that Spectrum's protocol-required blood draw data showed oncolytic blood blasts, Spectrum itself never reported or disclosed those results to the FDA, EMA, or even the study subjects. This is an apparent lie through omission, equivalent to providing false data to the relevant drug licensing authorities.
    - In contravention of standard industry practice, the Phase 3 trials for Rolontis did not collect aliquot blood samples, without which it is impossible for Assertio to demonstrate that Rolontis

was not the root cause of the blood blasts. Under such circumstances, the Rolontis BLA is vulnerable to revocation, at any time, as a result.

- If the data that Spectrum submitted to win approval of its BLA was fraudulent (as is apparent to us now), this means that Spectrum, now a subsidiary of Assertio, has evidently defrauded the U.S. Medicare system. False Claims Act lawsuits have been filed, and won, on flimsier grounds.

2) Another "gift" to Assertio shareholders, resulting from the Board's acquisition of Spectrum, is the class-action suit involving Spectrum's investigational drug, poziotinib. On January 23, 2024, Judge Valerie E. Caproni ruled that shareholders had adequately alleged actionable misstatements regarding Spectrum's alignment with the Food and Drug Administration on dosage for the study and patients' enrollment status."[1] All too similar to the issues with Rolvedon, and also missed in due diligence prior to the Board's agreement to acquire Spectrum.

3) The Company's most recent proxy statement indicates that members of the Board collectively own 0.78% of outstanding shares. It is suspicious that the Board A) appears to have material negative information, B) failed to disclose that information to Assertio's non-insider investors, C) holds a minuscule level of stock, and D) members have refrained from any material purchases of Assertio stock for years (Ms. Mason's ~$25k share purchase on June 5 does not move the needle on this issue). Doubts are raised about the Board's commitment to creating value given that directors' limited shareholdings and close to $0 cost basis means they face negligible actual loss if they act improperly and to the detriment of shareholders.

4) In our previous letter (dated April 22, 2024), Buxton Helmsley indicated its belief that Assertio's disclosures to shareholders are minimal and inadequate. No information provided by Assertio to date has dissuaded us from that view, and the further information we have obtained has only reinforced our view that Assertio's disclosures are woefully deficient. We will be responding shortly, under separate cover, to the Company's May 6 letter to BHG.

5) There are numerous inconsistencies and contradictions in the information that Assertio is providing to investors that must be reconciled. On this point, we leave it in your hands to determine if you will invite BHG into the boardroom to help ensure these issues are remedied, or if we must take these matters to shareholders.

6) Since our last engagement, BHG's concern that a financial restatement will be required has grown. It is apparent this leadership utterly failed to conduct adequate due diligence to uncover the evidence A) that Rolvedon (as currently licensed) is an apparent product of fraud, or B) that Spectrum was worth a much lower value than initially considered by this Board.

7) It seems clear the Board did not engage in appropriate due diligence of Spectrum prior to closing the deal. In light of the recently revealed strategy to diversify Assertio's portfolio, we believe that shareholders are legitimately concerned of another poorly-researched transaction. Assertio, with minimal due diligence, should have seen that Spectrum's Rolvedon biologic had a history of red flags involving 3 BLA submissions (2 prior BLAs failed; and one received an FDA Complete Response Letter rejection). Whether the flaw was in failure to uncover Spectrum's history, or failure to properly understand the implications, the Board's strategic priority should be reassuring shareholders that it has

---

[1] Bloomberg – "Spectrum Cancer Drug Trial Fraud Allegations Proceed After Trim" (January 23, 2024): https://news.bloomberglaw.com/health-law-and-business/spectrum-cancer-drug-trial-fraud-allegations-proceed-after-trim

added the experience needed for proper oversight, not figuring out what other assets it would like to own.

8) Assertio's pre-Spectrum portfolio was comprised solely of pharmaceutical drug products. In acquiring Spectrum, Assertio acquired its first biological product—Rolvedon (Rolontis). The Board must add a Director with experience in biological product manufacturing and regulatory compliance.

**Buxton Helmsley's Prescription for Assertio**

The Assertio Board needs additional expertise in multiple areas that is clearly not available from the current Board members. We believe that Assertio shareholders require and would respond well (just the same as Fossil investors did, upon the board reaching an accord with BHG) if the Board added relevant expertise that it clearly lacks in (among other areas) accounting, capital markets, due diligence, and disclosure. We are additionally concerned that the current makeup of the Board means that it is unable to navigate these issues like a vested shareholder would. For example, we doubt that director who was affiliated with a substantial shareholder would be comfortable with offering money for whistleblowers' silence.

On the subject of the Board's makeup, we note that Director McKee: 1) received the lowest support from shareholders at the 2024 Annual Meeting; 2) was unable to ensure that appropriate and sufficient due diligence was applied to the Spectrum acquisition, despite his role as the Board's resident financial expert (at that time); and 3) has experience and expertise that are redundant with those of Director Emany.

In light of Spectrum's actions prior to being acquired and Assertio's adjustment to the value of its intangible assets following the Spectrum acquisition, the Board must also add a director with experience in fraud litigation (BHG has already presented a very qualified candidate, Deirdre O'Connor, whom we would be happy to bring to the meeting with Chairman Staple).

Finally, shareholders require a director at the table who represents shareholders' perspectives and interests through ownership of shares—i.e., actual skin in the game. That shareholder with actual skin in the game is BHG, having a beneficial interest in more shares of the Company than current directors, and shares we actually purchased with our own capital—not shares simply handed to us.

Though the Board has refreshed itself slightly and appointed a new CEO (for clarity, we are underwhelmed by the market reaction to announcement of O'Grady's appointment), these changes do not ameliorate our concerns, and Assertio continues to operate with inadequate disclosure to shareholders and a strategy that could best be described as "hope we don't get caught." You have been caught. A director's denial of the reality they are facing does not absolve them of complicity in such matters.

The Company's apparent attempts to buy whistleblowers' silence has the secondary effect of confirming that the Board is aware of these points. Board members, your window for remedying this correctly is closing, and if you continue on the current path you will be liable for perpetuating a coverup of the Spectrum mess. BHG already has ideas as to how to legally maneuver for the protection of shareholders in this situation, close off liability, and spin this negative situation so that shareholders can emerge better off than before, but we—of course—need more clarity from the inside before those plans can be concretely put on the table.

We look forward to the Board's prompt response, but in anticipation of the possibility that the Board is unwilling to immediately initiate discussions to reach an accord, BHG has shifted a block of our equity holdings onto the books of Assertio's transfer agent, in preparation for formal demands for production of Assertio's books and records under Section 220 of Delaware General Corporate Law. If we do not receive a prompt response, we will direct our outside legal counsel to issue those demands. We also reserve the right to issue such books and records demands publicly. Among other books and records (this list is non-exhaustive), BHG will be demanding the production of items related to:

- Communications and documents relating to "settlement offers" made to certain whistleblowers, in return for expected silence;
- Documentation related to payments made to certain doctors associated with Assertio and Spectrum, including Dr. Vacirca;
- Documentation and communications related to the Board's evaluation of due diligence materials in support of its determination to proceed with the Spectrum acquisition;
- Documentation related to insurance coverage for the Spectrum acquisition;
- Records related to the intangible asset impairment charges for the financial reporting periods of Q3 2023 and Q4 2023;
- Communications relating to the pending litigation between the Company and certain whistleblowers;
- Communications and documents related to insurance coverage (and possible denial of coverage) of opioid-related claims asserted against the Company and its subsidiaries;
- Documentation related to insurance contracts expected to cover pending opioid-related claims asserted against the Company;
- Communications (including between the Company and Darrow Investor Relations) related to BHG and its correspondence/inquiries since April 22, 2024; and
- Communications, documents, and agreements entered into by the Company, with relation to the "retention mechanisms" referred to as part of Item No. 10 within BHG's April 22, 2024, letter to the Company (that includes, but is not limited to, communications between the Company and its retained "nationally recognized compensation advisor", as mentioned in the Company's May 6, 2024, letter to BHG).

Again, we have been contacted by multiple whistleblowers to corroborate the legitimacy of the issues we are raising in this letter. The fact that we found this information with minimal effort, yet the Board collectively failed to discover it pre-Spectrum acquisition, underscores why you need BHG at the table. It is your choice whether we reach an agreement peacefully or are forced to operate under "scorched earth" policy to forcibly obtain representation on the Board.

We look forward to the Board's immediate reply to this correspondence and speaking with Chairman Staple shortly. We can confirm that we are committed to change that will catalyze value for Assertio shareholders. If necessary, we are prepared to take our concerns directly to shareholders and let them decide which directors will best represent their interests. If it comes to a contest, in consideration of what BHG has learned about this Board's activities "behind closed doors", we anticipate it will be easy for our fellow shareholders to choose BHG over the Board.

Very Truly Yours,

Alexander E. Parker
Senior Managing Director
The Buxton Helmsley Group, Inc.

# Exhibit 7

BUXTON HELMSLEY
NEW YORK | EST. 2014

**VIA U.S. REGISTERED MAIL & ELECTRONIC MAIL**

September 27, 2024

Assertio Board of Directors – All Members
c/o Mr. Sam Schlessinger
Assertio Holdings, Inc.
100 South Saunders Road, Suite 300
Lake Forest, IL 60045
sschlessinger@assertiotx.com

Dear Assertio Holdings, Inc. ("**Assertio**" or the "**Company**") Board of Directors (the "**Board**"):

The Buxton Helmsley Group, Inc. ("**BHG**" or "**we**") hereby addresses the Board after review of Baker Botts L.L.P's ("**Baker Botts**") August 23, 2024 letter to Blank Rome LLP (the "**August 23 Letter**"); Baker Botts's August 27, 2024, letter to BHG (the "**August 27 Letter**"); and Baker Botts's September 25, 2024, letter to Schulte Roth & Zabel LLP ("**SRZ**") (the "**September 25 Letter**" and, together with the August 23 Letter and August 27 Letter, the "**Baker Botts Letters**").

We will begin by saying, very affirmatively, that this is going to be the last letter the Board will receive prior to the commencement of litigation. It has become very apparent, especially after the Baker Botts Letters, that the Board has no constructive/honorable intentions when it comes to its "engagement" with BHG (just the same as turning a blind eye to the Spectrum fraud), so we are going to waste no further time arguing nonsense with the Company, Board, and/or Baker Botts. We have made every attempt to amicably resolve this with the Board, for which the Board has made no reciprocal effort, attempted desperate and illogical arguments (which there is no way the Company or Board genuinely believes), and has only continued its evident dishonest and deceptive conduct.

With first regard to the Baker Botts Letters, we hereby notify the Board that we have—as a result of the Baker Botts Letters' contents—informed the whistleblowers that we believe there is no apparent possibility of a global resolution that could resolve their claims, because this Board does not intend to change the Company's views of those whistleblowers as honorable allies rather than adversaries. Any company that views internal whistleblowers as adversaries has a severe culture issue manifested by turning a blind eye to misconduct, which fosters a culture of non-compliance. This is the Company culture the members of this Board have now created. It is apparent to us that the Company acquired an evident culture of fraud when it acquired Spectrum Pharmaceuticals, Inc. ("**Spectrum**"), and now you are apparently deciding to embrace it at Assertio.

It is clear to BHG, based on this Board's statements and actions, that the Board is deliberately failing to address this apparent fraud by choosing not to pursue claims against the pre-acquisition Spectrum board of directors and management. We anticipate that the whistleblowers will, at the earliest possible moment, follow

DOC ID - 47280017.1

through on the course that they have determined to be in their best interests, which will likely include the filing of litigation related to the Spectrum fraud.

With further regard to the Baker Botts Letters, it is apparent the Board is opting to stonewall BHG's pending books and records demand pursuant to Delaware General Corporate Law ("**DGCL**") § 220, and we therefore have instructed our Delaware counsel to file suit for means of forcing the Board to turn over the books and records. The Company hypocritically claims no wrongdoing, yet are clearly fearful of BHG seeing these requested books and records. Interestingly, as well, the Baker Botts Letters were a clear desperate plead with BHG to get the whistleblowers to turn over the evidence the Board (again, hypocritically) says is "baseless" and has "no merit". Since the Board laughably claims they engaged in adequate due diligence prior to the Spectrum acquisition, we are sure you already have looked at Spectrum's source records, site audit records, and examined the metadata associated with clinical data edits, deletions, etc. There is more, but you could start there (or a number of other places). The Board has a very short window of time if it wishes to actually begin complying with the law, with relation to BHG's pending books and records demand. The Board entirely ignored BHG's holdings at one of our brokers, when falsely claiming BHG held less than half of 1% of the Company's equity shares in the Baker Botts Letters. We, once again, include evidence of ownership from both brokers, as of July 24, 2024. The Board is warned, if it continues to contrive obvious falsities about BHG and its interests, not to mention characterization of our motives, we reserve all rights to hold the Board liable for defamation (in the event any falsities are publicized).

While we are surprised to learn from the Baker Botts Letters that the Board apparently prefers itself to be on the hook here for the evident fraud at Spectrum (rather than Spectrum's pre-acquisition board of directors and management), it is gratifying to have reached a clarity of understanding that the Board will evidently accept liability for any actions the whistleblowers (or any other party) may shortly institute against the Company with respect to the Spectrum fraud, whether allegations of FCA violations or otherwise.

BHG will neither mince words nor act in half-measures as part of the upcoming proxy contest. We have no choice but to hold the Board fully accountable with substantial evidence production to counter the Board's public statements that BHG's claims are unfounded. In the August 23 Letter, Baker Botts asserts that the extensive troves of evidence in the possession of the whistleblowers to substantiate our allegations should not be publicly "broadcast", yet—at the same time—argues that we have not substantiated our allegations. The Board cannot have it both ways. When a board of directors is evident to be overseeing a fraud and misleading investors, it is absolutely necessary to broadly share evidence of that misconduct among other investors so that they understand the urgency to replace that board of directors. We believe many corporate catastrophes likely would not have occurred if whistleblowers had taken action to publicize the misconduct before it ballooned to a catastrophic level. Stockholders of those companies would have been well-served if an investor such as BHG had entered the picture and had aggressively taken all actions necessary to end the misconduct before it turned fatal, just as we are seeking to do here.

At this juncture, we would like to reach an agreement with the Board and strongly recommend that the Board, through Baker Botts, reach out to our counsel at SRZ to initiate discussions. **For absolute clarity, we would expect Baker Botts to reach out to SRZ immediately, given we are now pushing forward with litigation against the Company and Board (both on the front of the pending books and records demand, and subsequently/simultaneously, derivative litigation to hold every remaining member of this Board liable for the Spectrum fraud it is now causing the Company to perpetuate, putting the interests of Assertio's stockholders in continued and increasing peril).**

BHG has learned that the whistleblowers have—in the past several days—received inquiries from the U.S. Department of Health and Human Services (the "**HHS**"), who works in tandem with the U.S. FDA through an interagency cooperation agreement, apparently now investigating the Spectrum fraud. The Board's "head in the sand" response approach is likely to be as ineffective with HHS and FDA as it has been with BHG (nor will such an approach serve the Board when the EMEA intervenes, which appears to be inevitable). The writing is on the wall, and the Board has an obligation to act to mitigate risk to stockholders, rather than just waiting for Spectrum (or even the Company as a whole) to potentially be shut down by regulators for fraud. Further, as of September 19, 2024, BHG has also learned that the U.S. Center for Medicare and Medicaid Services ("**CMS**") *also* apparently inquired with the whistleblowers regarding the Spectrum fraud matters (particularly, an inquiry from CMS' "Medicare Drug Integrity Unit"). The whistleblowers are now apparently sharing extensive evidence with those regulators in response to those inquiries (BHG has no control over the whistleblowers), since the Board failed to collect it from them. What on *earth* are you all doing? Is your goal to become the poster children for pharmaceutical and biologic fraud? As outlined in BHG's last letter to the Board, a failure to act on these matters exposes each remaining member of the Board to, as any reasonable minds would conclude, significant out-of-pocket personal liability risk exposure.

As we've said before, BHG's investment thesis is predicated on the idea that full and complete disclosure is absolutely essential to an accurate, maximized valuation. We are fully prepared to endure a possible short-term downtick in the value of our equity holdings in the Company, in the name of transparency, and are confident that our path forward will lead to long-term value creation.

With regard to the Baker Botts Letters in general, Baker Botts states that it represents both Assertio and the Board. It is clear to us that Baker Botts has apparently failed to heed its ethical obligations as counsel to the Company, given the apparent hopeless conflicts of interest between the Board and the Company. In light of the Board's numerous investigative failures, including—most basically—the Board's failure to even request evidence from the Spectrum whistleblowers prior to claiming "no merit" to their allegations, Baker Botts does not appear to be truthfully representing Assertio's interests (which would be to fully investigate and cease any possible unlawful activities), but instead is representing only the Board's (going along with a sham "investigation" that did not even collect evidence from those whistleblowers alleging the misconduct, to attempt burying misconduct, now that whistleblowers have sounded the alarm over internal misconduct the Board has apparently chosen to turn a blind eye to for an extended period of time).

It is not possible to succeed in an attempt to understand how the Board concluded that the Spectrum whistleblowers' allegations had "no merit" **without even asking for evidence from those reporting the misconduct.** Moreover, we are baffled that supposed Company counsel has not invalidated the findings of such an evident sham "investigation" where the worst possible fact-finding failures undeniably have occurred. Baker Botts is, very clear to us, not representing the Company in these matters, despite their claim as such. It is, instead, clear to us that Baker Botts has arguably utterly failed in its ethical duty—as the Company's supposed counsel—to investigate, verify, and fully understand these matters before supporting a certain position. Let alone, the counsel on this matter has no pharmaceutical background, which is also counter to the rules of professional conduct for counsel. Baker Botts should be well aware that the Board's position is entirely unfounded, even just through the communications between the Company and BHG. Concluding "no merit" to the allegations of *multiple whistleblowers*, after not even having asked the whistleblowers for their evidence, is an acceptable investigation Baker Botts is willing to stand behind?

Spectrum is evidently continuing to defraud regulators, insurance companies, healthcare providers, investors, and cancer patients. If Baker Botts continues on this path (we highly doubt Baker Botts' firm-wide ethics and reputation management committees would agree with what is happening here, and especially if they saw the

extensive evidence that BHG has heard exists, which the Board never asked the whistleblowers to see—the time for the Board to do so has long passed), they would then not simply be defending a client's historical misconduct; they would be providing advice that serves to *perpetuate* the ongoing Spectrum fraud (Baker Botts has no plausible deniability over the sham "investigation" by the Board, where no evidence was requested from whistleblowers). If Baker Botts actually conducted an investigation with adequate industry knowledge, and collected the evidence from the whistleblowers the Company is *already* aware of, it would see the issues, but there is no plausible deniability with a refusal to investigate—not even for Baker Botts, but they lost their chance to collect the extensive evidence from the whistleblowers now, too (no reasonable minds would believe Baker Botts is capable of an adequate, impartial investigation at the Company now).

Given Baker Botts' now-potential role in furthering the Spectrum fraud, through its failure to end its hopeless conflicts of interest in representing both the Board and Company, not to mention going along with the Board's sham "investigation" that failed to even collect evidence from those whistleblowers the Board claims they were investigating the allegations of, we also believe Baker Botts is likely exposing itself to significant possible malpractice claims to be initiated by Assertio stockholders (that is, unless Baker Botts immediately decides to heed its ethical obligations here).

Just as we earlier advised the Company, with respect to our pending disciplinary complaint against Assertio General Counsel Sam Schlessinger, we anticipate that Baker Botts's insurers would contest any malpractice (or other related) claim unless all of BHG's communications and underlying evidence related to these matters have been turned over to those insurers as part of a "notice of circumstance". It would also be entirely inappropriate for the counsel having signed off on the Baker Botts Letters to—as is clear to us—prod forward with its current nonsensical position, to—as we see is inevitable—put the firm-wide reputation of Baker Botts in peril, without first consulting the firm's reputation management (and ethics) committee. We highly doubt those Baker Botts committees will think the firm's reputation will be aided when the FDA/HHS could—at any moment—shut down its client (partially or entirely) due to the evident Spectrum fraud and victimization of cancer patients (which Baker Botts apparently is choosing to turn blind eye to as much as the Board). That, or when BHG soon is forced to lay down all of the evidence Baker Botts failed to collect from whistleblowers before going along with the Board's conclusion after such an apparent sham "investigation". We are also beyond appalled that Baker Botts asked BHG for the evidence the Board failed to collect, to underscore its apparent awareness of the Board's "investigation" integrity issues. The Company had the chance (which has long passed) to engage with the whistleblowers and request their troves of evidence before concluding any investigation, but utterly blew that chance. Baker Botts would be wise to resign from such a client, and we very much bet the firm's reputation management and ethics committees would agree with us there.

Lastly, BHG has reviewed the presentation slide deck from Assertio's supposed "investor event" with Lake Street Capital Markets ("**Lake Street**") on August 16, 2024 (the "**August 16 Event**"). We note with suspicion that, as opposed to its standard practice of issuing a press release for investor events at which management is presenting, the Company *for some reason* decided not to broadly announce to investors that it was participating in the August 16 Event. We believe that the only reasonable conclusion for this deviation from the Company's normal practices would be that the Company selectively invited a limited set of parties to whom it wished to express inaccurate and misleading statements about BHG. Why else would the Company not wish for their broad investor base to attend an event with messaging supposedly meant for investors? We can only infer that the Company apparently chose to speak about BHG in front of a select audience rather than via a broadly disseminated press release because the members of this Board are well aware BHG has caught them red-handed, and because you know that any response to BHG's allegations attempted by the Company on August 16 would have been disingenuous. So, did the Board attempt to spread further inaccurate and

misleading information to investors through an unadvertised "investor event"? This incident serves as yet another demonstration of the Board's opposition to transparent disclosure.

The Company's written statements in the August 16 Event presentation deck already include false statements about BHG. For instance, the Company stated that BHG is only communicating with one whistleblower, which the Board clearly knows is false, given that the August 23 Letter repeats our mention of "*whistleblowers*" (plural) (though, in the September 25 Letter, the Company then returns to only recognizing Ms. Moore, when you already admitted knowledge BHG has more than one cooperating whistleblower). The Company also asserted that the whistleblowers' claims have "been thoroughly and previously investigated", which is false and misleading because the Board has never even asked the whistleblowers for their evidence. Spectrum also effectively and implicitly conceded that Ms. Moore's allegations were true when it stipulated to the dismissal of its defamation suit against her, but that detail is also **glaringly** absent from the Company's presentation.

Responsible board members do not permit management to tell half-truths to stockholders while, at the same time, ducking responsibility for their past failures. This is not going to end well for the remaining members of this Board. Put simply, the Board continues to prove that it cannot be trusted to be honest (one of the most basic expectations of a fiduciary), over and over again. The Board is making its own bed for the upcoming proxy contest (though, again, that is the least of the worries for any members of the Board who appallingly choose to remain standing by until then if the Company's status quo persists).

* * *

Now, we will briefly address arguments raised in the Baker Botts Letters, to make the Board's bad faith conduct abundantly clear by the time we initiate our litigation:

> **Company Allegation/Objection #1:** ***BHG's August 20 Letter to the Board was an "improper attempt by BH[G] … to obtain benefits to which they are not entitled".***
>
> The Board's own past behavior reveals that this argument is made in bad faith. In this regard, Depomed, Inc., before the enterprise was reorganized as Assertio, but nevertheless when Peter Staple was Board Chairman, executed a cooperation agreement with Starboard Value on March 28, 2017. A settlement to resolve the Board's shortcomings and avoid the need for a proxy contest would be as proper now as the settlement with Starboard was in 2017.
>
> The Company alleges that BHG is attempting to extract a financial gain through a settlement with the Board, which the Company knows is completely false. Under no circumstances would BHG request or accept a financial gain through a settlement with the Board. Any newly-appointed directors would receive the standard compensation for directorship, which *must be* reasonable, not improper, and in the best interests of stockholders, given the current Board receiving it (unless the Board would like to admit otherwise), and given the tremendous responsibility which corporate directorship entails. Even then, BHG itself would *still* not receive any financial gain through director compensation—only our nominees, if appointed/elected. The Company also has no idea as to the nominees we would propose now, given we retracted our initial (rough) proposal to the Board from months ago. If the Board actually upheld its duties and was protecting Assertio stockholders from the Spectrum fraud, we would have seen no need to now conclude a reconstitution of the Board being required.

We highlight, the Board did not take up BHG's offer even when it involved *zero* cash compensation for the proposed nominees—the Board contriving we have a desire for financial benefit is entirely fallacious. If the Board genuinely believes I, personally, want a financial benefit from serving on the Board, offer a seat (as part of a broader cooperation agreement—this would not be the only term of the agreement, of course) on the Board within five (5) days for zero compensation, and see if your offer is accepted. If you are not willing to make such an offer, then leave your disingenuous argument for not cooperating with BHG at the door. We have never asked the Board for anything not customary in a cooperation agreement between a stockholder and the corporation whose stock it owns (and nothing different than Chairman Staple was willing to sign off on before, in 2017). We look forward to polling our fellow stockholders as to who they believe would best represent their interests and "earn their keep" as Board members—the current Board members who are now perpetuating the evident Spectrum fraud, or the fellow stockholder who uncovered what this Board has been attempting to keep under wraps from its investors and regulators. That will be an easy choice.

The August 27 Letter also expresses a view that BHG cannot propose a cooperation agreement which would include a determination to not pursue litigation against certain parties, which is false. We are well aware that terms cannot feasibly be included in a cooperation agreement, which could interfere with a Board member's judgment and ability to uphold his or her fiduciary duties to the fullest extent. The Board continues jumping to unfounded conclusions as to what BHG would request in a cooperation agreement, before even having had a conversation about what could be included in a cooperation agreement, out of clear desperation. If and when the Chairman of Assertio's Board indicates that he is prepared to engage in discussions about the concerns that BHG has raised, our legal advisors will be delighted to indulge Baker Botts in a conversation about what is and is not appropriate for inclusion within the terms of any cooperation agreement.

**Company Allegation/Objection #2:** ***"[T]he legal actions that BH[G] proposes demonstrate BH[G] lacks even a basic understanding of the law and the facts."***

It is laughable that the Board asserts that it has a better understanding of the facts and the availability of potential procedural solutions with Spectrum, given its past and ongoing fact-finding and due diligence failures. As we note above, the Board did not even ask for evidence from those reporting the misconduct, **which means that the Board *does not have the facts*, very simply**. The Board underscores its delusion and incompetence when it says it has all of the information **it never asked for**. Such a dereliction of duties by the Board, and its failure to properly investigate and pursue remedies, is yet another reason that we are confident stockholders will support wholesale change in the Assertio boardroom.

With further regard to this item:

*First,* the implementation of the legal strategy BHG has outlined would be refined after a *proper* fact-finding investigation by the Company's Board. Such an investigation should include a review of how much capital the Company has siphoned out of Spectrum, and whether there is a corresponding risk of exposure to fraudulent conveyance claims.

*Second,* BHG has already consulted a leading whistleblower-focused law firm that has expansive direct experience with False Claims Act ("**FCA**") actions, and which has successfully prosecuted many FCA cases. We note that, in contrast, Baker Botts apparently has a single Partner who has worked on FCA matters.

*Third*, we also affirm having proactively considered the grounds for holding a board of directors joint and severally accountable in an FCA action where they are fully evidenced to be aware of the misconduct occurring under their watch and opted to stuff it under the rug. After this Letter, we are confident the paper trail we have created will be more than sufficient to demonstrate the Board has joint and several liability for any FCA liability (or any other liability related to the Spectrum fraud) the Company may imminently bear if the Board's inaction persists any further (the Company and its stockholders, including BHG, are entering extremely dangerous territory now, with the whistleblowers now "on the loose"—something we are only now comfortable with because of our confidence in the ability to recover any legally determined Spectrum damages from the Board, personally).

**Company Allegation/Objection #3:** ***The Board will base its decisions on its good faith business judgment.***

Why start now? The Board decided to rush to acquire Spectrum without first conducting proper due diligence. The Board then opted to offer settlement payments to Spectrum whistleblowers without reviewing their evidence, and then made the decision to claim those allegations were/are without merit (again, without reviewing the whistleblowers' evidence). The Board has decided to continue operating a business that is deriving revenues from an evident fraud, and continues its failure to correct these issues as the Company's executives falsely feign ignorance as to knowledge of the matters. Good faith business judgment is clear to us as having played no role in the Board's decision-making processes to date.

It is constructive to have confirmation that the Board members are aware that if they base corporate decisions on a desire to retain their seats, that could very likely constitute a breach of duty. In light of that acknowledgment, we urge the Board to revisit its failure to disclose the due diligence flaws that led to the acquisition of a business *that had to be written down by 75% less than three months later*. A decision not to disclose past mistakes to stockholders, in an effort to avoid the consequences of a director's decisions, evidences a clear breach of duty to stockholders (a clear failure to disclose, in a selfish attempt to retain Board seats). We are confident enough of our fellow stockholders will agree with us on this.

**Company Allegation/Objection #4:** ***BHG's proposed legal framework "appears to be [for] the purpose of defrauding Spectrum's creditors".***

This allegation is utter nonsense, and you know it. Assertio's current approach, in which it intentionally has not disclosed Spectrum's misconduct (nor failed to remedy the issues surrounding the fraud), is *already defrauding the Company's creditors* (and equity holders, both direct and indirect). Spectrum is also already evident to be defrauding the U.S. Center for Medicare and Medicaid Services (which is *also* a creditor). The Board is going to warn stockholders that, if BHG's nominees are appointed to the Board, they will start engaging in the very defrauding this Board is already overseeing? Make that make sense.

The legal framework we proposed would take the Company's liability to which stockholders may be exposed, which the Board has failed to properly disclose, and—at the same time of the Board taking action to recover damages as a result of the Spectrum transaction—disclose it so that stockholders and creditors have a clear picture of what is evident to have occurred, and still be occurring, at Spectrum (such disclosure is also not optional under the law). BHG's approach aims to end the Spectrum fraud,

clear up the issues with the FDA (not to mention rebuild trust in a way that we believe the FDA would agree is now impossible for the current Board, after having refused to take action after such an extended period of back-and-forth with BHG) for continued sales of Rolvedon, settle any potential damages from any apparent Spectrum fraud, and seek to recover damages from the pre-acquisition Spectrum board of directors and management (and/or any other culpable parties).

The Board has an obligation to cease, address, and resolve Spectrum's evident ongoing fraud *immediately*. A failure to take action immediately is the surest way to ensure that every remaining member of this Board to bear personal responsibility. It seems clear to us that the only way directors can prevent a derivative action for apparent causes of action including breach of duty and fraud is to finally begin acting in the interests of Assertio stockholders, which means adding new, disinterested directors charged with investigating and seeking to recover damages related to the Spectrum acquisition and fraud. The Board itself is *not* disinterested in the selection of any new directors, given its abysmal failures and inaction, even after you were caught "in the act" by BHG.

In matters that are brought under the False Claims Act, there is the possibility of treble damages being awarded. Until the FCA exposure is brought under control, the risk of value destruction that could result when a claim is eventually filed remains unmanaged. That status quo is entirely contrary to the interests of Assertio's stockholders. In allowing the status quo to continue, the Board is singlehandedly (personally, as a result of its gross inaction) causing the Spectrum fraud liability potential to balloon, at the expense of those to whom it has a fiduciary duty, which is a nonsensical course of action that only serves to preserve every member of this Board's seats, and the according excessive compensation to be received as a result. The Board's only path to "saving face" here is to voluntarily agree to BHG's recommended additions to the Board, and to also agree to appoint those directors to a newly-formed Special Committee of the Board (which should have been formed by the Board *quarters ago*—your time to act responsibly has long passed) charged to investigate the Spectrum matters.

**Company Allegation/Objection #5: *BHG will direct others to file litigation against Assertio and its directors* and *BHG is improperly attempting to extract a financial benefit for Ms. Moore.***

This allegation is both false and outrageous. While BHG has sympathy for the Spectrum whistleblowers (such as Ms. Moore), and while BHG believes it is appropriate to condemn directors who attempt to hide their mistakes in the hopes of continuing to be paid hundreds of thousands of dollars a year, BHG has neither the ability nor the intent to direct any other person to file litigation against Assertio and its directors. As stated above, BHG has informed the whistleblowers that we believe there is no apparent possibility of a global resolution of their allegations, and the issues underlying their allegations. All we can do is inform the whistleblowers of reality and not mislead them, unlike the Board. Sharing our opinion regarding the dim chances of a settlement (favorable for all parties involved) is wholly distinct from directing someone to file a lawsuit. Moreover, the Board is singlehandedly leaving the whistleblowers with apparently no choice but to file lawsuits against the Company, by hiding behind its lawyers, refusing to speak with BHG, and refusing to address the Spectrum fraud. That is *your choice*.

BHG is a fiduciary for its own investors. Our motivation is to create value for Assertio stockholders as a result of our findings, but—given that BHG's duty, at the present time, is to maximize value for our investors—we may be forced to modify our course of action for means of protecting and maximizing the value of our interests in Assertio, if the Board is unwilling to do what is so clearly in

the best interest of stockholders. We have asked to join the Board so that we may assume a duty to Assertio stockholders (so that BHG is entirely aligned with the duties of the Board), but the Board has refused to do so. So, the Board apparently wishes to leave for BHG to have no other apparent choice but to possibly take alternative courses of action to protect and maximize the value of our investment in the Company, as much as you all apparently wish to leave for the whistleblowers to likely file further litigation against the Company. We have "knocked on" every "door" possible, and the Board has shut each one in our face, so you have nothing to complain about as to the consequences of doing so. The Board's judgment continuing to be abysmal is a massive understatement.

The problems that stem from the Spectrum acquisition (especially related to Rolvedon, which the Board has now tainted, and continues to taint, because you have done nothing about its glaring integrity issues) and its ongoing business are a primary limiting factor on the Company's valuation. In recommending that Assertio reach a global resolution including Spectrum's whistleblowers (at the same time of entering into a cooperation agreement with BHG, to globally resolve these matters), BHG is advocating for a course of action that will ringfence Assertio's stockholder risk and position the Company to command a higher valuation as a result of leveraging the whistleblowers' first-hand knowledge of the Spectrum fraud, to recover the Board's massive Spectrum overpayment (as implicitly admitted at the time of the Spectrum write-down).

In seeking a cooperation agreement to obviate a proxy contest and improve the Board's composition, BHG is similarly advocating for a course that will improve Assertio's value for **all** stockholders. Global resolutions that resolve multiple matters with multiple adversarial parties are a common feature of complex negotiations with such an array of parties. BHG's proposed course of action reverses this Board's improper adversarial relationship with internal whistleblowers, while turning them into allies who will aid the Company in recovering from the Spectrum fraud through their first-hand knowledge of that fraud. We reject the allegation that this solution is improper and that it is not in the best interest of the Company (and cancer patients), and are confident our fellow stockholders will, as well. The Board has provided *zero* reasons why this solution is improper, not to mention proven it is incapable of determining what it is in the best interests of stockholders, attempting to hand money to whistleblowers in return for silence, rather than putting an end to the misconduct and leveraging the whistleblowers' knowledge to recover harms to stockholders as a result of the misconduct those whistleblowers are so aware of and knowledgeable towards as first-hand witnesses.

While on the subject of propriety, however, we—again—note that the Board has made "settlement" offers to multiple whistleblowers. Given the apparent terms of the offers and the circumstances under which they were made, a better description for these offers is "hush money". These offers would have simply handed hundreds of thousands of dollars to the very same people that the Board says have "no merit" to their claims. Responsible directors who take their fiduciary duties seriously do not seek to silence whistleblowers with cash payments. And having made those offers, responsible directors would not then hypocritically claim, after the fact, that they've reviewed the claims thoroughly (when they have not) and that the claims have no substance.

Again, for purposes of a complete response, BHG confirms that its recommended resolution of Ms. Moore's claims would not provide a shred of financial benefit for Ms. Moore unless her (and the other whistleblowers') extensive first-hand knowledge of the misconduct results in a recovery for the Company and, therefore, its stockholders. **The whistleblowers have even already affirmed they would be willing to receive their Spectrum recovery incentive in the form of equity, rather than cash (to then cost the Company *zero* hard assets), when the "hush money" offers under the**

**oversight of the Board, to date, would have simply handed massive amounts of hard assets to those whistleblowers, regardless of the merit of their claims (and, entirely hypocritically, when the Baker Botts Letters say the whistleblowers' claims are "baseless").** It is irrefutable that it would be in the best interest of stockholders that there be a Special Committee of the Board formed, where the Special Committee received only a very minor percentage of the amount they are able to recover for the Company (just as bankruptcy courts agree this is a proper, sensible incentive for trustees, to incentivize maximum recovery while keeping the fiduciary's interests aligned with all stakeholders that stand to benefit from their efforts). At worst, the Special Committee would conclude zero viable causes of action exist for pursuit, having investigated a massive (far more than material) loss that it has provided no logical explanation toward (the "explanation" contrived by didn't hold up with a dual CPA-Certified Fraud Examiner that was the President of the New York Society of CPAs, and this leadership was tongue-tied when asked to explain further), but we already know that to not be the case. The Board has an obligation to investigate these issues, but is hopelessly conflicted (both precluding the current Board's ability to investigate, and rendering it entirely improper that the Board would choose who is investigating).

It is also laughable that the Board portrays itself to have a better understanding of what happened at Spectrum when it was not a first-hand witness (other than Dr. Vacirca, which is exactly why we have demanded his resignation—he is not fit to serve on the Board), nor do any of you have any pertinent regulatory or biologics expertise that would even render you qualified to opine on these matters. We look forward to asking our fellow stockholders whether they prefer the Board's approach (the "hush money" offers it has already made, where stockholders pay whistleblowers for claims with "no merit") or BHG's route (in which the Company will only pay if stockholders gain as a result of the whistleblowers' knowledge, and—at the very worst—our Special Committee can say a full investigation was had with no causes of action for pursuit).

With respect to the propriety issue, the Baker Botts Letters claims that BHG is proposing some sort of improper "*quid pro quo*" arrangement:

> *First,* there is nothing improper about requesting a seat (or more than one) on the board of directors at a company you have a financial interest in, especially when the current Board is not only perpetuating an evident fraud at your expense, but also because not a single current member of that board of directors has a financial interest in the Company larger than yourself. Once again, BHG's nominees already offered to serve for zero cash compensation, and now we are re-opening a five (5) day window where the Company could offer myself, personally, a seat on the Board for zero compensation (as part of a broader cooperation agreement), but you all know these are all completely disingenuous allegations/arguments.
>
> *Second,* it is clear to us that a company proposing to pay whistleblowers money in return for the expectation the whistleblowers will remain silent, not to mention in return for those whistleblowers "losing possession" (or, however, the Company wants to creatively say it) of the troves of documents evidencing the Spectrum fraud, is an improper "*quid pro quo*" arrangement (we look forward to taking a poll of our fellow stockholders). So is, arguably, your old cooperation agreement between Depomed Inc. and Starboard, if you want to stick to your story that we know you do not genuinely believe.
>
> *Third*, we (and *any* other stockholder) have natural limitations on what may be offered as part of a cooperation agreement. We could, for instance, agree to support the (then-present) Board

at the upcoming annual meeting as part of a possible cooperation agreement. We could also, for instance, agree to relinquish (to a group of new, entirely disinterested directors constituting a newly-formed Special Committee of the Board to investigate the Spectrum matter) our ability to further investigate and seek recovery of damages related to the Spectrum fraud (possibly withdrawing our pending books and records demand, agreeing not to imminently litigate that pending demand, and agreeing to submit no further demands). We could not, however, as an example, offer the Company assurance that any person (including any Board member) or entity, would not possibly be found at least partially responsible for the Spectrum fraud by that newly-formed Special Committee of the Board. Whoever would become a member that newly-formed Special Committee of the Board would be obligated (in accordance with their fiduciary duty) to hold liable all parties that perpetuated the Spectrum fraud (which, if the Board continues its inaction after this letter, can easily be seen to include the Board—you can change that, however, if you cease rejecting reality). BHG, very simply, cannot provide immunity to any parties with respect to the Spectrum fraud. The Company reserves its rights, Board members (both current and future) would retain their fiduciary obligations to pursue all parties that have harmed the Company, and any other stockholder could file a derivative action, as BHG is preparing, regardless of whether BHG inks a cooperation agreement with the Company or not.

The Company's claim of BHG proposing some sort of improper "*quid pro quo*" arrangement is rejected, and is simply another "spaghetti at the wall" defense.

**Company Allegation/Objection #6:** ***BHG is pretending to be a stockholder when it is actually a short-seller of the Company's securities*** **and** ***BHG misrepresented its shareholdings.***

If BHG was a short-seller, why would we be pressuring the Company to unveil undisclosed asset value (a value that this Board and management already have indicated to be a material number)? That would not serve the interests of a short seller. If we were a short seller, we would also have no favorable interest in demanding that the Company cure its apparent violation of Regulation S-X by disclosing to investors the positive difference between the Company's GAAP balance sheet values and the fair values. If we were a short seller, BHG would also—with no delay or attempts to avoid doing so—publicly broadcast all of our findings, including our assessment that Assertio has omitted material information from its quarterly filings, and air out the Board's continued failure to disclose the ongoing Spectrum fraud, even in the face of additional evidence being pushed to the Company's leadership over recent days. These material omissions in filings, again, run entirely afoul of Messrs. O'Grady's and Patel's certifications as to the completeness of those quarterly disclosures, pursuant to their respective obligations under 18 U.S.C. § 1530.

We have had some sympathy for Mr. O'Grady, as we do not believe he was informed of the mess he was walking into. We could not help but chuckle, though, when—on the last Company earnings call—Mr. O'Grady claimed his new position was "everything [he] thought it would be", yet his tone of voice gave away the lack of sincerity in that statement. That said, after this letter especially, we will have *zero* sympathy for Mr. O'Grady if he does not demand the Board cooperate with BHG concerning these issues, with him otherwise resigning. It is baffling why Mr. O'Grady would put the rest of his career at risk because of a post he *just* assumed. We continue to have hope that Mr. O'Grady would leave a post if he was being forced to oversee an fraud he unknowingly inherited. He gets to choose the character he is perceived to have, when this all comes out from under wraps very shortly (beginning with BHG's litigation).

Regardless of Mr. O'Grady's mess, we are not a short seller, and publishing that we are is, on any level, materially misleading and defamatory. It is an illogical leap with no basis in reality, in furtherance of the Board's "spaghetti at the wall" defense approach, and reveals the utter desperation with which the Board is stretching for a rebuttal to BHG's charges. This letter is notice to Assertio's directors that BHG reserves its rights to seek all legal remedies against the Board should it continue to make statements that it knows are false and defamatory. You have already, in fact, acknowledged that we are a stockholder of record within the Baker Botts Letters.

**Company Allegation/Objection #7:** ***The whistleblowers' evidence supporting their allegations is protected.***

Even if an NDA with any of the whistleblowers existed (which, to our knowledge, it does not), public policy would render any such NDA unenforceable where it served to keep illegal activities of the party involved being protected under wraps, let alone where *cancer victims* are being further victimized by a pharmaceutical company those patients trusted to be honest in the treatment being delivered to them. In consideration of the efforts that Assertio has undergone to silence the whistleblowers, and—in response to the concerns BHG has raised—we wholly reject the assertion that the whistleblowers' claims have "no merit". It is simply impossible that the Board could reach *any* conclusion in good-faith without even asking the whistleblowers for their evidence before outright rejecting the validity of their corroborating stories/allegations (and the extensive troves of aligning evidence supporting the allegations in their possession).

In its efforts to resist engagement, entrench its position, and preserve its seats, the Board has chosen a logically inconsistent path that will simply not stand up to public scrutiny.

**Company Allegation/Objection #8:** ***BHG is saying it will file the derivative action against the Board, no matter what.***

This is a clearly erroneous interpretation of BHG's statements. We have offered to enter into a cooperation agreement. Subject to the negotiation of such an agreement, BHG would consider offering a release of claims against the Board. BHG would also possibly agree to relinquish its ability to investigate and pursue valid causes of action to a Special Committee of the Board charged with investigating and seeking to recover losses related to the Spectrum acquisition and related fraud. If the Board does not wish to negotiate, however, so be it—that only works against yourselves.

The upcoming course of action is *your* choice. The Board can pursue the Spectrum board of directors for fraud, which would knock the wind out of any claim that you are all now perpetuating the Spectrum fraud, but you are *choosing not to do so.* We have tried to give the Board an opportunity to correct course before filing our derivative action, but it appears that the Board has, inexplicably, determined that it prefers for BHG to pursue the Board's failures rather than agree on a course of action to resolve past (and ongoing) failures. It is nonsensical for the Board to complain about lawsuits and "harassment" when you are *choosing* that path rather than correcting course to avoid it. The Board needs to choose its path and quit complaining about the consequences of going any further down its current path.

**Company Allegation/Objection #9:** ***BHG is going to "broadcast" books and records, damaging the Company.***

The Company states that BHG's claims are unsubstantiated, and then expresses concern about the possibility that BHG will broadcast evidence that substantiates those same claims. The Board should accept that BHG's concerns about fraud are valid or else the Board should (a) provide the requested books and records to demonstrate that they are not or (b) accept that BHG will be compelled to release any evidence that will emphasize the Board's gross dishonesty, if the Board continues claiming we have not substantiated our claims enough. You are leaving us with no choice, given there was evidence of increasing cancer proliferation in study subjects that received Rolvedon, that data was not submitted to the FDA/EMEA, nor disclosed to study subjects (or their doctors, as required by their informed consent form), and Assertio has done nothing about it.

It is indeed damaging if a Board is overseeing fraud (and knowingly, for that matter), but it is even more damaging to the Company if directors overseeing a fraud are not immediately removed (and, thereby, able to possibly oversee *even more* fraud). It is abundantly clear we are trying *not* to disseminate evidence of the Spectrum fraud openly, but that is not in our control. It is in *your control.*

A "broadcast" of the evidence vindicating the reality that the Board rejects will not be necessary unless the Board continues to reject reality. Should that be the case, we are headed for a proxy contest, and the Board should be prepared to respond to stockholders' questions about the Board's failure to disclose and remedy the Spectrum fraud (that is, beyond questions from the regulators who appear to already be investigating). We will, however, ensure that our derivative action is filed against the Board prior to disclosing what the Company is facing under this Board, to spin such a negative situation positively, and to ensure it is clear to Assertio stockholders that the Board will be aggressively pursued (unless it changes course) so as to recompense the victims of its failures and betrayals; that is, those whom the Board has a fiduciary duty to, and is continuing to utterly fail.

**Company Allegation/Objection #10:** ***BHG was not a stockholder at the time of Spectrum's fraud and therefore lacks standing.***

This objection relies upon erroneous assumptions. The Spectrum fraud is a continuing scheme. BHG is currently a stockholder. BHG is demanding that Assertio cease Spectrum's allegedly fraudulent activity because the effects of that activity will also likely lead to bankruptcy, not only of that subsidiary but also of the parent company.

**Company Allegation/Objection #11:** ***BHG has viewed non-public evidence related to the whistleblowers' corroborating allegations.***

In the Baker Botts Letters, Baker Botts, on behalf of the Board and Company, has creatively arranged select parts of multiple quotes, out of order, to desperately contrive this statement that BHG has viewed non-public evidence related to the whistleblowers' corroborating allegations, as furtherance of Baker Botts' aggressive but misguided defense approach. Such statements are false and (if stated to third parties) defamatory, and we again reserve our legal rights to pursue an action against the Board for defamation. The Company already has admitted it knows BHG has not viewed any non-public evidence in the August 16 Event presentation deck. The Board's lies need to stop.

We have not viewed the whistleblowers' non-public evidence, but our legal advisors have independently done so. BHG's involvement with non-public evidence has been strictly limited to instructing the whistleblowers to share their evidence with certain of our external counsel for review and safekeeping. There is nothing improper about that, especially when the whistleblowers may fear

the possibility of being defamed, or even physically violated (physically or their property), knowing the extensive troves of jarring evidence they have in their possession (there is a reason why certain of the whistleblowers have hard drives stuffed away in foreign countries).

**Company Allegation/Objection #12:** ***BHG has not properly petitioned the Board prior to pursuit of its threatened derivative action.***

BHG is well aware of the requirements related to derivative actions. Baker Botts should also be aware of a legal concept called "demand futility," which is applicable where "the director would face a substantial likelihood of liability on the claims that are the subject of the demand." *United Food & Commercial Workers Union & Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg* (Del. Ch. 2020).

The circumstances of "demand futility" are clearly present in this case: 1) a trove of supporting public evidence related to the claims; 2) additional troves of non-public evidence in the possession of more than one whistleblower, with corroborating allegations; 3) the Company began receiving evidence of fraud at Spectrum by September 2023; 4) the Board then stood by as its management wrote down Spectrum by approximately 75% (revealing that the Board did not understand what it had acquired) after the Company received the evidence of fraud at Spectrum; 5) the Board oversaw the now-apparent concealment of the *real* reason for the Spectrum write-down from SEC filings; 6) the Board failed to remove a Chief Legal Officer who falsely denied knowledge of these matters to investors; 7) the Board failed to even *request* evidence from the whistleblowers (yet then still preposterously claimed a "thorough investigation" and that there was "no merit" to the whistleblowers' allegations); 8) while under the Board's oversight, management evidently falsely certified that there were no disclosure omissions from multiple quarterly filings with the SEC, running afoul of this leadership's obligations under 18 U.S.C. § 1530; 9) the Board has continued its failure to act to protect and mitigate risk to stockholders, merely to preserve its seats and excessive compensation; and the list just goes on.

Therefore, we doubt that we will petition the Board prior to the filing of a derivative action for the already-apparent causes of action including breach of fiduciary duty and fraud, given the risk of imminent irreparable harm to the Company as a result of any further dawdling response by the Board. Consider, for example, the Board's glacial reaction to BHG's books and records demand. Very simply, if the Board is given any additional time to continue the dereliction of its fiduciary duties (failing to address these matters), that not only presents a risk of personal liability for the Board, but also puts investor interests at risk of irreparable harm where the parent company could be named a joint defendant in an FCA action (or other litigation) if BHG does not put a stop to this here and now. If the Board continues its delaying tactics much longer, investors face the real possibility that the Company will be abruptly closed by regulators (who are already apparently investigating the Company). The HHS/FDA will give no warning before they walk in and shut Spectrum (and, possibly even Assertio) down, especially if the Board forces these letters to be used in a public proxy contest.

We reiterate that once BHG files a derivative action against the Board, our ability to settle these matters peacefully will be eliminated. At that point, we will have assumed a duty on behalf of the class we represent. Under those circumstances, the Board can—again—be absolutely assured that out-of-pocket payments from every Board member will be a prominent feature in any settlement

proposals to be entertained (of course, only to the extent any such payments would be aligned with the fiduciary obligations as the derivative action's plaintiff representative).

* * *

The Board has an irrefutable obligation to cease the Spectrum fraud immediately and to immediately perform a full investigation of these matters, but you are all hopelessly conflicted now (again, leaving you hopelessly conflicted in selecting any directors to be added to the Board to impartially perform such investigation). The core population data that Spectrum submitted to the FDA as part of the first BLA submission is publicly evidenced to be the *same* core population data that was submitted as part of the third BLA submission (which was appallingly approved, considering Spectrum had numerous reports from multiple whistleblowers that the data was fraudulent and had been tampered with, rendering it useless, and thus far from statistically significant).

**The resubmission of the same fraudulent core population data (as part of the follow-on BLA submissions) can be gleaned from public records. Spectrum also essentially admitted to the data integrity issues when their press releases consistently stated different figures (for core population data) than what was being reported to the FDA. Based on even just that evidence, the Board cannot avoid seeing the already-blatant discrepancies; that is, before even looking at all of the other public evidence, not to mention (more importantly) the troves of non-public evidence in possession of the whistleblowers. At the very least, this publicly evidenced discrepancy alone obligates the Board to investigate, but you all are hopelessly conflicted now.**

Multiple whistleblowers not only raised these issues directly to the highest levels of Spectrum (including former Spectrum Chairman Bill Ashton, and Ms. Moore apparently has copies of direct e-mails and text messages to/from him), but even offered to help *fix* the issues and rebuild trust with the FDA. Ms. Moore even offered *Assertio itself, after the Spectrum acquisition*, to help fix the issues, yet the Company laughably feigns her being an adversary. Neither Spectrum nor Assertio has taken up those offers for help to resolve these issues. That said, the Company also—not shockingly—continues to employ Anil Hiteshi, who was apparently one of the primary masterminds behind the Spectrum fraud (i.e., the individual who evidently implemented the Spectrum fraud scheme under the "oversight" of Spectrum's pre-acquisition board of directors and management). That appears to be all too similar to the Company continuing to employ Sam Schlessinger, who already evidently made false representations to investors. We have come to realize the apparent unspoken criteria for employability (and continued employment, for that matter) at the Company is certainly not ethics. Such a pattern in Company employees (and Board members) has become crystal clear to us.

**On this note, we also include (annexed below as "<u>Exhibit A</u>") two pages (pages 32 and 33) of the representations made by Spectrum, as part of the Spectrum merger agreement dated April 24, 2023 (the "<u>Merger Agreement</u>"),[1] which are blatantly false representations under the circumstances, and therefore, evident fraud on the part of the pre-acquisition Spectrum board of directors and management, which this Board has long had an obligation to pursue (again, you are hopelessly conflicted, now that you have turned a blind eye to it for months now, throughout your correspondence with BHG). Spectrum, for instance, represented in the Merger Agreement (page 32):**

[1] Spectrum Merger Agreement, dated April 24, 2023: https://www.sec.gov/Archives/edgar/data/831547/000110465923049367/tm2313548d2_ex2-1.htm

> ***"[Spectrum] does not have knowledge of any facts or circumstances that would be reasonably likely to lead to the revocation, suspension, limitation, or cancellation of a Permit required under Health Care Laws."*** (emphasis added)

**Spectrum had numerous corroborating reports of the Spectrum fraud, in written record, from more whistleblowers than Kellie Moore, and Spectrum should have archived those communications (we suspect, though, probably purged any less than flattering data, just as they evidently did with regard to clinical data). The whistleblowers also have extensive troves of non-public evidence that prove Spectrum's fraudulent representation as part of the above quote, not to mention will identify other witnesses to testify as to these matters (you all really are underestimating how many witnesses there are here, and are critically naïve if you think this is just Kellie Moore). The Board should have already collected that extensive non-public evidence (from what we hear, the text messages, written notes, and other non-public evidence are beyond jarring), but breached its duties by failing to do so (SRZ already cited relevant case law on that front, in that a board of directors breaches its duties when it turns a blind eye to red flags). The Board has more than utterly failed here, in virtually every way possible, and we are more than confident will be doing the "walk of shame" out the door if it forces us to shortly take these matters to our fellow stockholders. Exhibit A includes only two pages of the Merger Agreement, just to begin to illustrate how blatant the Spectrum fraud is, and to make it so the Board cannot "unsee" its failures.**

To the extent that the Board has discussed these issues at Board meetings, directors are cautioned that merely voting in support of cooperating with BHG for resolution of these issues (i.e., ending the Spectrum fraud) does not alleviate any such individual Board member of liability for allowing this fraud to continue a moment longer. Each remaining member of the Board *will* be held accountable if the collective Board fails to uphold its duties. **As stated before, we would expect Baker Botts to reach out to SRZ immediately, as we are proceeding with litigation.** This is, again, the last letter we will issue now that the Board has unveiled its preposterous arguments and statements (contradicting yourselves from letter to letter) that you somehow believe will serve you in a proxy contest. We refuse to waste any further time arguing against such nonsense.

Concluding here, we also were made aware that the Company—just days ago—got lucky in successfully pulling the wool over the eyes of the decider in Ms. Moore's pending litigation (the Company aggressively running to the JAMS judge with an apparently false story after BHG's August 20 letter, in clear fear of BHG closing in and of Ms. Moore's cooperation with BHG). Baker Botts did not think that course of action through enough, quite clearly, to now leave Ms. Moore with the ability to litigate the matters outside of private arbitration. If Baker Botts were intelligent, they would have left Ms. Moore's claims in private arbitration. The Company evidently claimed Ms. Moore had a settlement with Spectrum that was not being followed through on (there is no other way the JAMS arbitrator would have believed as such), when you all very well know there was no settlement between the Company and Ms. Moore. The Company has sent Ms. Moore multiple settlement offers, which she never signed, which means a settlement was not reached, and was rejected. In fact, there was never even a neutral present at the half-cocked "mediation" the Company orchestrated, which put a quick end to such a sham mediation session. Relatedly, we demand that all Baker Botts counsel (both the counsel that represented Spectrum in Ms. Moore's litigation and the Baker Botts counsel having signed off on the Baker Botts Letters), and Mr. Schlessinger, swear under penalty of perjury that a settlement with Ms. Moore has been reached and memorialized, and provide us copies of the documents that prove that this is so. That said, we know Mr. Schlessinger will not do so, as that is *yet another* evident false representation by the Company he has now stood behind as Chief Legal Officer. We *also* demand that Mr. O'Grady swear under penalty of perjury that a settlement was reached and memorialized with Ms. Moore, and—if he is unable to bring himself to do so—he needs to either terminate Mr. Schlessinger, or resign

himself, given his apparent failure to adequately oversee Mr. Schlessinger on multiple occasions now. With this last new falsehood perpetuated under the Board, the Company is on notice that it must abstain from falsely representing publicly anything other than Ms. Moore's claims being dismissed (temporarily, since she is entitled to file them again, and sounds like will be doing at the earliest possible moment) without prejudice. If the Company portrays that Ms. Moore's claims were dismissed on their merit, the Board will prove this leadership's dishonesty, yet again.

Once again, we believe the Company's D&O insurer would/will agree that the Board is obligated to provide a copy of this letter as part of a follow-on "notice of circumstance" (or should otherwise be prepared to have any claims related to these matters swiftly contested). The Company also must turn over this letter (and all communications with whistleblowers related to these matters leading up until now, including those private e-mails from whistleblowers to executives including Mr. O'Grady, where he received even further evidence he is apparently turning a blind eye to) to its auditors at Grant Thornton LLP ("**Grant Thornton**"). If BHG ends up meeting with Grant Thornton due to the Board's continued inaction over these issues (we are considering it), we believe Grant Thornton will also see it that they were defrauded (we highly doubt you turned over all relevant documents, between communications with whistleblowers, BHG's letters, and otherwise, as we pointed out your obligation to do in our last letter—you know Grant Thornton would view these as very material issues).

For the avoidance of doubt, BHG reserves all rights, at law and in equity, and waives none.

Very Truly Yours,

Alexander E. Parker
Senior Managing Director
The Buxton Helmsley Group, Inc.

Cc: Peter Staple (Chairman, Assertio Holdings, Inc.)
William T. Mckee (Director, Assertio Holdings, Inc.)
Heather L. Mason (Director, Assertio Holdings, Inc.)
Jeffrey L. Vacirca (Director, Assertio Holdings, Inc.)
Sravan K. Emany (Director, Assertio Holdings, Inc.)
Sigurd C. Kirk (Director, Assertio Holdings, Inc.)
Brendan P. O'Grady (Director and Chief Executive Officer, Assertio Holdings, Inc.)
Ajay Patel (Chief Financial Officer, Assertio Holdings, Inc.)
Matthew Kreps (Investor Relations Officer, Assertio Holdings, Inc.)
Ele Klein (Partner, Schulte, Roth & Zabel, LLP)
Julia Beskin (Partner, Schulte, Roth & Zabel, LLP)
Daniel Goldstein (Special Counsel, Schulte, Roth & Zabel, LLP)

# EXHIBIT A

Section 3.19 Health Care Regulatory Matters.

(a) The Company, and to the knowledge of the Company, each of its directors, officers, management employees, agents (while acting in such capacity), contract manufacturers, suppliers, and distributors are, and at all times prior hereto were, in material compliance with all health care laws to the extent applicable to the Company or any of its products or activities, including, but not limited to the following: the Federal Food, Drug, and Cosmetic Act ("FDCA"); the Public Health Service Act (42 U.S.C. § 201 et seq.), including the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a); the Federal Trade Commission Act (15 U.S.C. § 41 et seq.); the Controlled Substances Act (21 U.S.C. § 801 et seq.); the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); the Physician Payment Sunshine Act (42 U.S.C. § 1320a-7h); the civil monetary penalties law (42 U.S.C. § 1320a-7a); the civil False Claims Act (31 U.S.C. § 3729 et seq.); the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)); the Stark law (42 U.S.C. § 1395nn); the Criminal Health Care Fraud Statute (18 U.S.C. § 1347) and all other criminal laws relating to health care fraud and abuse, including but not limited to 18 U.S.C. §§ 286, 287, 1035, 1349; the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. § 17921 et seq.); the exclusion laws (42 U.S.C. § 1320a-7); Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act) and any other law pertaining to a government sponsored or funded healthcare program, including the collection and reporting requirements, and the processing of any applicable rebate, chargeback or adjustment, under applicable rules and regulations relating to the Medicaid Drug Rebate Program (42 U.S.C. § 1396r-8) and any state supplemental rebate program, Medicare average sales price reporting (42 U.S.C. § 1395w-3a), the Public Health Service Act (42 U.S.C. § 256b), the VA Federal Supply Schedule (38 U.S.C. § 8126) or under any state pharmaceutical assistance program or U.S. Department of Veterans Affairs agreement, and any successor government programs; and the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (42 U.S.C. § 18001 et seq.); any regulations promulgated pursuant to such laws; and any other state, federal or ex-U.S. laws, accreditation standards, or regulations governing the manufacturing, development, testing, labeling, advertising, marketing or distribution of pharmaceutical or biological products, kickbacks, patient or program charges, record-keeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, licensure, accreditation or any other aspect of providing health care, clinical laboratory or diagnostic products or services ("Health Care Laws"). To the knowledge of the Company, there are no facts or circumstances that reasonably would be expected to give rise to any material liability under any Health Care Laws.

(b) The Company is not party to any corporate integrity agreements, monitoring agreements, deferred or non-prosecution agreements, consent decrees, settlement orders, or similar agreements with or imposed by any Governmental Entity.

(c) All applications, notifications, submissions, information, claims, reports and statistical analyses, and other data and conclusions derived therefrom, utilized as the basis for or submitted in connection with any and all requests for a Permit from the U.S. Food and Drug Administration ("FDA") or other Governmental Entity relating to products that are regulated as drugs, medical devices, or other healthcare products under Health Care Laws, including biological and drug candidates, compounds or products being researched, tested, stored, developed, labeled, manufactured, packed and/or distributed by the Company or any of its Subsidiaries ("Company Products"), including, without limitation, investigational new drug applications, when submitted to the FDA or other Governmental Entity were true, complete and correct in all material respects as of the date of submission and any necessary or required updates, changes, corrections or modification to such applications, submissions, information and data have been submitted to the FDA or other Governmental Entity. The Company does not have knowledge of any facts or circumstances that would be reasonably likely to lead to the revocation, suspension, limitation, or cancellation of a Permit required under Health Care Laws.

(d) All preclinical studies and clinical trials conducted by or, to the knowledge of the Company, on behalf of the Company have been, and if still pending are being, conducted in material compliance with research protocols and all applicable Health Care Laws, including, but not limited to, the FDCA and its applicable implementing regulations at 21 C.F.R. Parts 50, 54, 56, 58, 312, 314 and 601. No clinical trial conducted by or on behalf of the Company has been conducted using any clinical investigators who have been disqualified, debarred or excluded from healthcare programs. No clinical trial conducted by or on behalf of the Company has been terminated or suspended prior to completion, and no clinical investigator who has participated or is participating in, or institutional review board that has or has had jurisdiction over, a clinical trial conducted by or on behalf of the Company has placed a partial or full clinical hold order on, or otherwise terminated, delayed or suspended, such a clinical trial at a clinical research site based on an actual or alleged lack of safety or efficacy of any Company Product or a failure to conduct such clinical trial in compliance with applicable Health Care Laws, their implementing regulations and good clinical practices. The Company has not identified or received notice of instances or allegations of research misconduct (defined as falsification or fabrication of data, or plagiarism, as those terms are defined in 42 C.F.R. Part 93) involving research conducted by, or on behalf of the Company, that could compromise or affect the integrity, reliability, completeness, or accuracy of the data collected in such research, or the rights, safety, or welfare of the research subjects.

(e) All manufacturing operations conducted by or, to the knowledge of the Company, for the benefit of the Company have been and are being conducted in material compliance with all Permits under applicable Health Care Laws, all applicable provisions of the FDA's current good manufacturing practice (cGMP) regulations for pharmaceuticals and biological products at 21 C.F.R. Parts 210, 211, 600 and 610 and all comparable foreign regulatory requirements of any Governmental Entity.

(f) The Company has not received any written communication that relates to an alleged violation or noncompliance with any Health Care Laws, including any notification of any pending or threatened claim, suit, proceeding, hearing, enforcement, investigation, arbitration, import detention or refusal, FDA Warning Letter or Untitled Letter, or any action by a Governmental Entity relating to any Health Care Laws. All Warning Letters, Form FDA-483 observations, or comparable findings from other Governmental Entities listed in <u>Section 3.19</u> of the Company Disclosure Letter have been resolved and closed out to the satisfaction of the applicable Governmental Entity.

(g) There have been no seizures, withdrawals, recalls, detentions, or suspensions of manufacturing, testing, or distribution relating to the Company Products required or requested by a Governmental Entity, or other notice of action relating to an alleged lack of safety, efficacy, or regulatory compliance of the Company Products, or any adverse experiences relating to the Company Products that have been reported to FDA or other Governmental Entity ("<u>Company Safety Notices</u>"), and, to the knowledge of the Company, there are no facts or circumstances that reasonably would be expected to give rise to a Company Safety Notice.

# Exhibit 8

# Buxton Helmsley Issues Letter to Assertio Stockholders Disclosing Inversion to Short Position Following Board Refusal to Address Product-Related Fraud

*Well-Documented Evident Product-Related Fraud Related to the Acquisition of Spectrum Pharmaceuticals' Rolvedon Biologic Illuminates the Basis for Assertio's Massive Write-Down of Spectrum Immediately After Acquisition*

*Assertio Board Has Overseen Evident "Hush Money" Offers to Whistleblowers who Have Privately Raised Concerns and Evidence Relating to Rolvedon*

*Extensive Evident Fraud, Coupled with Assertio Chairman Peter Staple's Continued Refusal to Speak with BHG, Implicating Evident Liability at Parent Company Level, Has Driven BHG to Invert to Short Position*

*Warns Assertio Stockholders to Conduct Appropriate Diligence and to Consider Abandoning Stock Ownership*

November 08, 2024 09:00 AM Eastern Standard Time

NEW YORK--(BUSINESS WIRE)--The Buxton Helmsley Group, Inc. (together with certain of its affiliates, "BHG" or "we"), a New York City-based investment fund manager that has now inverted its long equity position into that of a short interest in the publicly traded securities of Assertio Holdings, Inc. ("Assertio" or the "Company") (NASDAQ: ASRT), today released an open letter to Assertio stockholders.

"Today, BHG has sadly been forced to issue a letter to Assertio stockholders, in light of the board of directors' refusal to engage over evident product-related fraud and misconduct uncovered by multiple former Spectrum executives-turned-whistleblowers, who have continued sounding the alarm over severe and ongoing safety matters that are continuing to put cancer patients at risk," said Alexander Parker, Senior Managing Director of BHG.

"Despite extensive attempts by BHG to persuade Assertio's leadership to address these serious matters, the board of directors and management team have continued to opt for a 'head in the sand' approach to avoid admitting colossal due diligence failures as part of the Spectrum acquisition, at the expense of Assertio's stockholders and to the detriment of cancer patients. We believe the timeline for the Spectrum acquisition was rushed because Assertio's leadership was aware that its own flagship product, Indocin, was at imminent risk of losing exclusivity and facing generic competition. It is well-known in the pharmaceutical industry when the 'patent cliff' of a branded product is about to expire. To be clear, it appears to us that both Assertio stockholders and Spectrum stockholders were defrauded as part of the Assertio-Spectrum merger, and that the fraud is continuing, as is thoroughly detailed within today's open letter. To ensure the validity of these corroborating allegations from multiple former Spectrum executives-turned-whistleblowers, BHG engaged outside counsel to conduct an independent investigation, which included the review of substantial non-public evidence related to these matters.

"Assertio's board has continued with a 'head in the sand' approach, even after being notified by BHG that the whistleblowers had received inquiries regarding Rolvedon from the U.S. Department of Health and Human Services, U.S. Center for Medicare and Medicaid Services, and the U.S. FDA's Center for Biologics Evaluation and Research (CBER).

The board has claimed a "thorough investigation" of the whistleblower allegations, even though they have never asked for the whistleblowers' extensive non-public evidence supporting their allegations, making clear that a sham investigation occurred, at best. Assertio's leadership has continued to receive non-public evidence from the whistleblowers via e-mails since BHG's investigation began, and has never responded to any of those e-mails, other than a non-substantive effective autoreply.

"Had Assertio's leadership acted in accordance with its fiduciary duties, stockholders would not have been exposed to this evident imminent catastrophe. We urge all stockholders to read the below-linked open letter very carefully, and consider the implications of net asset insolvency on the value of their investment in Assertio. BHG intends to donate a portion of any profits to the Cancer Research Institute of New York, a nonprofit organization. Although our initial intent was to create value by seeking change to the Assertio board, subsequently identified information has led us to conclude that it would require an utter miracle for Assertio's equity value to have any value now, following the board's endless betrayals and failures to address such well-documented and evident product-related fraud," ended Parker.

The full letter to Assertio's stockholders, issued today, in addition to the extensive private correspondence between BHG and Assertio's leadership, may be found at: https://www.buxtonhelmsley.com/asrt/

**About Buxton Helmsley**

The Buxton Helmsley Group, Inc. is a New York City-based investment advisory firm and fund manager, engaging both active and passive investment strategies across a range of asset classes, with a general focus on opportunities in North America and Europe. The investment approach is based on deep fundamental analysis and risk management, with a focus on ensuring disclosure obligations are being upheld under applicable accounting standards and securities laws.

**Disclosure:** We hold a short position in the securities of ASSERTIO HOLDINGS, INC. (NASDAQ:ASRT)

**Legal Disclaimer:**
The use of Buxton Helmsley Group, Inc.'s ("BHG") research and analysis is at your own risk. In no event will BHG or any affiliated party be liable for any direct or indirect trading losses caused by any information in this letter. You further must do your own research and due diligence, and consult with your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that as of the publication date of any BHG letter, BHG (possibly along with or through our members, partners, affiliates, employees, and/or consultants) has a short position in the stock, bonds, derivatives or securities covered herein, and therefore stands to realize significant gains in the event that the price of the securities of the issuer discussed in this letter declines. Following publication of this letter, BHG intends to continue transacting in the securities covered therein and may be long, short, or neutral at any time thereafter regardless of BHG's initial position or views. BHG's investments are subject to its risk management guidance, which may result in the de-risking of some or all of its positions at any time following publication of any report or letter depending on security-specific, market or other relevant conditions. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. BHG is registered as an investment advisor with the State of New York. To the best of BHG's knowledge and belief, and except as otherwise described herein, all information contained herein is accurate and reliable, and has been obtained from public sources believed to be accurate and reliable, and who are not currently insiders or, to BHG's knowledge, who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer discussed in this letter. Such information is presented "as is," without warranty of any kind – whether express or implied. BHG makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any information contained herein, or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and BHG does not undertake to update or supplement this report or any of the information contained herein or its position in any securities.

**Cautionary Statement Regarding Forward-Looking Statements:**
The information herein contains "forward-looking statements." Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "may," "will," "expects," "believes," "anticipates," "plans," "estimates," "projects," "potential," "targets," "forecasts," "seeks," "could," "should" or the negative of such terms or other variations on such terms or comparable terminology. Similarly, statements that describe our objectives, plans or goals are forward-looking. Forward-looking statements are subject to various risks and uncertainties and assumptions. There can be no assurance that any idea or assumption herein is, or will be proven,

correct or that any of the objectives, plans or goals stated herein will ultimately be undertaken or achieved. If one or more of such risks or uncertainties materialize, or if BHG's underlying assumptions prove to be incorrect, the actual results may vary materially from outcomes indicated or suggested by these statements. Accordingly, forward-looking statements should not be regarded as a representation by BHG that the future plans, estimates or expectations contemplated will ever be achieved.

## Contacts

**Media:**

Buxton Helmsley Group

Press@BuxtonHelmsley.com

# Exhibit 9

businesswire
A BERKSHIRE HATHAWAY COMPANY

# Buxton Helmsley Releases Evidence of Product-Related Fraud at Assertio

*Evidence Corroborates Allegations of Multiple Former Executives*
*Calls on Assertio Board to Release Full Investigation Report and Supporting Materials*

November 11, 2024 03:41 PM Eastern Standard Time

NEW YORK--(BUSINESS WIRE)--The Buxton Helmsley Group, Inc. (together with certain of its affiliates, “BHG” or “we”), a New York City-based investment fund manager that has inverted its long equity position into that of a short interest in the publicly traded securities of Assertio Holdings, Inc. (“Assertio” or the “Company”) (NASDAQ: ASRT), today responded to the Company’s attempt to deny, in its November 11, 2024, press release, the evident product-related fraud at Spectrum Pharmaceuticals, Inc., now wholly-owned by Assertio.

“The statement from Assertio this morning is a blanket response that, tellingly, does not even bother to rebut BHG’s specific allegations—it does not even deny the ‘hush money’ offers to whistleblowers. Instead, the Company is attempting to ‘shoot the messenger’ instead of addressing its failure to properly investigate these matters. Assertio apparently wishes to continue its evident product-related fraud that, as a byproduct, also appears to be defrauding Assertio investors. In defense of the validity of BHG’s claims, we have released an initial set of evidence so that shareholders and regulators can judge for themselves where the truth lies,” said Alexander Parker, Senior Managing Director of BHG.

“For example, within the evidence set we have released, shareholders will see a memo from Spectrum’s former Executive Director of Clinical Operations to Spectrum’s former SVP of Clinical Development and former SVP of Clinical Science about a request to delete adverse event data from Spectrum’s database, which is fraudulent conduct. The pages from site audit reports reveal ‘Major’ discrepancies in clinical trial data and cite insufficient training for clinical trial staff. Although whistleblowers sent Assertio’s leadership those site audit reports in private e-mails, Assertio is still issuing statements that say Spectrum’s clinical trials were not ‘Major[ly]’ flawed across multiple products. The site audit reports tell the real story, and this is just one example of the full volume of material we will hand over to regulators.

“Given the misleading claims from Assertio to date, particularly the claim that the Company investigated the corroborating whistleblower allegations, we call on Mr. O’Grady and the rest of Assertio’s board of directors to release: (i) the full report of its investigation; (ii) documentation that it actually communicated with the whistleblowers; and (iii) documentation confirming it obtained materials from the whistleblowers. Shareholders will note that the investigation, if it ever occurred at all, never collected or reviewed the whistleblowers’ supporting evidence – the Company did not even communicate with the whistleblowers in writing. BHG believes this raises substantial questions about the validity of the investigation’s conclusions and the judgment of the board, which accepted the investigation report.

“If the Assertio board’s preferred path is to continue denying the fraud at Spectrum and the pathetically inadequate due diligence leading up to the Spectrum acquisition, we agree with Assertio that regulatory attention is warranted. For its part, BHG is already seeking to engage with the U.S. SEC about these matters, having filed a whistleblower complaint with the agency. The materials we are prepared to turn over include the evidence released to stockholders today, supplemented by vast additional material possessed by the Spectrum whistleblowers.

"The next step will be made by the Assertio board. If they wish to acknowledge reality and pivot to seek to cure the Company and the board's related liability, we will applaud their decision to reverse course and accept responsibility for past mistakes. If they continue to deny the validity of our evidence-backed assertions, we will continue taking steps to cast light on their considerable evident malfeasance," concluded Parker.

An initial set of the referenced evidence, which has been reviewed by legal counsel, may be found at: https://www.buxtonhelmsley.com/asrt/

***

**About Buxton Helmsley**

The Buxton Helmsley Group, Inc. ("BHG") is a New York City-based investment advisory firm and fund manager, engaging both active and passive investment strategies across a range of asset classes, with a general focus on opportunities in North America and Europe. The investment approach is based on deep fundamental analysis and risk management, with a focus on ensuring disclosure obligations are being upheld under applicable accounting standards and securities laws.

**Disclosure:** BHG holds a short position in the securities of ASSERTIO HOLDINGS, INC. (NASDAQ:ASRT)

**Legal Disclaimer:**
The use of BHG's research and analysis is at your own risk. In no event will BHG or any affiliated party be liable for any direct or indirect trading losses caused by any information in this press release. You further must do your own research and due diligence, and consult with your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that as of the publication date of this communication, BHG (possibly along with or through our members, partners, affiliates, employees, and/or consultants) has a short position in the stock, bonds, derivatives or securities covered herein, and therefore stands to realize significant gains in the event that the price of the securities of the issuer discussed in this press release declines. Following publication of this press release, BHG intends to continue transacting in the securities discussed herein, and may be long, short, or neutral at any time thereafter regardless of BHG's initial position or views. BHG's investments are subject to its risk management guidance, which may result in the de-risking of some or all of its positions at any time following publication of any report or letter depending on security-specific, market or other relevant conditions. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. BHG is registered as an investment advisor with the State of New York. To the best of BHG's knowledge and belief, and except as otherwise described herein, all information contained herein is accurate and reliable, and has been obtained from public sources believed to be accurate and reliable, and who are not currently insiders or, to BHG's knowledge, who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer discussed in this press release. Such information is presented "as is," without warranty of any kind – whether express or implied. BHG makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any information contained herein, or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and BHG does not undertake to update or supplement this report or any of the information contained herein or its position in any securities.

**Cautionary Statement Regarding Forward-Looking Statements:**
The information herein contains "forward-looking statements." Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "may," "will," "expects," "believes," "anticipates," "plans," "estimates," "projects," "potential," "targets," "forecasts," "seeks," "could," "should" or the negative of such terms or other variations on such terms or comparable terminology. Similarly, statements that describe our objectives, plans or goals are forward-looking. Forward-looking statements are subject to various risks and uncertainties and assumptions. There can be no assurance that any idea or assumption herein is, or will be proven, correct or that any of the objectives, plans or goals stated herein will ultimately be undertaken or achieved. If one or more of such risks or uncertainties materialize, or if BHG's underlying assumptions prove to be incorrect, the actual results may vary materially from outcomes indicated or suggested by these statements. Accordingly, forward-looking statements should not be regarded as a representation by BHG that the future plans, estimates or expectations contemplated will ever be achieved.

Contacts

**Media:**

Buxton Helmsley Group

Press@BuxtonHelmsley.com

# Exhibit 10

BUXTON HELMSLEY
NEW YORK | EST. 2014

November 8, 2024

Dear Assertio Holdings, Inc. ("**Assertio**" or the "**Company**") Stockholders:

The Buxton Helmsley Group, Inc. (together with certain of its affiliates, "**BHG**" or "**we**") regrettably announces that we have inverted our long position in Assertio's stock into a short position. Similar to the losses incurred by many Assertio stockholders, BHG realized a minor loss when divesting our long position in the Company's stock.

To be perfectly clear, BHG's mission is dedicated to protecting and maximizing value for stockholders. However, securing such value requires joint cooperation and collaboration, which certain boards of directors may stonewall, as has been the case here. More importantly, it requires a willingness to admit and address mistakes on the part of a board of directors.

Building value for stockholders requires a board of directors willing to work together to fix any and all underlying issues, rather than a board of directors that tries to bury those issues, refuses to engage over them, and betrays and deceives to the point of collapsing the enterprise. It is an investor's biggest mistake to remain committed to an investment position where circumstances have so materially changed to the negative. While BHG had planned to engage in a proxy contest, there is no reason to bear the expense of a proxy contest when we so firmly believe the Company's equity to be worthless (i.e., no equity value to fight for) after such appalling, destructive betrayals by its leadership, both management and Assertio's board of directors.

BHG hopes this will be the last short sale we are ever forced to engage in, very pointedly.

Case in point, we would much rather have an outcome like we achieved at Fossil Group, Inc. (NASDAQ: FOSL):

> In March 2024, BHG secured board-level representation at Fossil and added critically required expertise to fill gaps on its board of directors. Fossil voluntarily agreed to add such expertise to its board of directors, given its ultimate willingness to engage and collaborate with BHG. Within three months of Fossil agreeing to collaborate with BHG, Fossil's equity market capitalization had climbed ***over 80%.*** *That* is what we wish to happen in every company we become involved in; however, such requires both cooperation and the willingness of boards of directors to engage and productively collaborate in good faith with BHG.

* * *

Over the past several months, in numerous instances of private correspondence with Assertio's board of directors (the "**Board**"), BHG has tirelessly attempted to advocate for the survival of Assertio stockholder interests, even after our grim findings. However, we firmly believe that Assertio equity now has zero long-term value, and will shortly have virtually zero value in the open market after the enlightening of stockholders as to the reality here; that is, the catastrophic tangible exposure here quickly turns horrific when exposed under that glaring and indefensible floodlight of evident tort-related product liability that that we foresee as being rapidly and

imminently revealed and then asserted against the Company after a public discussion of these matters by BHG. If, after releasing this letter to Assertio stockholders, we question whether public market participants genuinely understand why we so firmly believe Assertio has zero net asset (equity) value, we believe it would be a disservice not to enlighten public market participants a bit further, through the release of such extensive supporting evidence related to these exceptional matters. The very point of this discussion is not just to illuminate our findings, but rather to urge stockholders not to lose more on their investment by clinging onto hope in the face of such circumstances, not to mention an evidently misplaced trust in the, clear to us, corrupted leadership that caused such issues.

BHG took our loss on our equity holding, and we would advise other stockholders to do the same. Assertio's stockholders can thank the Board for such evident betrayals, although we anticipate that, instead of gratitude, the Board will be met with an onslaught of class-actions and other stockholder litigation. This could have ended so very differently.

By the end of this letter, we believe that Assertio's stockholders will firmly understand BHG's foundation for its views/beliefs that:

- While Assertio's Board and management claim the Company is "well-funded," we believe Assertio is, in fact, firmly **net asset insolvent** (i.e., *the liabilities in reality far exceed the Company's assets, on a consolidated basis, while not yet recorded on the Company's balance sheet*). Such liability gets compounded by the catastrophic expense and exposure to be incurred under that tort and product liability, which has not yet been asserted (but we believe it will be imminently and rapidly asserted after this public letter) due to evident product-related fraud. The Board has adopted a "*hear no evil, see no evil"* approach, which will now cost stockholders immensely, given the Board's betraying of stockholders through such a reckless approach.
- **As will also be made clear why by the end of this letter, we believe the value of Rolvedon is actually worthless due to the evident clinical data falsification and tampering, misrepresentations as to certain severe adverse events and other safety data that collectively impacts the product and taints such product's regulatory submission to FDA, which we—more pointedly—believe will result in an adverse regulatory action, including without limitation, the imminent revocation of the Rolvedon (initially investigated and FDA approved as "Rolontis" and then marketed as Rolvedon) product approval by the FDA, given the Board's prior-mentioned "*hear no evil, see no evil*" non-response to such serious risk matters. At a minimum, we expect the FDA to immediately initiate and take all such regulatory and compliance enforcement action prudent and necessary for patient safety and in the public interest thereafter.**
- **In the event that FDA shockingly decides to delay and/or not take affirmative action towards investigating, restricting and/or revoking its prior product approval and/or commercial authorization to market and sell Rolvedon/Rolontis, such a lack of action by the FDA would merely work against public policy and the public interest in commercially selling only safe, effective and compliant medical products. Any federal agency and/or authority inaction would also be expected to fuel public anger, raise realistic suspicions regarding product safety, thereby effectively crippling Rolvedon's market potential.**
- **Furthermore, any perceived inaction by FDA would only serve to incentivize other illegal conduct within the medical product industry; including, for example, safety data editing/tampering efforts to obtain wrongful approval of future drugs to be evaluated by the FDA.**
- **Under such circumstances, we do not see the FDA setting up a precedent where Assertio's profits will be allowed to continue to flow when based on a foundation of tampered and edited clinical records in addition to unreported serious adverse events and other safety data. Instead, we would**

**not be surprised to see the FDA making a *very* firm example out of not only Spectrum and Assertio, but—even more importantly—their respective leaderships. We also believe, beyond the FDA taking action, that CMS will feel forced to take further action by retracting the unique "J-Code" associated with Rolvedon, which would cut off significant government funding that Spectrum critically relies on.**

- The Board has committed serious betrayals as fiduciaries to the Company, resulting in (our belief, given our interactions with Assertio's Board and management) a likely absence of adequate insurance coverage for this evident mass tort and product liability. Consequently, we firmly believe that Assertio's equity has no long-term value,[1] a reality we expect will be reflected in the open market over the coming days as public market participants digest this letter and the extensive accompanying private communications between BHG and Assertio's leadership.
- This significant tort and product liability is now (obvious to us) the reason why the Company has effectively refused to engage in share repurchases. That is, not only due to the apparent securities fraud at hand, but also given that any Assertio' share repurchases under the circumstances of such apparent net asset insolvency would then almost surely constitute fraudulent conveyances under the U.S. Bankruptcy Code.
- Between BHG's engagement with the Board and Assertio's claims of being "well-funded" while its stock trades at supposedly "undervalued" levels, there has been a clear disconnect between Assertio's leadership's words and actions from the beginning. We were far from convinced (and greatly discomforted) when Assertio's Audit Committee Chair (Sravan K. Emany) and CFO (Ajay Patel) stated they were "not following" BHG's direct questions during a closed-door meeting on May 7, 2024 (the "**May 7 Meeting**"). The questions we posed were straightforward, and our independent forensic accounting consultants have had *zero* issues understanding our questions, in addition to our basis for asking them. It became clear, at that point, that Assertio's leadership was simply "playing dumb" to conceal something—we now know what that is, and now all stockholders will too.
- Under the current circumstances, Assertio cannot engage in any further M&A that involves the issuance of any securities tied to Assertio's existing capital structure—as the Board has now entirely tied the Company's hands. Furthermore, any of Assertio's newly issued securities would be a further byproduct of the evident ongoing fraud (*multifaceted, between the evident product-related fraud, investor fraud, etc*.). We also believe no counterparty would (with full disclosure of the reality, yet far belatedly, that would be) be willing to receive equity (or any other security interests) linked to a company with such significant tort-related liability, especially now that this liability appears to be firmly implicated at the parent company level. We think it would be nothing short of a miracle if that weren't the case, considering the Board's "*head in the sand*" approach to these matters. Unfortunately, while the Board's gross failures in responding to these issues have not only implicated—in our view—likely personal liability for each of the Board members themselves, such gross failures also have almost certainly also guaranteed the tort-related product liability to exist at the parent company level, too, given that is where the Board serves.
- Assertio's Board and management have personally implicated themselves in these matters in such a way that we believe it would be—in our view—very unlikely that director and officer insurance coverage would cover stockholder losses, given our alarming private communications with the Board, attached hereto. Has the Board, under its indemnification agreements, already begun siphoning millions of dollars from the Company's coffers as a means of defending themselves against their own apparent investor betrayals? For certain reasons we will not get into here, we believe yes.

[1] That is, no equity value unless and until Assertio's capital structure can be forcefully reorganized through a court-overseen restructuring to discharge a significant portion of this evident catastrophic tort-related liability that, clear to us, far exceeds Assertio's asset values on a consolidated basis.

- Intriguingly, if stockholders recall, the ***Board attempted to pass*** a resolution that would have meant providing themselves with a ***platinum-level, 110% indemnification coverage*** under Delaware law, but suspiciously couldn't/didn't explain why they believed their current indemnification coverage was inadequate for their realistically possible personal liability. Our findings indicate the Board's concerns regarding their need for enhanced indemnification were *more than* well-founded. However, the Board chose not to disclose those reasons. BHG is enlightening stockholders as to those issues here, despite the then-apparent disclosure failures on the part of Assertio's Board and management.
- By the time the substantial expected tort-related and product liability claims reach a settlement or are litigated to verdict, we do not believe the Board will possess the personal financial resources to repay the Company for their personal defense costs advanced from the Company piggy bank under their indemnification agreements, when they may simply personally file for bankruptcy to discharge the indemnification-related debts. By the time of the "CYA" spend-down coming to a grinding halt (i.e., the Board having depleted Company's financial resources through the use of Company funds for their personal defense), we anticipate the Company will then also *far* lack sufficient financial resources to cover all settlements or verdicts stemming from the expected wave of tort-related product liability litigation BHG believes will emerge shortly (and rapidly) after we have been forced to publicly bring attention to these issues. It is clear to us that, by the time that the civil liability to government entities, cancer patients, and their grieving families could be settled, it is a pipe dream to think that there will be enough funds to pay those harmed parties (and regulators), let alone stockholders. And, that is far from the only expected litigation to be had. A lawyer's dream, we see this situation rapidly descending into a corporate version of lions and a carcass. Stockholders all have "front-row tickets" to the party (their equity ownership), but do they really wish to keep holding on to that equity, or would they like to sell it before no possible counterparty desires to take it off their hands? BHG realized what a mistake it would be not to sell our equity, and that was far from an easy decision.
- After this letter, let's be realistic: BHG has done everything we possibly could to avoid publicizing these issues, but the Board has far from engaged in good-faith. Assertio's Chairman refusing to *even speak* with BHG, hiding behind the Board's lawyers, very tellingly. Such a "head in the sand" reaction unfortunately implicates the tort-related liability at the parent company level, too. It is now obvious that, since we have been forced to inform stockholders of these serious issues publicly, the Board will have paved the way for Assertio's competitors to seize the opportunity to cannibalize their competitor due to such gross inaction and failures. Why would a company like Amgen (NASDAQ: AMGN) (maker of Neulasta, a competing drug to Rolvedon, or the maker of any of the other Neulasta biosimilars on the market) not take every action in their power to get their competitor shut down in the face of such egregious matters coming to light? BHG, as can be seen from the below-attached letters, did everything we could to avoid this happening. Assertio stockholders have no one to blame but their Board and management here.

**Given the issues at hand involving the evident victimization of cancer patients, BHG intends to make a donation to a cancer-focused charity after closing our short position, using a portion of the profits expected to be realized over the near-term. A portion of these anticipated "profits" will cover the significant professional fees incurred during our pursuit of these matters. BHG undertook these expenses in the hope that they would ultimately benefit all stockholders (providing our expertise to help stockholders), but that required the cooperation of Assertio's Board and management, which was not forthcoming in the slightest—you can only bring a horse to the water. However, stockholders can and should hold their Board and management accountable for the lack of a positive outcome.**

**We did not wish to sell short here, but the Board left us with no choice after hiding behind its lawyers and refusing to engage with BHG, fully aware they were caught "red-handed." The Board thereby created**

**significant liability risk exposure for the Company through their colossal due diligence failures and inability to come clean about, let alone address/correct, them.**

*   *   *

For background, on May 17, 2024, BHG issued a press release publishing the preliminary report from a dual-CPA/Certified Fraud Examiner (the "**May 17 BHG Press Release**"), attesting to the reasonableness of BHG's grave concerns and suspicions surrounding Assertio's sudden, massive nearly 75% write-down of Spectrum Pharmaceuticals, Inc. ("**Spectrum**"), with a stated basis for the impairment charge that was both ambiguous and illogical under the Company's circumstances.

**Less than a *quarter* after the date of Assertio's acquisition of Spectrum, the Board oversaw the ~75% write-down (*thereby admitting to having massively overpaid for Spectrum*), yet acting as though nothing was materially misrepresented to them as part of the acquisition—entirely suspicious.** Put simply, the Board rushed to expedite the Spectrum acquisition closing, and it blew up in their face.

Within days after the May 17 BHG Press Release, BHG spoke with Spectrum's former Senior Counsel for Global Research and Development (the "**First Spectrum Whistleblower**"). The First Spectrum Whistleblower, with decades of experience in the area of biologic pharmaceutical regulation and product development, had refused to sign off on the initial biologic license application ("**BLA**") for Rolvedon (then, Rolontis), given that **Spectrum had—among many other issues of research misconduct—tampered with a material amount of clinical data that showed, after study subjects were dosed with Rolvedon, their bodies were creating pre-cancerous oncolytic blood blasts.** Not only was this clinical data tampered with to create a fraudulent BLA, but the study subjects and their doctors were *never notified* that such a detrimental health risk issue had developed over the course of the Rolvedon clinical trials (in violation of health care laws and Spectrum's direct promise as made to each of those cancer patients in the Rolontis Study's Informed Consent Form that each of those study subjects signed prior to their enrollment in the study).

Those study subjects' notice of such a critical health issue developed after participating in the Rolvedon/Rolontis clinical trials, which was absolutely required to be reported under their Informed Consent Form, is now coming from BHG (*not* Spectrum)—*years* after it should have been disclosed by Spectrum to those study subjects and their doctors.

Beyond the issue of tampered clinical data (and other misconduct as part of the research and development process), the initial Rolvedon BLA was also filed even though missing multiple required sections and other contents (i.e., it was "*dead on arrival*," once submitted to the U.S. FDA, just based on the missing sections alone, before even considering the clinical data integrity issues). Spectrum executives were still determined to submit Rolvedon/Rolontis BLA #1[2] to the FDA, given that Spectrum's executives contractually triggered a large bonus (shockingly approved as reasonable by Spectrum's board of directors) by submitting effectively *anything* in the form of a BLA by the end of 2018—a performance incentive in no way aligned with Spectrum stockholder interests (not to mention, cancer patients).

The issue of the Rolvedon/Rolontis BLA #1 being wholly insufficient and incomplete was the reason for it being entirely withdrawn shortly after being filed (causing Spectrum's stock price to drop significantly). We bring this issue up as it goes to show the level of (clear to us, no) "*care*" Spectrum's pre-acquisition leadership had for upholding their duties to not act selfishly, but rather, in the interests of their stockholders.

[2] The Rolvedon/Rolontis BLA was submitted *three* times in total, spanning from 2018 to 2022.

So, none of this should come as a surprise to stockholders. The pattern of an inability to uphold fiduciary duties at Spectrum is beyond glaring.

The First Spectrum Whistleblower had raised and reported these issues of misconduct repeatedly to not only Spectrum's pre-acquisition Chief Compliance/Legal Officer, Keith McGahan (then, a Section 16 officer of Spectrum), but also to other high-level Spectrum executives as well as Spectrum's Compliance team[3] (which Mr. McGahan ultimately oversaw), repeatedly.

Despite Mr. McGahan having received written reports of such egregious research misconduct, he stood behind the following representation (while still holding his position Chief Compliance/Legal Officer) on page 33 of the Assertio-Spectrum merger agreement ("**Spectrum Merger Agreement**"):[4]

> **"[*Spectrum] has not received any written communication that relates to an alleged violation or noncompliance with any Health Care Laws*…"**

If that does not constitute evident securities fraud, we do not know what does. There are also numerous other blatant misrepresentations within the Spectrum Merger Agreement, not only on page 33 but also on page 32, among others. If Mr. McGahan suffers from such deficient mental capacity, we believe he should be immediately stripped of his law license by the North Carolina State Bar (copied here) and barred by the U.S. SEC from ever serving in a fiduciary capacity at a public company again in the future. According to Mr. McGahan's LinkedIn profile, he is now the Chief Legal Officer of ALG Senior, based in Hickory, North Carolina.[5] Would such a senior living-focused facility wish to continue its employment of Mr. McGahan after hearing about what he stood behind at Spectrum? Mr. McGahan is also apparently a board member at Provectus Alliance and WiNK Therapeutics.

**The First Spectrum Whistleblower, after a complete failure by Spectrum's executives and Compliance team to address the issues, went so far as to ultimately raise the issues of misconduct directly to Spectrum's pre-acquisition Chairman William Ashton (whom the First Spectrum Whistleblower has personal phone calls, text messages and e-mails with—**back when Chairman Krassner led Spectrum's board of directors).

Mr. Ashton did *nothing* and, in fact, decided to stick his head "in the sand," as was communicated to the First Spectrum Whistleblower who received a notice from Spectrum's outside counsel that she should not send Mr. Ashton any further reports of Spectrum misconduct directly, ever again. That was, however, after Mr. Ashton had already spoken with and e-mailed the First Spectrum Whistleblower requesting more information and subsequently, he clearly must have realized that he would be *sunk* if the material information he had been receiving was ever seen by regulators (or prosecutors). It should be noted that while Mr. Ashton

---

[3] As noted in Spectrum's 2018 *Code of Business Conduct and Ethics*, all e-mails sent to Spectrum's designated e-mail address for its Compliance department ("**compliance@sppirx.com**"), were then further distributed to former Spectrum Chief Legal/Compliance Officer Keith McGahan, and other former Spectrum employees including Justin Underwood, Esq., Stanton Gregg Kunzi,, Esq. Ritesh Srivastava, Esq., Jennifer Barbere, and Melissa Cox-Swanson. That ***Code of Business Conduct and Ethics*** also stated the requirement that (pg. 26) "***all accounting-related complaints and other serious compliance-related complaints are reported to the CEO/Board of Directors***." Thus, Spectrum's board of directors (including current Board member Dr. Jeffrey Vacirca) must know all about these matters.

[4] Spectrum Merger Agreement, dated April 24, 2023: https://www.sec.gov/Archives/edgar/data/831547/000110465923049367/tm2313548d2_ex2-1.htm

[5] LinkedIn profile of Keith McGahan (Last Accessed November 8, 2024): https://www.linkedin.com/in/keith-mcgahan

had been Spectrum's pre-acquisition Chairman, he did not hold the Chair title at the time of his communications with the First Spectrum Whistleblower, which implies and effectively implicates that the rest of the Spectrum board of directors (including the then-Chairman Krassner and the current Board member Dr. Jeffrey Vacirca) almost surely knew of the issues of misconduct being raised to him, too (that was, after all, the stated policy from within the previously footnoted *Code of Business Conduct and Ethics* for Spectrum)—it would be entirely illogical that Mr. Ashton would have kept the issues to himself, to then have only implicated himself in the matters.

> **To shine upon them the spotlight they deserve, Spectrum's board of directors during this time period included:**[6] 1) Joseph W. Turgeon; 2) William L. Ashton; 3) Raymond W. Cohen; 4) Elizabeth A. Czerepak; 5) Jeffrey L. Vacirca, M.D., FACP; 6) Dolatrai M. Vyas, Ph.D.; 7) Bernice R. Welles, M.D., M.B.A.; 8) Anthony Maida, III, M.A., M.B.A., Ph.D.; 9) Gilles R. Gagnon, M.Sc., M.B.A., ICD.D; and 10) Stuart M. Krassner, Sc.d., Psy.d.

**Interestingly, Mr. Krassner (then, Spectrum's Chairman) opted *not* to stand for re-election to Spectrum's board of directors after the First Spectrum Whistleblower had spoken with and exchanged written communications with the then-board member William Ashton about the Spectrum misconduct he sought more information regarding and she reported witnessing.**

**Also interestingly, Ms. Czerepak only served on Spectrum's board of directors for *one year* before departing (departing just after the Spectrum Whistleblowers were reporting the Spectrum fraud, even to the Board, left and right).**

We will also pose the obvious question: *Why would Mr. Ashton be so worried as to change his mind and stop all communication so as to not receive any further information from the First Spectrum Whistleblower if it were not problematic?* It is a horrible optic when a fiduciary refuses to hear from an internal whistleblower—there is simply no reason why a fiduciary would cut off communications with a whistleblower other than if he or she were worried about plausible deniability. Mr. Ashton, clearly hoping for plausible deniability, had none left.

Ironic, but not shocking to BHG, Mr. Ashton was, just months ago, serving on the board of directors of the same public pharmaceutical company as Bryan Reasons, who is *still* (*somehow*) the Chief Financial Officer of Mallinckrodt plc., where BHG—in March 2023—discovered and exposed Mr. Reasons' oversight of a *repeat* multibillion-dollar accounting and securities fraud scheme. After BHG published a nearly 40-page report detailing how Mr. Reasons had evidently defrauded investors during the first round of the evident accounting fraud, BHG then also detailed how Mr. Reasons was doing the same thing *all over again*: Mallinckrodt plc. *re-filed* for bankruptcy shortly thereafter, then admitting (within bankruptcy court filings) to the billions of dollars in financial losses BHG alleged were being (re-)concealed within SEC-filed financial disclosures, *all over again*. Mallinckrodt's auditor over the course of *both* accounting fraud schemes, Deloitte & Touche, continued their audit work until just weeks after BHG publicly (via an open letter) asked the U.S. Senate Committee on Finance if Deloitte's client needed to commit the same accounting fraud scheme *three times over* before their "feet" would be "held to the fire."

> **Interesting Observation for Investors to Keep in Mind:** Deloitte was not only the auditor for Mallinckrodt plc., but also was (and still is) the auditor for Fossil Group, Inc., where BHG secured board-level representation in March 2024. Over the course of BHG's due diligence questioning at Fossil, it quickly became apparent that Fossil's interpretation of what constituted GAAP-compliant

[6] Some Spectrum board members listed did not serve at the same time as others.

> accounting (particularly in the area of accounting for asset values) was vastly different than Mallinckrodt plc.'s interpretation of those same accounting rules. The obvious question? How could Deloitte have signed off on the financial statements for two companies with such vastly different interpretations of what constitutes GAAP-compliant accounting? BHG generally agreed with what we eventually heard from Fossil—not at all agreeing with what was happening at Mallinckrodt plc., obviously. We add this "tidbit," as it just goes to show *why* BHG applies such a level of critical analysis (over public disclosures), and also why investors should not simply trust a company's financials because a company has a big-name auditor—the existence of a big-name auditor should give an investor *zero* assurance, case in point here, too.

We are enlightening Assertio's stockholders of that additional "*fun fact*" related to Mr. Reasons serving on another public company board with Spectrum's pre-acquisition Chairman, Mr. Ashton, as it *also* just goes to show that none of this should come as a shock. As the old adage goes, "*You are the company you keep.*" It is becoming increasingly apparent to BHG, over the course of our research, that the corporate types in the pharmaceutical industry, with no apparent moral bounds, all seem to know and work with each other.

As can be gleaned from the below enclosures, it is clear to us that Spectrum's culture of deception was no different than that of Assertio now. Assertio has had multiple creative reorganizations, acquisitions, and name changes (i.e., and/or re-brandings), and yet, Assertio apparently still has critical integrity issues.

Clearly, fiduciary duties were not central to the decision-making process of Spectrum's pre-acquisition leadership, nor are fiduciary duties an integral part of the decision-making process of Assertio's Board and management.

Spectrum—in 2018 (days from the new year, and ***just in time* for executive bonus awards**)—submitted that Rolvedon/Rolontis BLA #1, despite having knowledge of the lack of accurate reporting of all serious adverse events experienced by study subjects, the tampered clinical data among other data integrity issues, and the multiple missing sections (in addition to other contents) that were required for the BLA even to be considered ready for evaluation by the FDA, which clearly was not in the interests of Spectrum stockholders.

Shortly thereafter, Spectrum terminated the First Spectrum Whistleblower, after her having advised Spectrum—among other things—on how to correct, complete and remedy the Rolvedon/Rolontis BLA #1 *while simultaneously preserving Spectrum's "FDA Agrees-to-Review-By Date," in accordance with the Prescription Drug User Fee Act "PDUFA"* by submitting an amendment or an addendum to the FDA (the First Spectrum Whistleblower specifically communicated such guidance as to Spectrum's regulatory opportunities directly to the former Spectrum executive, Chief Medical Officer, Francois Lebel, M.D., as such). This course of action provided Spectrum with an opportunity to correct the problematic BLA just submitted to the FDA, which the First Spectrum Whistleblower had refused to sign off on.

**This is why the Rolvedon/Rolontis product took so much time, expense and THREE FDA BLA submissions from 2018-2022 before being FDA approved, despite still including the same problematic clinical trial data.**

As can be gleaned from public records, the core study subject population data reviewed by the FDA did not change between all three Rolvedon/Rolontis BLA submissions, spanning from 2018 to 2022.

Subsequent to BHG connecting with the First Spectrum Whistleblower, BHG also connected with *another* former Spectrum executive-turned-whistleblower—an Ivy League-educated physician who was involved in the

oversight of clinical trial operations at Spectrum (the "**Second Spectrum Whistleblower**"). (The First Spectrum Whistleblower and Second Spectrum Whistleblower are collectively referred to herein as the "**Spectrum Whistleblowers**") The Second Spectrum Whistleblower was terminated around the same time as (just before) the First Spectrum Whistleblower, after reporting similar and additional clinical data and regulatory compliant enrollment issues, as well as additional ethical matters that she knew were unlawful and created substantial risk to the Rolontis BLA filing corporate goal The Second Spectrum Whistleblower, thereby, affirmed the allegations of the First Spectrum Whistleblower for BHG.

Incidentally, the Second Spectrum Whistleblower had been reporting and escalating substantially similar research misconduct issues as had the First Spectrum Whistleblower, *even before* the First Spectrum Whistleblower contacted Spectrum's Compliance team and Spectrum's board of directors, in her own attempts to correct Spectrum's gross misreporting and misconduct.

By chance, the Second Spectrum Whistleblower stopped to ask directions from the First Spectrum Whistleblower when lost trying to locate the Compliance Department, which was not in her building but rather was in the First Spectrum Whistleblower's entirely separate building. The First Spectrum Whistleblower offered her directions to the Compliance Department. In the process of obtaining directions to the Compliance Department, the Second Spectrum Whistleblower began sharing her concerns with the First Spectrum Whistleblower. The First Spectrum Whistleblower advised the Second Spectrum Whistleblower to communicate all she was witnessing to Spectrum's Compliance Department. Shortly thereafter, the Second Spectrum Whistleblower met with two of Spectrum's Compliance team members, Rosa Montoya-Montiel (Chen) and Stanton Gregg Kunzi, who was Vice President & Deputy General Counsel (collectively, the "**Spectrum Compliance Executives**").

After the Second Spectrum Whistleblower met with Ms. Montoya-Montiel (Chen) and Mr. Kunzi, she was directed to make written notations of everything she was witnessing, and was even provided with a special notebook for doing so (which the Second Spectrum Whistleblower has informed BHG she has preserved). The Second Spectrum Whistleblower personally received that special notebook from the Spectrum Compliance team. The Second Spectrum Whistleblower also had multiple personal conversations about the challenges identified on the path forward towards filing the Rolontis BLA#1 and her Compliance concerns and observations together with Spectrum Chief Legal/Compliance Officer Keith McGahan and the former Spectrum CEO Tom Riga—who also claims himself on LinkedIn to be a "Servant leader."[7]

Mr. Kunzi also ***told the Second Spectrum Whistleblower explicitly that she could not be terminated given her protected whistleblower status***. Mr. Kunzi, further, told the Second Spectrum Whistleblower that she was thereby ***protected (given such a status) from termination for two years***.

***Mr. Kunzi*** (who was a direct report to former Spectrum Chief Legal/Compliance Officer Keith McGahan) also ***told the Second Spectrum Whistleblower*** that, ***if Spectrum tried to terminate her, she should call the him or someone in the Compliance Department immediately.*** Despite the Second Spectrum Whistleblower documenting so much of the day-to-day Spectrum research misconduct, neither Spectrum executives nor its board of directors took any action.

Instead, Spectrum retaliated and was quick to "terminate" the Second Spectrum Whistleblower, but the story is more than interesting, so we must share. While the Second Spectrum Whistleblower was in a meeting with

[7] LinkedIn profile of Tom Riga (Last Accessed November 8, 2024): https://www.linkedin.com/in/tom-riga-a66574184/

members of Spectrum's Compliance and Clinical Operations Departments (in particular, Lola Alade and J.D. Turgeon, who was former Spectrum board member and CEO Joe Turgeon's son),[8] where the Second Spectrum Whistleblower was showing those Compliance Department team members inconsistencies in the clinical trial and safety data and the grading of that data. **In particular, the Second Spectrum Whistleblower showed how the severe adverse events reported by clinical trial sites contained notes (from the site) stating that the severe adverse events were being "*changed at the sponsor's (i.e., Spectrum's) request*" (in order to downplay the severity of adverse reactions, and to fraudulently skew the statistical significance of adverse reactions and their probability).** While the Second Spectrum Whistleblower was in this meeting, the meeting was interrupted by Mr. McGahan, who pulled her out of the meeting and brought her to Earl Falls's (former Spectrum Vice President of HR, who reported directly to Keith McGahan) office. Upon her entry into Mr. Falls' office, the Second Spectrum Whistleblower was informed that there was supposedly a note that was written by the Second Spectrum Whistleblower in the BLA file concerning Ms. Mai Huang (WES Evaluation M.D.) (who was the Director of Regulatory Affairs and Pharmacovigilance for Spectrum, *supposed* to be ensuring the safety of patients), stating that Ms. Huang had been performing a job she was neither trained nor qualified for—***a note that Spectrum executives believed would "kill" the company***. The Second Spectrum Whistleblower, knowing she did not write the note, demanded to see the note, but was told by Mr. Falls that he did not have the note and would give her a copy when he did. The Second Spectrum Whistleblower was then walked out of Spectrum's offices after being "terminated," when she continued asking for proof of the note she knew she had never written. After the Second Spectrum Whistleblower was "terminated," she called Compliance team member Rosa Montoya-Montiel (Chen), given that the Compliance Department had told the Second Spectrum Whistleblower to immediately contact them if anyone attempted to terminate her, given her protected whistleblower status.[9] Ms. Montoya-Montiel said she was going to follow up with Mr. Kunzi. The Second Spectrum Whistleblower never got a call back, however.

But it gets more interesting! The Second Spectrum Whistleblower, although "terminated," was *automatically* enrolled in COBRA coverage, which she never paid premiums for throughout that coverage. **Moreover, after the Second Spectrum Whistleblower's supposed "termination," Spectrum kept her on the payroll for approximately a year after being "terminated," and issued her a W-2 related to those continued payments as a "terminated" employee.**

Also very interesting, J.D. Turgeon (again, the son of former Spectrum board member and CEO Joe Turgeon) endlessly praised the Second Spectrum Whistleblower for her work and said he was so sorry that she had been terminated, in writing. Why would the Second Spectrum Whistleblower have received such praise and been suspiciously kept on the payroll for a year after being "terminated," if there was not something critically wrong at Spectrum? Assertio's Board can seek to explain that one until they are blue in the face, but it still won't be believable, especially if the Board then forces us to start airing out all the non-public evidence of the Spectrum Whistleblowers, including the written notes from J.D. Turgeon (and others).

As another fascinating part of this story, the Second Spectrum Whistleblower was terminated based on the belief of two former Spectrum executives[10] that this nonexistent note somehow existed. After the Second Spectrum

---

[8] At this time, the Second Spectrum Whistleblower's daughter had just suffered a stroke, was in the hospital, and her son was losing the vision in his right eye. The Second Spectrum Whistleblower was also the sole provider for the family.

[9] Again, the Compliance executive who gave the Second Spectrum Whistleblower the special notebook told her that she was to use the notebook for documenting all of the the Spectrum misconduct that she was witnessing so frequently.

[10] In particular, Mamta Trivedi (former Vice President of Quality for Spectrum) and Christian Tran (former Director of Product Development, Chemical Manufacturing and Controls, and Clinical Quality).

Whistleblower was already terminated (*not before*), Mr. McGahan apparently directed his direct report and Compliance team member, Ritesh Srivastava (who apparently fears the First Spectrum Whistleblower enough to have blocked her on LinkedIn), to investigate whether the alleged note to the file even existed. Months later, Mr. Srivastava then, after his investigation, realized the note never existed. Next, Mr. Srivastava then was *promoted* to Global Compliance Officer by Spectrum after the Second Spectrum Whistleblower lost her job for a note that never existed.

As one "***fun fact***" related to Mr. Srivastava, he was, according to his LinkedIn profile, a Trial Attorney for the Healthcare Fraud Division of the U.S. Department of Justice—all too fitting for these matters, so we trust he will understand how serious they are.[11] We also wonder, did Mr. Srivastava also sell his Spectrum shares with knowledge of these serious (very material, in our view) matters never disclosed by Spectrum?

The Second Spectrum Whistleblower had followed up with Spectrum numerous times asking for the alleged note that resulted in her termination, and—of course—it never was produced for her.

As a side note related to Mr. Srivastava, he was also the Company representative at an August 31, 2023, poorly managed and hosted "mediation" session related to the First Spectrum Whistleblower's wrongful termination claims against Spectrum. This also goes to support Mr. Srivastava being *well aware* of the First Spectrum Whistleblower's allegations, and very possibly is the reason why he has blocked the First Spectrum Whistleblower on LinkedIn. Interestingly, not long after this "mediation" session, Mr. Srivastava apparently opted to "jump ship" to BPGbio Inc., where he now serves as General Counsel (according to his LinkedIn, starting this new position as of January 2024).

As another interesting "***fun fact***" concerning the Spectrum leadership dynamic, former Spectrum "counsel" Justin Underwood was terminated after it was discovered he was practicing law without a license (i.e., ***was not registered with the California Bar***), resulting in a major hike in insurance premiums for Spectrum. BHG asks, what even would be the insurance coverage for actions taken by "counsel" practicing without a law license? In fact, Mr. Underwood is apparently (according to his LinkedIn) an in-house counsel at Evolus, Inc. (NASDAQ: EOLS), but is still apparently not registered with the California Bar... The overall lack of compliance at Spectrum should not be a shock to anyone, given that Spectrum had a "lawyer" practicing without a law license, and we then wonder how many other "lawyers" they employed.

In case this is not already enough, the Spectrum Whistleblowers also know of many more Spectrum employees who are aware of the misconduct Spectrum engaged in, in addition to other misconduct we have not even yet heard about (as though Assertio's stockholders need any more nails in the coffin here). BHG has not discussed the specifics, but has also been advised there has been significant misconduct in connection with the research and development of other Spectrum products as well, including Poziotinib (as has been alleged in class-action suits, but—according to the Spectrum whistleblowers—those class-action complaints "miss the mark" on how bad the underlying issues really are).

Even if BHG eventually hears what those issues are, there are enough nails in this coffin related to Spectrum that it would not affect our firm belief of zero equity value existing for Assertio stockholders (knowledge of that misconduct would simply drive Assertio equity even *further* into negative territory).

[11] Linkedin profile of Ritesh Srivastava (Last Accessed November 8, 2024): https://www.linkedin.com/in/ritesh-sri/

Certain witnesses to the Spectrum misconduct were creatively terminated under the fabricated guise of being "sold off" through Spectrum M&A activities (particularly, when Spectrum entirely divested of its commercial product portfolio[12]), including the First Spectrum Whistleblower.

---

**Please note, BHG encourages any current or former Spectrum employees who read this letter or merely have knowledge of misconduct at Spectrum to contact regulators.**

---

**BHG did not just take the Spectrum Whistleblowers' statements at face value. BHG has went so far as to engage outside counsel (a leading law firm of the United States) to independently investigate and review a sufficient portion of the extensive troves of non-public evidence in the possession of the Spectrum Whistleblowers, in preparation for a possible derivative action for such evident fraud.** BHG is, therefore, not just lobbing accusations of misconduct without having had an investigation of the Spectrum Whistleblowers' claims undertaken. The aforementioned possible derivative action was set to name defendants, including (a) Spectrum's pre-acquisition leadership; and (b) given the below-enclosed private communications between BHG and Assertio's Board (and management).

Will insurance cover all of this? While BHG referred these matters to a law firm that may file that derivative action (with BHG having indicated our willingness to support the litigation as a witness, if appropriate), we believe it would be an utter miracle if director and officer insurance ultimately covers any claims arising from these matters, given apparent concealment of the Company's circumstances from stockholders and, presumably, insurers alike. If there is a "coverage denial," it is evident to us that the Company would be drained of its assets due to director-officer indemnification agreements, which apparently require the Company to advance litigation defense costs to Board and executive management (if those fiduciaries are personally named as defendants in litigation), even after such evidently endless betrayals of the Company on their part—not fair, but the reality.

On top of the anticipated coverage denial, we further believe any such claims would be contested by the Company's director and officer insurance carriers now that the below-enclosed correspondence between BHG and the Company has been released, with Assertio Board members and management effectively putting their hands over their ears and sticking their heads in the sand, to the demise of stockholders. Insurers are not usually very quick to defend directors who clearly turned a blind eye to unaddressed misconduct occurring under their oversight, and repeatedly failed to investigate the matters in accordance with their fiduciary duties. They usually also then have failed to provide notice of such circumstances to those insurers, paving an easy route for coverage denial by insurers.

Beyond the highly likely derivative litigation, we also anticipate an utter *avalanche* of off-chute litigation, by and between Assertio and cancer patients (or their grieving families, on behalf of the cancer patients' estates), and health insurers, as well as investor class-action suits, regulatory action, and otherwise. Assertio's stockholders can only imagine how much cancer patients and their grieving families will demand in civil damages as a result of having never been told (as Spectrum promised within the study subjects' Informed Consent Forms) that, after being dosed with Rolvedon/Rolontis, their bodies were creating pre-cancerous oncolytic blood blasts, and were therefore never able to address such a severe adverse event (the outcome of

[12] "*Spectrum Pharmaceuticals Sells Marketed Portfolio to Acrotech Biopharma L.L.C. to Focus on New and Innovative Therapies for Cancer Patients*" – BusinessWire:
https://www.businesswire.com/news/home/20190117005355/en/Spectrum-Pharmaceuticals-Sells-Marketed-Portfolio-to-Acrotech-Biopharma-L.L.C.-to-Focus-on-New-and-Innovative-Therapies-for-Cancer-Patients

likely many of those cases perhaps could have been avoided if Spectrum had upheld its disclosure obligations to study subjects). That is, not only clinical trial study subjects, but cancer patients that have received Rolvedon since it was (evidently, wrongfully) approved by the FDA.

BHG is also cooperating as a witness in a False Claims Act lawsuit that is being pursued against the Company over these matters, which we believe will likely decimate Assertio's book value for equity; such decimation of equity value is likely to occur long before civil damages claimed by cancer patients or any other litigation. The federal False Claims Act not only carries possible treble damages over the collective amount of value extracted from the government as a result of fraud, but also carries sizable additional punitive damages for each individual claim, not to mention there is similar state-level legislation that presents *even further* liability exposure for Assertio. Far significant liability exposure for Assertio compared to the False Claims Act issue, stockholders can easily begin to imagine the colossal damages that every cancer patient who has received Rolvedon, after its approval, will likely claim (raw cost for the drug, punitive damages, and more). Such evidently endless breaches of fiduciary duties on the part of the Board have exposed Assertio to tremendous tort-related liability risk exposure (far beyond the evident False Claims Act liability) which we believe could have originally been contained to Spectrum, had the Board decided to act in the interests of investors rather than trying to effectively "cover up" their colossal Spectrum due diligence failures—but that did not happen. Investor call after investor call, the Board has clearly been far more concerned about finding a new acquisition rather than addressing the evident ongoing fraudulent conduct occurring under its oversight that could have ensured the survival of Assertio's investor interests. Talk about misplaced priorities…

The Spectrum illegalities BHG learned of in May 2024 from the First Spectrum Whistleblower are publicly included in court filings/documents, among other sources (if someone knew where to look, what data to compare, etc.). After the First Spectrum Whistleblower was terminated for her refusal to sign off on the Spectrum fraud, she understandably filed a wrongful termination suit against Spectrum. Spectrum, continuing its retaliation against the First Spectrum Whistleblower, filed a defamation suit against her in the State of Nevada—vindictively dragging her out-of-state, as though Spectrum had not harmed her enough already.[13] After the First Spectrum Whistleblower produced a mere sliver of the evidence in her possession, Spectrum voluntarily stipulated to dismiss its retaliatory lawsuit against the First Spectrum Whistleblower (effectively admitting they did not want to embarrass themselves any further in a public setting). The Spectrum Whistleblowers also have preserved and secured their records, even preserving those records in foreign countries, given their knowledge of what those records contain and what it would mean for Spectrum if the information ever saw the light of day. BHG has proactively had the Spectrum Whistleblowers make copies of these records so that they may be turned over to regulators (or other government officials), as we expect to receive such requests shortly after this public letter.

**Significantly, after Spectrum voluntarily withdrew its defamation claims against the First Spectrum Whistleblower, Spectrum then made a series of effective "hush money" offers to the First Spectrum Whistleblower, whereby she would sign an agreement, receive a sum of cash, would agree to not speak to anyone further about the issues, and would turn over all Spectrum records in her possession. Spectrum also wanted the First Spectrum Whistleblower to attest (as part of that effective "hush money" agreement) that no misconduct had ever occurred at Spectrum from the beginning of time to her knowledge, which would have been untrue. The First Spectrum Whistleblower has not accepted any settlements with the Company, despite these offers, and therefore never received any such money from Spectrum. Not only did Spectrum make such effective "hush money" offers to the First Spectrum Whistleblower before being acquired by Assertio, but Assertio—under the oversight of the Board—also made at least one similar**

[13] *Spectrum Pharmaceuticals, Inc. v. Kellie Moore* (Clark County, NV Dist. Ct.—Case No. A-21-827343-C).

**"hush money" offer to the First Spectrum Whistleblower after having acquired Spectrum. Of course, the "hush money" offers came to a grinding halt after BHG intervened, with the Board knowing they were caught red-handed.**

**While Assertio's leadership has continually claimed these corroborating allegations of the Spectrum Whistleblowers have "no merit," then why were they attempting to use stockholder funds to effectively purchase control of these Spectrum records from the First Spectrum Whistleblower?** The Board has also continually claimed that those non-public records preserved by the Spectrum Whistleblowers (including some that have been sent directly to Assertio's leadership, *and were never responded to*), if ever seen publicly, would severely damage the Company, so apparently the Board recognizes there are serious problems at hand. The Board acts as if the damning non-public evidence preserved by the Spectrum Whistleblowers are trade secrets, when that is not the case—the Board simply (*clearly*) knows that this information about its business operations is damning, which is not the same as trade secrets (any details about a company's fraudulent activities could then be considered "trade secrets"). Unfortunately for the Board, even if it had a non-disclosure agreement with an internal whistleblower (*any* whistleblower), such an agreement would be unenforceable if its effects would be contrary to public policy—clearly, it is not in the public's interest for these matters to be "covered up" by the Board anymore, and certainly not if it would result in the victimizing of *cancer patients*, not to mention the defrauding of investors. It is clearly in the public interest that these matters be brought to light, since no regulatory action has been taken thus far and cancer patients are still being put in danger under the oversight of the Board and its purely self-interested lack of action concerning such serious matters.

**We have heard that some stakeholders are fond of Board member Heather Mason, but she—in fact—oversaw at least one of the "hush money" offers to the First Spectrum Whistleblower, while she was serving as Interim CEO of Assertio. That is not an honorable business leader in BHG's book. This is the very reason that BHG demanded Ms. Mason resign in our last press release on July 24, 2024.** More pointedly, the entire Board (apart from Mr. O'Grady) oversaw at least one of the "hush money" offers to the First Spectrum Whistleblower.

**BHG also demanded that Dr. Jeffrey Vacirca resign from the Board in our press release of July 24, 2024, given that he was on Spectrum's pre-acquisition board of directors even before the filing of Rolvedon/Rolontis BLA #1, at the time the First Spectrum Whistleblower was sounding the alarm to Spectrum's pre-acquisition Chairman, William Ashton, over the fraudulent activity she was witnessing at Spectrum. Dr. Vacirca also serves on numerous boards of directors, including that of the New York Cancer Foundation (as its *Chairman*, in fact). We do not believe the evident defrauding of cancer patients at Spectrum is something that would be in alignment with the mission of that cancer-focused charity. According to Mr. Vacirca's LinkedIn profile, he also serves on the boards of Annexus Health, PatientPoint, and OneOncology.** We are not convinced Dr. Vacirca's primary goal is the wellness of cancer patients, given he has continued to remain on Assertio's Board (as well as Spectrum's, since 2018) as all of the Spectrum research misconduct has been coming to light (even before the First Spectrum Whistleblower began repeatedly reporting these matters to Spectrum's leadership and Compliance Department).

We suspect the Spectrum fraud could be why former Board member James Tyree resigned in protest, although his note filed with the U.S. SEC (as part of the Company's April 2, 2024, Form 8-K disclosure announcing Mr. Tyree's resignation in protest) did not indicate as such. We do not buy Mr. Tyree's resignation in protest was primarily due to Board Chairman Peter Staple failing to realize he is too dated of a fixture to continue serving on the Board. We now know why the Board likely had no choice but to continue with Mr. Staple as Chairman (surely, none of the other directors would agree to take ultimate ownership of the improper actions by the Board), and why Mr. Staple would not wish to relinquish ultimate leadership of the Board, in light of the Spectrum

misconduct that Assertio's leadership has been trying to keep under wraps, even as it has been slowly leaking out publicly (again, if stockholders knew where to look).

**Further, while Mr. O'Grady was not a Board member at the time of the "hush money" offers to the First Spectrum Whistleblower, he apparently has received *further* evidence of the Spectrum fraud, personally, over the past months (via private e-mails from the First Spectrum Whistleblower), yet has apparently opted to turn a blind eye to it. Mr. O'Grady *never even responded* to the First Spectrum Whistleblower to ask for any clarification or any further evidence available, even as the Board was simultaneously and inappropriately asking BHG for the Spectrum Whistleblowers' non-public evidence. Clearly, Mr. O'Grady did not genuinely wish to see that evidence, even as it was being spoon-fed to him.**

**For the record, the Spectrum Whistleblowers have never given their non-public evidence to BHG, and have only provided it to the outside counsel engaged by BHG to conduct an independent investigation of the Spectrum Whistleblowers' claims. Therefore, as we have repeatedly made clear to the Board over the course of its continued disingenuous requests for that non-public evidence, BHG is not the entity to be asked for the Spectrum Whistleblowers' evidence.**

Mr. O'Grady has also continued to sign off on quarterly reports filed with the U.S. SEC, in which he has certified no material omissions of disclosure, which—in our view—clearly run afoul of his obligations as a certifying officer under 18 U.S.C. § 1350 (as BHG firmly alleged in our private letters to the Board). Based on the foregoing, we believe Mr. O'Grady's recent public statement at the October 15, 2024, Maxim Group Healthcare Virtual Summit (a recording of which can be obtained from Bloomberg), where he said he believed Assertio's stock was more likely to climb from $1/share to $2/share, than drop from $1/share to $0/share, was *more than* disingenuous. This statement not only indicated an utter act of desperation to try to artificially prop Assertio's stock price (in the face of BHG's intervention and the Spectrum research misconduct being continually waved in his face), but was particularly disingenuous (in light of Mr. O'Grady personally being sent further communications/evidence related to the Spectrum fraud, to which he did not respond to). We have demanded, numerous times, that Mr. O'Grady resign to show he is on the right side of these matters, but that has not happened.

Attached to this letter, we are enclosing all communications BHG has had with Assertio's Board and management since the start of our attempt to bring value to all Assertio stockholders. Assertio's investors will see the extreme lengths BHG went to in the hope that Assertio's Board would correct course and even just speak with us about these issues (rather than continuing to hide behind their lawyers, knowing they were caught). Among other things, we:

- Threatened to speak with the Company's auditor (Grant Thornton LLP, which we believe has an obligation to resign *immediately*, given the clear ongoing failures of Assertio's Board and management to uphold their obligations under Principles 1 and 2 of the COSO Framework). If the Board were *actually* upholding their ethical obligations and *actually* independent from management, the Board would have conducted an *actual* investigation into these issues (and would not be ignoring them). The Board's failure to uphold its ethical duties and its collusion with management is thereby abundantly clear to BHG;
- Provided written notice that the Board needed to turn our private communications (and those of all whistleblowers) over to their insurance carriers and to Grant Thornton (which we suspect they did not do, and we believe that would implicate and constitute this leadership's misleading their auditors);
- Advised the Board they were apparently accepting personal liability in these matters, multiple times; and

- Pulled a multitude of other "stops," in hopes the Board would actually begin upholding its fiduciary duties.

Instead of acting honorably and in accordance with their fiduciary duties:

- **At first, Assertio's Board and management denied even mere knowledge of the whistleblowers' allegations, which was far from the truth.** Assertio's Chief Legal Officer, Sam Schlessinger, initially claimed it was "unfair" that BHG knew of the Spectrum Whistleblowers' allegations, and that he and the Board did not know of such allegations. He also said that BHG should just trust the Board to investigate any such issues, even though they had already clearly, massively failed in their pre-acquisition investigation (due diligence) related to Spectrum. The Board's pre-acquisition due diligence for Spectrum is when all of these matters should have been discovered (they could have simply called the First Spectrum Whistleblower, which the Board had to have known was already suing Spectrum for wrongful termination over these matters).

  BHG explained the Spectrum Whistleblowers' allegations to Mr. Schlessinger in far enough detail that it certainly should have prompted Mr. Schlessinger's recollection of the matters. In fact, Mr. Schlessinger was directly addressed by the First Spectrum Whistleblower, in a September 2023 private message. This was almost immediately after Assertio closed on the Spectrum acquisition, and nearly two months before Assertio suspiciously admitted Spectrum was worth approximately 75% less than Assertio's Board and management initially thought).

  Days after Mr. Schlessinger feigned ignorance over the Spectrum misconduct matters, BHG informed him that he was *well aware* of everything he had just denied knowledge of.

  Days after apparently realizing he was caught in a false representation to one of the Company's public investors (BHG), Mr. Schlessinger then said a "*thorough investigation*" of the First Spectrum Whistleblower's allegations had *already been conducted* by the Company (after just, days before, having said that the Board should just be trusted by BHG to complete an investigation, indicating it never happened), and that the allegations supposedly had "no merit." Given these false representations by Mr. Schlessinger, we informed him that—in light of false representations to a public investor—we would be reporting him to the Illinois Attorney Registration and Disciplinary Commission (in hopes that Assertio's leadership would begin correcting course, coming clean, and actually begin addressing these matters in accordance with their fiduciary duties).

- **Assertio's Board and Management falsely claimed a "thorough investigation" of the First Spectrum Whistleblower's claims resulted in a finding of "no merit" to the allegations, *without ever having spoken to the First Spectrum Whistleblower*, and *never having asked the First Spectrum Whistleblower for any and all evidence supporting her very detailed allegations*.** Again, Assertio's leadership has never replied to a single e-mail/letter from the First Spectrum Whistleblower (never even asking her for her evidence in support of her allegations), yet claims to have conducted a "thorough investigation."[14] We bid good luck to the Board when they are asked by regulators (or other government officials) how they investigated such serious allegations of misconduct by a whistleblower, without even

[14] The only "message" the First Spectrum Whistleblower has received was not from Assertio's leadership, but a virtual autoreply from Assertio's Compliance Department, which did not address the issues raised, yet again—entirely beating "around the bush," nor did it ask for all evidence in her possession to conduct a "thorough investigation." That "message" is released alongside this public letter.

having talked to the whistleblower, and without having even asked the whistleblower for the evidence supporting her allegations. That is not a path to plausible deniability, but rather to personal liability.

The First Spectrum Whistleblower has, again, been *continuing* to drop pieces of evidence into the laps of Assertio's leadership (even Mr. O'Grady, personally) over recent months, and Assertio's leadership has *never* responded to *any* messages, even still. The Company has continued their fallacious requests that BHG turn over all of the First Spectrum Whistleblower's evidence, when they know there is only one way to get it—from the source. Clearly, Assertio's Board and management realized they were caught claiming a "thorough investigation" had occurred, when it was a sham investigation at best. Very clearly, the Assertio Board and management's choice of response was to write down Spectrum massively (distracting with a basket of other write-downs at the same time), simply hoping that no one would realize their accounting disclosures were not the least bit logical. Unfortunate for the Board, BHG did realize it.

- **Endlessly gaslighted BHG about the Spectrum write-downs and what *actually* triggered those admissions of massively overpaying for Rolvedon and other assets.** Given that Mr. Schlessinger became aware of these issues in September 2023, it is also apparent to us that the First Spectrum Whistleblower's note to Mr. Schlessinger is what caused the Company to admit Spectrum was worth ~75% less than what they initially bought it for—necessitated of course, because of the major asset integrity issues that they knew could easily result in the FDA revoking the Rolvedon/Rolontis approval (which would certainly have caused a massive cut to the expected cash flow forecasts for Rolvedon, just as the impairment charge indicated), given that it was only being approved as a result of Spectrum's tampered clinical data submission to the FDA. It is also then clear to us that Assertio's leadership thought writing down multiple other assets at the same time would distract from the major write-down related to Spectrum.

  In the May 7 Meeting (between BHG and Assertio's Audit Committee Chair and CFO), BHG recognized there was something very rotten afoot after Messrs. Emany and Patel suspiciously could not explain what changed their cash flow forecasts for Rolvedon so materially that it would warrant a ~75% write-down. Both CPAs also could not explain how they could peg the values of assets based on the Company's equity market capitalization in the face of such material contingent liability interference already existing (the equity market attempting to price in numerous contingent factors related to litigation, between possible fear of inadequate insurance for the Company's opioid-related litigation, potential settlement values for that litigation, fear of whether the liability exposure would eventually possibly be implicated and borne at the parent company level, and otherwise). BHG's independent forensic accountants had *no issue* understanding BHG and why we knew there was an underlying reason for Rolvedon's cash flow forecasts being cut so significantly, and Messrs. Emany and Patel's inability to articulate adequate reasons for the write-down in that meeting with BHG gave away they were hiding the real reason for those cash significant cash flow forecast reductions. Unfortunately for Messrs. Emany and Patel, BHG investigated enough to find out itself what they did not wish to tell BHG.

  **As a related side note to this item (to further make clear the lack of authenticity of Assertio's disclosures to investors):** At the time of the closed-door May 7 Meeting (between BHG and Assertio's Audit Committee Chair and CFO), the Company's stock was—yet again—trading significantly below the then-current book value for equity. Such a valuation discrepancy was the very basis (though illogical, under such circumstances of material contingent liability interference) that Assertio cited as a reliable indicator of asset value impairment. That was the claimed basis for asset values needing to be

written down so massively, *immediately* after the Spectrum acquisition. At the time of the May 7 Meeting, Assertio's stock was—yet again—trading significantly below Assertio leadership's book value for equity. More specifically, Assertio's stock price, on May 7, 2024, was trading ~32% below the Company's GAAP book value. To really make clear Messrs. Emany and Patel had been feeding public investors "a line" (and to make clear they did not actually believe that was a reliable indicator of asset value impairment), BHG asked both (along the lines of), "S*o, since Assertio's stock is trading significantly below its book value now, too… you are going to take another impairment charge to bring the book value in line with the open market capitalization of equity again, right*?" Of course, Messrs. Emany and Patel were fumbling over their words, *yet again*. Then, Assertio *did not* take an impairment charge in the midst of such another major discrepancy between the market capitalization for Assertio's stock and the Company's GAAP book value for equity, despite Assertio's Board and management *already having claimed* they deemed that to be a reliable indicator of asset value impairment.

Why is this cherry-picking of whether to follow already-stated accounting policies/beliefs so important? It makes clear that there was a deeper reason for requiring the massive Spectrum write-down—a reason never disclosed by Assertio's Board and management, but now BHG has enlightened all other stockholders as to that reason. Messrs. Emany and Patel were simply "playing dumb" at the time of the May 7 Meeting. It is abundantly clear to BHG that if Assertio's Board and management had fully disclosed the Spectrum misconduct matters thoroughly discussed by BHG in this letter today, then they would not need to be engaging in such evident flim-flam accounting and illogical financial disclosures to continue keeping the Spectrum matters under wraps. Assertio's Board and management may have gotten away with such smoke and mirrors with their financial disclosures up until BHG entered the scene, but that will end with this letter.

- **Assertio's Board desperately tried to claim that I, personally, wanted a board seat for financial gain, when BHG's first offer involved myself serving for *zero* cash compensation.** This has nothing to do with the Spectrum matters, but just goes to show how Assertio's Board continually acts in bad faith and that its claims/arguments cannot be trusted to be genuine. After Assertio's Board lobbed this personal accusation more than once, BHG—to prove the Board's bad faith—said that we would give the Company five days to offer a cooperation agreement that would include myself serving on the Board for *zero compensation* (no cash, no equity), and—guess what!—that did not happen. Beyond illustrating the Board's fallacious arguments/claims, this just further illustrates how bad the situation at Assertio/Spectrum is—Assertio's leadership wants no one seeing what is happening behind closed doors, knowing what they have been keeping under wraps. Assertio's leadership did not want *any* of BHG's (informally suggested) director nominees on the Board, including—tellingly—a Certified Fraud Examiner, sporting a credential no one on the Board has, and in the face of multiple internal and external whistleblowers alleging fraud at Assertio.

- **Desperately and falsely suggesting that BHG was a short seller from the start, when we have been, among other things, demanding to know why Assertio's leadership implied the existence of materially positive financial circumstances that were never disclosed—something far from in the interest of a short seller.** Though we believe this was yet another false representation to the Company's public investors (i.e., we do not believe there are actually any materially positive financial circumstances related to asset values, but rather the very opposite), a short seller would never be interested in a company disclosing materially positive financial circumstances. To be clear on this issue, BHG had—in particular—asked in our first letter to the Company if Assertio's leadership was aware of its asset values having a fair value materially higher than was represented in the Company's GAAP

financial disclosures filed with the U.S. SEC.[15] The Company, in response to that question, cited Regulation FD, which indicated that the answer to that question would have, indeed, been material. If Assertio's leadership was not aware of any material undisclosed asset value, then the answer would not have been material and should have been a simple "no." Moreover, in the May 7 Meeting, BHG brought up the Company's citation of Regulation FD, and Messrs. Emany and Patel's response was that they thought BHG wanted to know "*the number*." BHG then, mortified, issued a response along the lines of "*you know a material number, and you have not disclosed it?!*" BHG then informed Messrs. Emany and Patel that any such material knowledge would be something that a "prudent investor ought to know," not represented within the Company's GAAP financial reporting (while insiders would have been trading on that knowledge of undisclosed financial circumstances cited as material). That then implicated the Company in a violation of the Company's disclosure obligations under Regulation S-X and possible insider trading while in possession of purportedly material, yet undisclosed financial circumstances. Messrs. Emany and Patel then claimed to not be aware such material knowledge would have had to be disclosed under Regulation S-X, if they knew of a "*number*." This was the point from which Assertio's leadership began desperately contriving BHG being a cloaked short seller, when we advised the Company that this implicated failure to disclose materially positive financial circumstances was then defrauding short sellers, since disclosure of such positive information would have been for the very benefit of *stockholders* (a failure to disclose knowledge of such materially positive circumstances means stockholders would have been trading in the open market at then-likely artificially depressed prices, in light of such implicated material disclosure failures). Thus, BHG did not understand why such materially positive financial circumstances were being withheld from investors. Clearly, BHG was not a short seller if we demanded the disclosure of circumstances Assertio's leadership implied were materially positive—that would not have been in the interests of a short seller.

This all said, we believe the Company's citation of Regulation FD was not because materially positive financial circumstances actually existed, but rather, because the Company did not wish to answer BHG's questions surrounding asset values altogether, given they knew there was more to the story than Assertio's Board and management had disclosed at the time of the massive Spectrum write-down. By implying that materially positive financial circumstances existed to BHG, when they did not, also constituted *yet another* instance of apparent securities fraud on the part of Assertio's leadership—enticing BHG to acquire further shares by implying that the fair values of assets materially exceeded their book values, and that Assertio's Audit Committee Chair and CFO apparently even knew of a "*number*."

- **Continued desperately painting BHG as a likely short seller, even after we submitted proof of our shareholdings.** At this point, the Company then even preposterously tried to disregard one of the brokerage accounts submitted as proof of our long position, in an attempt to claim that BHG held less than one-half percent of the Company's outstanding equity shares. The Company also continued trying to paint the picture of BHG being a short seller, even after admitting knowledge that BHG was a stockholder of record (a required admission, given that BHG had a block of our equity shares transferred

[15] As discussed in BHG's May 17, 2024, press release, GAAP accounting (in particular, ASC 350/360, which governs the accounting of assets including definite-lived intangible assets, indefinite-lived intangible assets, and property, plant and equipment assets) does not permit the book values of such assets to be marked up where the fair value of an asset exceeds its book value. As an example, a building could be acquired by a company for $1 million, could have a fair value of $2 million 5 years after being acquired, when there would be $1 million in asset value not represented within such a company's GAAP financial reporting.

to, held with, and registered directly with the Company's transfer agent).

- **Assertio's Board and management continued burying their heads in the sand *even after* BHG advised the Board that the *Spectrum Whistleblowers have now recently received inquiries from the U.S. Department of Health & Human Services (HHS) (the effective enforcement division of the FDA, which has an interagency cooperation agreement with the FDA) and the Centers for Medicare & Medicaid Services' (CMS) "Medicare Drug Integrity Unit."***

  **BHG then even more firmly demanded the Board address the Spectrum fraud matters immediately, given the obvious increased risk that the Company was under formal investigation by HHS and could/would/will be shut down at any moment (partially or entirely, but now we believe entirely, given such a bad-faith response to the serious matters at Spectrum by its parent company, Assertio).**

  **As most know, HHS—for good reason—generally does not give a warning before they shut down a fraudulent pharmaceutical operation, nor do we think they would here, *especially* after reading this letter detailing such appalling conduct by Assertio's fiduciaries. We believe Assertio's days are numbered after HHS sees this public letter—HHS *absolutely* needs to take forceful action against the Company, in the name of the safety of cancer patients. We believe that Spectrum may have already purged many of the records that have been preserved by the Spectrum Whistleblowers. BHG has done its part of the job by bringing these matters to light in such a way that we should be able to rest assured HHS should be seeing and acting on them.**

* * *

We are going to close this communication, as the attached paper trail of private communications between the Board and BHG will paint the rest of the picture. Stockholders may continue reading if they have not already heard enough as to why we believe they should immediately collect any amount of money they can for their shares in the open market (by selling them), given—in our view, after our extensive research and communications with the Board—it would be an utter miracle if Assertio's equity interests do not already have a far negative value (investors can imagine the value of unasserted claims related to these matters, likely to now be imminently asserted against the Company by a multitude of parties, including cancer patients and their grieving families). Again, reasonable minds will quickly realize the exorbitant amount of civil damages that would likely be awarded by a jury to cancer victims and their grieving families, when a pharmaceutical company promised *in writing* to inform them of something that could cause them to want to withdraw from a clinical trial, and then withheld disclosure of data reporting the proliferation of pre-cancerous oncolytic blood blasts immediately after being dosed with the Rolontis/Rolvedon study drug (again, Spectrum not only withheld the disclosure from the study subjects, *but from their doctors*, as well). Also, as noted, not just study subjects were never informed that, after receiving Rolvedon, Spectrum was observing the development of pre-cancerous oncolytic blood blasts, resulting in leaving every cancer patient who has been treated with Rolvedon (after its evidently wrongful approval) to then have a possible claim against the Company. Reasonable minds can easily conclude a jury would award a substantial amount for those defrauded cancer victims and their families. Moreover, again, the Company still faces a swath of opioid-related litigation, in addition to the entirely unrelated False Claims Act suit unsealed less than one quarter before this letter, which we do not even think needs to be considered before stockholders will agree with our analysis of the Company's *real* financial condition.

We cannot even express how much it saddens us that this situation has gotten to this point, where we do not believe the Company's equity value will survive even the next annual meeting (especially given the likelihood

regulators will determine it necessary to forcibly shut the Company down). We highly doubt the Board will allow their replacement at an annual meeting of stockholders before they can hide behind the "shield" of bankruptcy to ensure they receive the broadest releases from civil liability in these matters possible. It is apparent to us that the Board was misled as part of its acquisition of Spectrum (clearly, this Board is entirely incapable of conducting adequate due diligence, or did not care enough to do so when spending "other people's money"). However, rather than admitting to its colossal due diligence failures, Assertio's Board and management came up with a cockamamie explanation for its massive impairment charges disclosed immediately after Assertio's acquisition of Spectrum, hoping that no one would catch on. It is clear to BHG that Assertio's Board and management thought that no one would ask the questions that BHG did, and that they opted to selfishly continue siphoning massive director compensation out of the Company's coffers rather than come clean about their mistakes, knowing that they would almost surely have been ousted by stockholders.

BHG endlessly pressed the Board to act in accordance with its fiduciary duties, which would have clearly meant pursuing Spectrum's pre-acquisition leadership for the evident fraud, but that would have meant the Board admitting significant personal, possibly career-ending due diligence failures. It is our hope that the U.S. SEC will not allow a *single member* of Assertio's Board (or management) to serve in a fiduciary capacity in the future at *any* public company, as we believe they would be a danger to any public company and its investors, given such evident betrayals. We believe a director-officer bar for each remaining member of the Board is absolutely necessary under such egregious circumstances. It goes without saying we think the same of Spectrum's pre-acquisition board members and management.

Stockholders can rest assured that BHG will speak with any class-action investor protection firms (or those that may wish to represent cancer patients having received Rolvedon) that may reach out (and who may wish for our support as a witness in litigation for a means of recovering Assertio investor losses given these matters laid on a silver platter) after viewing this letter and the accompanying press release. We have also filed a whistleblower report with the U.S. SEC and will support any investigation (or any investigations by other government agencies, including FDA/HHS/CMS) into the Company and Board as much as we possibly can, just as BHG has supported government investigations in other cases of investor deception that we have investigated and exposed.

We believe this case is a prime example as to why investors need to be *far* more diligent in analyzing the disclosures of public companies. It is incomprehensible to BHG why investors broadly do not apply the same level of due diligence (including questioning of fiduciaries) with public companies as is standard with private companies. The existence of an auditor should not negate any due diligence over an investment—case in point here. Auditors do not have "skin in the game," do not have a fiduciary duty, and—bottom line—a company's fiduciaries are ultimately responsible for the accuracy of financial disclosures—not the auditor.

Before closing, we warn the Board that any public response denying these matters (or attacking any whistleblowers) will greatly backfire, and if the Board is so brazen as to initiate any litigation over these matters, BHG will take full advantage of the automatically granted discovery privileges (though, we are confident at this point that the Spectrum Whistleblowers probably have far more evidence in their possession than we could ever obtain through discovery, given the evident history of data tampering at Spectrum). If any such public response is asserted by the Board, we will also then begin releasing pieces of evidence to reinforce who the honest ones are in this situation[16]—that is, clearly BHG.

[16] This evidence includes recent e-mails from the First Spectrum Whistleblower to Assertio's leadership, dropping further evidence of these matters into their laps that continued to be ignored.

The Board should also not make a bigger fool out of itself by asking for the Spectrum Whistleblowers' extensive troves of non-public evidence, only after this letter. Those records, ignored by the Board all thus far, will be provided to regulators (or any other government official who seeks them), and the Board is *beyond* hopelessly conflicted in investigating any of these matters anyhow, leaving them with no legitimate use for those non-public records preserved by the Spectrum Whistleblowers. The Board is also *absolutely* and hopelessly conflicted in the selection of any new Board members. Assertio's Board and management should resign in disgrace if they have any conscience.

We also warn Assertio's leadership, should it proceed with the Company's proposed earnings call scheduled for the coming days, that we are going to publicly rip any continued misstatements to shreds (just as we did with Mallinckrodt, when they failed to heed our warning to avoid continuance of unwise public statements) if the Board is so foolish as to allow management to proceed with it. We do not believe Assertio's management will be able to avoid implicating the Board further in these matters through less-than-thought-out verbal statements, and the *last* thing the Board needs is more evidence of their apparent personal liability in these matters. With respect to the Company's scheduled earnings announcement, we do not see how these matters coming to light, so publicly, will not materially impact its financial statements, thereby requiring a significant re-analysis before the filing of the Company's imminently due quarterly report with the U.S. SEC (Assertio absolutely needs to extensively consult Grant Thornton after this letter being made public)—a level of careful re-analysis which we are confident any auditor (and we believe will result in a *far further* write-down of Rolvedon) would agree is impossible to take place over a period of four or so days.

With immense sorrow for the anticipated fate of Assertio, we sign off. We hope stockholders can see we did absolutely everything that we conceivably could.

Very Truly Yours,



Alexander E. Parker
Senior Managing Director
The Buxton Helmsley Group, Inc.

Cc: Peter Staple (Chairman, Assertio Holdings, Inc.)
William T. Mckee (Director, Assertio Holdings, Inc.)
Heather L. Mason (Director, Assertio Holdings, Inc.)
Jeffrey L. Vacirca (Director, Assertio Holdings, Inc.)
Sravan K. Emany (Director, Assertio Holdings, Inc.)
Sigurd C. Kirk (Director, Assertio Holdings, Inc.)
Brendan P. O'Grady (Director and Chief Executive Officer, Assertio Holdings, Inc.)
Ajay Patel (Chief Financial Officer, Assertio Holdings, Inc.)
Matthew Kreps (Investor Relations Officer, Assertio Holdings, Inc.)

**Disclosure:** We hold a short position in the securities of ASSERTIO HOLDINGS, INC. (NASDAQ:ASRT)

**Legal Disclaimer:**
The use of Buxton Helmsley Group, Inc.'s ("BHG") research and analysis is at your own risk. In no event will BHG or any affiliated party be liable for any direct or indirect trading losses caused by any information in this letter. You further must do your own research and due diligence, and consult with your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that as of the publication date of any BHG letter, BHG (possibly along with or through our members, partners, affiliates, employees, and/or consultants) has a short position in the stock, bonds, derivatives or securities covered herein, and therefore stands to realize significant gains in the event that the price of the securities of the issuer discussed in this letter declines. Following publication of this letter, BHG intends to continue transacting in the securities covered therein and may be long, short, or neutral at any time thereafter regardless of BHG's initial position or views. BHG's investments are subject to its risk management guidance, which may result in the de-risking of some or all of its positions at any time following publication of any report or letter depending on security-specific, market or other relevant conditions. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. BHG is registered as an investment advisor with the State of New York. To the best of BHG's knowledge and belief, and except as otherwise described herein, all information contained herein is accurate and reliable, and has been obtained from public sources believed to be accurate and reliable, and who are not currently insiders or, to BHG's knowledge, who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer discussed in this letter. Such information is presented "as is," without warranty of any kind – whether express or implied. BHG makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any information contained herein, or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and BHG does not undertake to update or supplement this report or any of the information contained herein or its position in any securities.

**Cautionary Statement Regarding Forward-Looking Statements:**
The information herein contains "forward-looking statements." Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "may," "will," "expects," "believes," "anticipates," "plans," "estimates," "projects," "potential," "targets," "forecasts," "seeks," "could," "should" or the negative of such terms or other variations on such terms or comparable terminology. Similarly, statements that describe our objectives, plans or goals are forward-looking. Forward-looking statements are subject to various risks and uncertainties and assumptions. There can be no assurance that any idea or assumption herein is, or will be proven, correct or that any of the objectives, plans or goals stated herein will ultimately be undertaken or achieved. If one or more of such risks or uncertainties materialize, or if BHG's underlying assumptions prove to be incorrect, the actual results may vary materially from outcomes indicated or suggested by these statements. Accordingly, forward-looking statements should not be regarded as a representation by BHG that the future plans, estimates or expectations contemplated will ever be achieved.

# Exhibit 11

BUXTON HELMSLEY
NEW YORK | EST. 2014

**VIA U.S. REGISTERED MAIL & ELECTRONIC MAIL**

November 15, 2024

Committee on Health, Education, Labor & Pensions
United States Senate
428 Senate Dirksen Office Building
Washington, D.C. 20510
Attn: Chairman Bernie Sanders
Ranking Member Bill Cassidy

Re: Well-Documented Clinical Data Fraud Endangering Cancer Patients – Refused to be Addressed by **Assertio Holdings, Inc. (NASDAQ: ASRT)**

Dear Senators of the Committee:

The Buxton Helmsley Group, Inc. ("**BHG**" or "**we**") addresses the Senate in relation to Assertio Holdings, Inc. ("**Assertio**") (NASDAQ: ASRT), after **Assertio's Chairman and its M.D. oncologist board member have just resigned.** Those resignations were announced just one business day following BHG's public release of an exposé (linked below) regarding well-documented clinical data fraud at Assertio subsidiary Spectrum Pharmaceuticals, Inc. ("**Spectrum**"), with **multiple former executives-turned-whistleblowers possessing extensive non-public evidence, *including real, untampered clinical data.*** BHG also engaged an outside law firm to conduct an independent investigation into the corroborating whistleblower allegations and their extensive non-public supporting evidence/data.

Right now, Rolvedon[1] is being dosed to cancer patients (paid for under a unique "J-Code" (J1449), and is thereby being purchased by the U.S. Government, since 2023), putting those patients' health at risk as a result of the evident clinical data fraud—there is no excuse. For example, we enclose (below) an e-mail from an employee of Spectrum to its executives, stating:

> *"**I'm trying to understand the below. I've never 'deleted [Adverse Events]' from a database. I need to understand the history and decision making here.** During the ROLONTIS BLA BIMO inspection, I will be scrutinized for any Note To File (NTF) surroundings deletion of [Adverse Events]."*

[1] Rolvedon (initially investigated as "Rolontis") is a biologic cancer treatment, approved in 2022 by the FDA despite the undetected clinical data fraud, initially marketed under the brand name "Rolontis". **Three BLA submissions (from 2018 to 2022) were required for Rolontis, given such problematic submissions to the FDA, as thoroughly discussed within the first-linked press release. It can be gleaned from public records that the same core population data was submitted for each of the three BLA submissions.** Shedding light on why Assertio's leadership has continued its "head in the sand" approach over these matters, Rolvedon/Rolontis is Assertio's biggest revenue-generator, bringing in approximately $60mm per year, or approximately 50% of Assertio's overall revenues.

THE BUXTON HELMSLEY GROUP, INC.
1185 AVENUE OF THE AMERICAS, THIRD FLOOR NEW YORK N.Y. 10036
T. +1 (212) 561-5540 F. +1 (212) 561-6349 ALEXANDER.PARKER@BUXTONHELMSLEY.COM

***Assertio's leadership claims that a "thorough investigation" of the corroborating whistleblower allegations was undertaken. However, Assertio never spoke to the whistleblowers they claim to have investigated the corroborating allegations of, and never obtained the extensive non-public evidence in the possession of those whistleblowers.*** Despite such a sham investigation (at best), Assertio's board of directors and management claim "no merit" to the allegations of those whistleblowers.

**Assertio's leadership stated on their November 11, 2024 earnings call that they will never again address these matters** (as if they ever addressed them to begin with), despite their clear sham investigation (a convenient "head in the sand" approach, to continue raking in profits at the same time of endangering cancer patients). **Such a refusal to address these matters was communicated on the earnings call, in particular, by Assertio CEO Brendan O'Grady, who is also a member of the board of directors.**

It is clear now that the only way this well-documented clinical data fraud endangering cancer patients will be addressed is by action of the Senate. We believe it is more than required that the Committee on Health, Education, Labor & Pensions hold a hearing that will *require* Assertio's leadership to hear from these multiple former executives-turned-whistleblowers (possessing immense non-public evidence as to this egregious instance of clinical data fraud), to further unravel this egregious, well-documented scheme that the Assertio board of directors is now, clear to us, attempting to turn a blind eye to. We hope such a hearing will compel the U.S. HHS, FDA, and SEC to take *immediate* action here, as cancer patients and investors are—again—in imminent danger. A firm example needs to be made by the Senate out of Assertio's board of directors and management.

Grant Thornton LLP (Assertio's auditor), even after BHG has raised these matters directly to them *multiple times*, also apparently continues to stand by Assertio's perpetuated misconduct; that is, even after—on Monday, November 11, 2024—BHG publicly released that below-enclosed e-mail from a Spectrum employee, evidencing their having been asked to delete adverse events from clinical data, and with such a clear sham investigation having been conducted by Assertio's board of directors, if any investigation at all. Such requests to delete adverse events from clinical data did not end with that employee either. As is also part of the "well-documented" nature of this clinical data fraud scheme, there were notes to clinical data files that adverse events were "deleted at sponsor's request" (clinical trial sites had documented in the notes section that they had deleted serious adverse events at the request of Spectrum, now a wholly-owned subsidiary of Assertio). The Assertio Board's investigation failures, not to mention the underlying well-documented clinical data fraud, implicate stark failures (by Assertio, Grant Thornton's audit client) to uphold Principles 1 and 2 of the COSO Framework. Yet, Grant Thornton has *still* not resigned.[2]

[2] Ernst & Young acted correctly when they recently resigned from their engagement as the auditor of Super Micro Computer, Inc. (NYSE: SMCI), *before* matters became public indicating why Ernst & Young believed SMCI's leadership was not upholding Principles 1 and 2 of the COSO Framework. Here, it is now *entirely public* that Assertio's leadership has failed to even speak with, let alone obtain all evidence from, multiple former executives-turned-whistleblowers with extensive troves of evidence supporting their corroborating allegations of clinical data fraud. That is far from a commitment to ethical and lawful conduct (starkly violating Principle 1 of the COSO Framework), and a board of directors independent from management would *never* have concluded an investigation of such serious allegations of fraud by multiple executives-turned whistleblowers without having spoken with them, and without collecting the evidence in the possession of those whistleblowers (starkly violating Principle 2 of the COSO Framework). It goes without saying that, where there is fraud, whistleblowers often have evidence that has already been hidden, covered up, or deleted, as was the case here. Grant Thornton has an obligation to resign from such an audit client immediately, given such failures, and *even public* defiance, when it comes to upholding Principles 1 and 2 of the COSO Framework.

* * *

Rather than restating the details of this egregious, unaddressed misconduct occurring at Assertio, how BHG learned of it, and how we connected with the multiple former executives-turned-whistleblowers, we point the Senate to **BHG's press release immediately preceding the announcement of Assertio's Chairman (and its M.D. oncologist board member, Dr. Jeffrey Vacirca, M.D.) resigning, in addition to BHG's follow-on press release days later, within which BHG began to release evidence of the clinical data fraud (including a clinical trial site audit report citing "Major" clinical trial data discrepancies at MD Anderson Cancer Center, whose data was used by Spectrum as part of regulatory submissions to the FDA):**

- Press Release by BHG Exposing Matters (Friday, November 8, 2024): https://www.businesswire.com/news/home/20241107257609/en/
- Press Release by BHG Beginning to Release Evidence (Monday, November 11, 2024): https://www.businesswire.com/news/home/20241111117591/en/

As noted within the first-linked press release, the "First Spectrum Whistleblower" is Spectrum's former Senior Counsel for Global Research and Development, **who *refused to sign off on the initial Rolontis Biologic License Application with the FDA, given her knowledge the submission contained tampered, fraudulent clinical data*. This whistleblower has been offered effective "hush money" by Assertio, under the creative guise of a "settlement" (as the Senate knows, many arguable "hush money" agreements are made under the guise of some purpose that could be legitimate under other circumstances—the unusual terms and circumstances of those offers establish the *real* intent, just as in this case).**

As further noted in the November 8 press release, the "Second Spectrum Whistleblower" is an Ivy League-educated physician who oversaw clinical trials at Spectrum. **Interestingly, this second former executive-turned-whistleblower was kept on the payroll for *over a year* after being "terminated." Such continued pay after "termination" does not "just happen"—another clear attempt of "hush money" under these circumstances of terminating a protected whistleblower who spoke up about the fraudulent conduct she was witnessing at Spectrum.**

* * *

In the words of the whistleblowers, cancer patients deserve respect. After generously giving their bodies to science, cancer patients trust corporations and healthcare institutions will accurately report their clinical trial data, and with integrity. Years ago, the FDA set expectations through its guidance on Data Integrity and Compliance for the Drug Manufacturing (cGMPs). However, to date, the FDA has not addressed pre-clinical and clinical research data (cGCPs) that directly speaks on whether or not a medical product is worthy of the FDA's approval or clearance. The FDA needs to implement programs and technical systems designed to protect the integrity and accuracy of clinical data received in regulatory submissions, case in point here. Compliance in the medical world is so critical it requires both *trust* and *verification* technologically. Such would build efficiency into the compliance process.

In closing, we believe it is in the interest of public safety for the Senate to hold a hearing concerning these matters, where—most importantly—the Senate may question Assertio's board of directors and management, at the same time of the Senate hearing from the multiple former executives-turned-whistleblowers Assertio's leadership claims to have "thoroughly investigated" the allegations of, despite never having spoken to those brave whistleblowers, and never having collected the extensive evidence in the possession of those whistleblowers. We believe such a hearing by the Senate is required to ensure that the publicity compels

immediate action of the U.S. FDA, HHS, and SEC. Assertio's leadership is now absolutely hopelessly conflicted in any investigation of these matters they have so neglected (there is no "re-opening" their sham "investigation," now at this point), leaving the clear need for regulatory investigation and intervention. BHG has filed a whistleblower report with the U.S. SEC, but has not yet heard from the agency.

We respectfully hope to hear from the Committee shortly.

Very Truly Yours,

Alexander E. Parker
Senior Managing Director
The Buxton Helmsley Group, Inc.

Cc: U.S. Senate Committee on Finance – All Members
Heather L. Mason (Chair, Assertio Holdings, Inc.)
William T. Mckee (Director, Assertio Holdings, Inc.)
Sravan K. Emany (Director, Assertio Holdings, Inc.)
Sigurd C. Kirk (Director, Assertio Holdings, Inc.)
David Stark (Director, Assertio Holdings, Inc.)
Brendan P. O'Grady (Director and Chief Executive Officer, Assertio Holdings, Inc.)
Ajay Patel (Chief Financial Officer, Assertio Holdings, Inc.)
Matthew Kreps (Investor Relations Officer, Assertio Holdings, Inc.)

Delete | Respond | Move | Tags | Editing

NN

Mon 7/9/2018 9:05 AM

Nadia Noorzai

**Re: Respond Today: Rolontis - AE deletion**

To Kellie Moore

Red Category

**From:** Nadia Noorzai <nadia.noorzai@sppirx.com>
**Date:** July 9, 2018 at 7:51:17 AM PDT
**To:** Zane Yang <zane.yang@sppirx.com>, Gajanan Bhat <Gajanan.Bhat@sppirx.com>
**Subject: Fwd: Respond Today: Rolontis - AE deletion**

FYI below.

I'm trying to understand the below. I've never "deleted AEs" from a database. I need to understand the history and decision making here. During the ROLONTIS BLA BIMO inspection, I will be scrutinized for any Note To File (NTF) surroundings deletion of AEs.

Begin forwarded message: